**2024-1401**

# United States Court of Appeals
# for the Federal Circuit

ACADIA PHARMACEUTICALS INC.,

*Plaintiff-Appellee,*

— v. —

AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA, INC.,
TEVA PHARMACEUTICALS USA, INC.,

*Defendants,*

MSN LABORATORIES PRIVATE LTD., MSN PHARMACEUTICALS, INC.,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the
District of Delaware in No. 1:20-cv-00985-GBW,
Gregory Brian Williams, Judge*

## BRIEF FOR DEFENDANTS-APPELLANTS

CHAD A. LANDMON
THOMAS K. HEDEMANN
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8100
clandmon@axinn.com
thedemann@axinn.com

*Counsel for Defendants-Appellants*

MARCH 29, 2024



## ASSERTED CLAIM

Asserted claim 26 of U.S. Patent No. 7,601,740 depends from claim 22:

22.  A compound having the structure of Formula (I):



(I)

26.  A compound of claim 22, wherein the salt is a tartrate salt.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 24-1401 |
| **Short Case Caption** | Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd. |
| **Filing Party/Entity** | MSN Laboratories Private Ltd., MSN Pharmaceuticals, Inc. |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/12/2024

Signature:  /s/ Chad Landmon

Name:  Chad Landmon

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| | ☑ None/Not Applicable | ☐ None/Not Applicable |
| MSN Laboratories Private Ltd. | | MSN Pharmaceuticals, Inc. is a wholly owned subsidiary of MSN Laboratories Private Ltd. |
| MSN Pharmaceuticals, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest                                    Form 9 (p. 3)
                                                                   March 2023

---

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable            ☑   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

---

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)    ☑  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable            ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

**4. Legal Representatives.** List all law firms, partners, and associates that (a)appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

<u>Appearances in originating court</u>

- Seitz, Van Ogtrop & Green, P.A.
  - o  James S. Green, Jr.
- Upadhye Tang LLP
  - o  Brent A. Batzer
  - o  Shashank D. Upadhye
  - o  Yixin H. Tang

# <u>TABLE OF CONTENTS</u>

STATEMENT OF RELATED CASES ..............................................................1

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES....................................................................2

STATEMENT OF THE CASE........................................................................3

    A.    Factual Background.........................................................................3

    B.    Procedural Background ...................................................................6

SUMMARY OF THE ARGUMENT ...............................................................6

ARGUMENT ...............................................................................................11

I.     STANDARD OF REVIEW ..................................................................11

    A.    Summary Judgment......................................................................11

    B.    Statutory Interpretation ................................................................11

    C.    Obviousness-Type Double Patenting...........................................12

    D.    The Safe-Harbor Provision...........................................................14

II.    THE DISTRICT COURT LEGALLY ERRED IN HOLDING THAT ONLY EARLIER-FILED PATENTS CAN BE OTDP REFERENCES.................16

III.   THE DISTRICT COURT LEGALLY ERRED IN INTERPRETING THE SAFE-HABOR PROVISION SO AS TO BLOCK THE '271 PATENT FROM BEING AN OTDP REFERENCE. .................................................20

    A.    The District Court Erred in Finding That the '271 Patent Issued on a Divisional Application That Was "Filed as a Result of . . . a [Restriction] Requirement" in the Original Application.....................20

        1.    The District Court legally erred in holding that *amending* an existing application qualifies as *filing* a new application for purposes of the safe harbor. .....................................................20

        2.    Even if *amending* could be conflated with *filing*, the '271 patent is outside the safe harbor because the amendment was not "a result of" of the restriction in the original application.............25

    B.    The District Court Legally Erred in Interpreting the Safe Harbor Provision as Giving "Paramount Protection" to the Original Application. .................................................................................31

CONCLUSION .........................................................................................39

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Mathilda & Terence Kennedy Institute of
    Rheumatology Trust*,
    764 F. 3d 1366 (Fed. Cir. 2014) ........................................................12, 14, 16, 17

*Allergan USA, Inc. v. MSN Lab'ys Priv. Ltd.*,
    No. 19-1727, 2023 WL 6295496 (D. Del. Sept. 27, 2023) .................................18

*Amgen Inc. v. F. Hoffman-La Roche Ltd*,
    580 F.3d 1340 (Fed. Cir. 2009) .............................................................34, 37, 38

*Automated Merchandising Sys's, Inc. v. Lee*,
    782 F.3d 1376 (Fed. Cir. 2015) ........................................................................10

*Baker Botts L.L.P. v. ASARCO LLC*,
    576 U.S. 121 (2015)........................................................................................9, 22

*Boehringer Ingelheim Int'l GmbH v. Barr Lab'ys, Inc.*,
    562 F. Supp. 2d 619 (D. Del. 2008), *rev'd*, 592 F.3d 1340 (Fed.
    Cir. 2010) ...........................................................................................................26

*Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc.*,
    592 F.3d 1340 (Fed. Cir. 2010) .................................................................*passim*

*Burrage v. United States*,
    571 U.S. 204 (2014)...........................................................................................26

*In re: Cellect, LLC*,
    81 F.4th 1216 (Fed. Cir. 2023) ........................................................7, 13, 17, 18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...........................................................................................11

*Eli Lilly & Co. v. Barr Lab'ys, Inc.*,
    251 F.3d 955 (Fed. Cir. 2001) ..........................................................................14

*Geneva Pharm., Inc. v. GlaxoSmithKline PLC*,
    349 F.3d 1373 (Fed. Cir. 2003) ...................................................15, 22

*Gilead Scis., Inc. v. Natco Pharma Ltd.*,
    753 F.3d 1208 (Fed. Cir. 2014) ...........................................*passim*

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
    527 F.3d 1318 (Fed. Cir. 2008) .........................................................11

*In re Hubbell*,
    709 F.3d 1140 (Fed. Cir. 2013) .........................................................13

*Ex Parte Janssen Biotech, Inc. & New York Univ. Pat. Owner & Appellant*,
    No. APPEAL 2016-006590, 2016 WL 6921121 ...........................9, 22

*In re Janssen Biotech, Inc.*,
    880 F.3d 1315 (Fed. Cir. 2018) ...........................................*passim*

*In re Longi*,
    759 F.2d 887 (Fed. Cir. 1985) ..........................................................13

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
    No. 14-03657, 2017 WL 1493025 (N.D. Cal. Apr. 26, 2017) ...........19

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
    583 U.S. 109 (2018)...........................................................................9, 22

*Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.*,
    909 F.3d 1355 (Fed. Cir. 2018) .........................................................16

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
    678 F.3d 1280 (Fed. Cir. 2012) .........................................................12

*Perricone v. Medicis Pharm. Corp.*,
    432 F.3d 1368 (Fed. Cir. 2005) .........................................................12

*Pfizer, Inc. v. Teva Pharm. USA, Inc.*,
    518 F.3d 1353 (Fed. Cir. 2008) ...................................................25, 38

*St. Jude Med., Inc. v. Access Closure, Inc.*,
    729 F.3d 1369 (Fed. Cir. 2013) .......................................14, 34, 35, 36

*Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*,
  611 F.3d 1381 (Fed. Cir. 2010) ........................................................12

*Syngenta Crop Prot., LLC v. Willowood, LLC*,
  944 F.3d 1344 (Fed. Cir. 2019) ........................................................11

*Tubular Rollers, LLC v. Maximus Oilfield Prod., LLC*,
  No. 2021-2319, 2023 WL 4230371 (Fed. Cir. June 28, 2023)...........................28

*Union Carbide v. Dow Chem. Co.*,
  619 F. Supp. 1036 (D. Del. 1985).................................................*passim*

*United States v. Seay*,
  No. 20-67, 2023 WL 171148 (S.D. Ohio Jan. 12, 2023)...................................26

**Statutes**

28 U.S.C. § 1295(a)(l)....................................................................1

28 U.S.C. § 1338(a) ......................................................................1

35 U.S.C. § 121 ....................................................................*passim*

35 U.S.C. § 154(a)(2)...................................................................12

35 U.S.C. § 154(b) ..................................................................4, 13

**Other Authorities**

Fed. R. App. P. 28(a)(4)..................................................................1

Fed. R. App. P. 28(a)(5)..................................................................1

Fed. R. Civ. P. 54(b) ....................................................................1

## STATEMENT OF RELATED CASES

No other appeal in or from this civil action was previously before this or any other appellate court.  The undersigned counsel does not know of any case pending in this Court, or in any other court, that will directly affect or be directly affected by this Court's decision in the present appeal.

## JURISDICTIONAL STATEMENT

Under Federal Rule of Appellate Procedure 28(a)(4) and Federal Circuit Rule 28(a)(5), the undersigned counsel state:

A.    The action giving rise to this appeal was a patent infringement case, and the district court had subject matter jurisdiction under 28 U.S.C. § 1338(a).

B.    This Court has exclusive jurisdiction over this appeal under 28 U.S.C. § 1295(a)(l).

C.    On December 13, 2023, the District Court denied MSN's motion for summary judgment of invalidity and granted Acadia's cross-motion for summary judgment of no invalidity.  Appx016.  On January 11, 2024, the court entered final judgment under Fed. R. Civ. P. 54(b). Appx017-018.  MSN filed its timely Notice of Appeal to this Court on January 18, 2024.  Appx055.

D.    MSN appeals from the summary judgments and the final judgment.

## <u>STATEMENT OF THE ISSUES</u>

Whether the District Court legally erred in entering summary judgment that U.S. Patent No. 9,566,271 ("the '271 patent") cannot be an obviousness-type double patenting ("OTDP") reference for U.S. Patent No. 7,601,740 ("the '740 patent") because it held that:

1.      Only an earlier-*filed* patent can be an OTDP reference, despite this Court's binding precedent that any earlier-*expiring* patent can be an OTDP reference and recent affirmance that a later-filed and earlier-expiring patent was an invalidating OTDP reference;

2.      The '271 patent meets the safe-harbor requirement in 35 U.S.C. § 121 that the application from which it issued must have been "filed as a result of such a [restriction] requirement," despite (a) the application having been *filed* as a continuation before the restriction and only later *amended* to recast it as a divisional, and (b) the later amendment not being "a result of" the restriction in the original application but rather, as Applicants acknowledged during prosecution, a result of a restriction in a different application; and

3.      The safe harbor provides "paramount protection" to the original application such that the safe-harbor requirement that a patent must issue from a divisional application that is "filed before the issuance of the patent on the other application" is inapplicable when the challenged patent issued from the original

2

application, despite the absence of any basis for such "paramount protection" in the statutory language or surrounding case law.

## STATEMENT OF THE CASE

### A.    Factual Background

This is a patent infringement action brought by Plaintiff-Appellee Acadia Pharmaceuticals, Inc. ("Acadia"), alleging that the '740 patent was infringed by MSN Laboratories Pvt. Ltd. and MSN Pharmaceuticals, Inc.'s (collectively, "MSN") Abbreviated New Drug Application ("ANDA") No. 214925 for a generic version of the Parkinson's Disease drug Nuplazid® (pimavanserin).  The parties have narrowed the dispute to a single issue, namely whether claim 26 of the '740 patent is invalid for OTDP over claim 5 of the '271 patent.

Acadia owns both the challenged '740 patent and the OTDP reference '271 patent.  Appx065.  Claim 26 of the '740 patent is directed to the tartrate salt of pimavanserin, and claim 5 of the '271 patent is directed to using pimavanserin tartrate to treat hallucination or delusion.  Appx064-065.  Because a claim directed to a method of using a chemical compound will render obvious a claim to that compound under the doctrine of OTDP, *see, e.g.*, *Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc.*, 592 F.3d 1340, 1345 (Fed. Cir. 2010), there is no dispute that claim 26 of the '740 patent is invalid if the '271 patent is a proper OTDP reference.

3

The District Court adopted the below timeline of the prosecution history for the '740 and '271 patents:



**Exhibit A**
**Timeline of Relevant Prosecution Events**

Appx003.  As shown on the timeline, the '740 and '271 patents both claim the benefit of U.S. Patent Application No. 10/759,561 ("the '561 application" or the "original application"), filed on January 15, 2004, and are therefore entitled to the same 20-year statutory term.  Appx066-067.  However, whereas the '740 patent received a 980-day patent term adjustment ("PTA"), the '271 patent does not have any term adjustments and expired on January 15, 2024.  *Id.*[1]

During prosecution of the '561 application, on July 5, 2007, the Examiner issued a restriction requirement and placed the 86 pending claims into Groups I-VII.  Appx067-070.  Applicants elected to pursue the Group I claims, drawn to the

---

[1] The '740 patent also received a patent term extension or "PTE" under 35 U.S.C. § 154(b).

4

pimavanserin compound.  Appx070.  The other Groups are drawn to different

methods of using the pimavanserin compound, including relevantly Group IV,

which is drawn to a method of treating neuropsychiatric disease.  Appx067-070.

On October 13, 2009, the '740 patent issued from the '561 application.  Appx071.

On May 3, 2006, prior to the restriction requirement for the '561 application,

Applicants filed U.S. Patent Application No. 11/416,527 ("the '527 application")

as a "continuation" of the original application.  *Id*.  On July 1, 2009, Applicants

cancelled all 16 claims in the '527 application and added a new set of claims 17-

40.  *Id*.  Applicants alleged that the new claims 17-40 were "based on subject

matter in restriction groups not elected in U.S. Patent Application Nos. 10/759,561

and 11/416,855 . . . ."  Appx072.  More specifically, Applicants stated that the new

claims were "substantially the same subject matter as claims 28-31 of the

'855 application, [and] also within group IV (claims 40-47) of the . . .

'561 application."  Appx385.  Applicants also stated an intention to change the

application from a continuation to a divisional of the original application.

Appx072.

On January 26, 2010, the Examiner allowed the new claims 17-40 in the

'527 application.  Appx072-073.  On April 13, 2010, Applicants amended the

specification to change it from a "continuation" to a "divisional" of the original

application.  Appx073.  This amendment occurred six months after the '740 patent

5

issued from the '561 application.  Appx071, Appx073.  Also on April 13, 2010,

Applicants filed a continuation of the '527 application that in turn gave rise to a

string of continuations that ultimately lead to the issuance of the '271 patent.

Appx073.

### B.    Procedural Background

On April 28, 2023, the parties stipulated to resolve their remaining disputes

on summary judgment.  Appx056-062.  MSN stipulated to infringement of Claim

26 of the '740 patent, Acadia withdrew its assertions of infringement of all other

claims, and the parties agreed to limit their dispute to whether the '271 patent can

be used as an OTDP reference to the '740 patent.  *Id.*  The crux of the dispute is

whether the '271 patent is blocked from use as an OTDP reference against the

'740 patent by the safe-harbor provision in 35 U.S.C. § 121.

On May 15, 2023, MSN moved for summary judgment of invalidity.

Appx052.  On June 14, 2023, Acadia filed its answering brief and cross-moved for

summary judgment of no invalidity.  *Id.*  On December 13, 2023, the District Court

denied MSN's motion and granted Acadia's cross motion.  Appx016.  On January

11, 2024, the District Court entered final judgment.  Appx017-018.

<u>**SUMMARY OF THE ARGUMENT**</u>

The District Court's summary judgment ruling is based on legally erroneous

holdings that (1) improperly reach beyond this Court's binding precedent that any

earlier-*expiring* patent may serve as an OTDP reference, and (2) fail to apply the plain language of the safe harbor provision in 35 U.S.C. § 121.  The Court should therefore reverse the ruling below and direct entry of summary judgment in favor of MSN.

### A.     The District Court's New "Earlier-Filed" Threshold Rule Is Legal Error.

The District Court legally erred in creating a threshold rule that a patent cannot be an OTDP reference unless it was filed earlier than the challenged patent. This "earlier-filed" rule is contrary to this Court's binding precedent that "any earlier *expiring* patent" may be a double-patenting reference.  *Gilead Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208, 1216 (Fed. Cir. 2014) (emphasis added).  The District Court purported to base its new rule on certain statements in *In re: Cellect, LLC*, 81 F.4th 1216 (Fed. Cir. 2023), but failed to recognize that those statements are *dicta* that are contradicted by the opinion's articulation of the legal standard for double-patenting as well as by its affirmance that a later-filed but earlier-expiring patent was an invalidating reference.

Furthermore, an earlier-filed threshold rule is contrary to the "bedrock principle" underlying the OTDP doctrine that, "when a patent expires, the public is free to use not only the same invention claimed in the expired patent but also obvious or patentably indistinct modifications of that invention."  *Gilead*, 753 F.3d at 1214.  Pursuant to this principle, the public is entitled to practice the invention in

the '271 patent as well as any obvious variations upon its expiration, irrespective of whether that invention is also claimed in the earlier-filed '740 patent.

**B.    The District Court Legally Erred in Interpreting the Safe-Harbor Provision.**

The safe-harbor provision only prohibits the use of a patent as an OTDP reference if it issued on an application that was (1) "filed as a result of . . . a [restriction] requirement" in the application of the challenged patent, and (2) "filed before the issuance of the patent on the [challenged] application."  35 U.S.C. § 121.  The District Court misinterpreted and misapplied these conditions in holding that the '271 patent is prohibited from use as an OTDP reference.

**1.    The '271 patent did not issue on a divisional application "filed as a result of . . . a [restriction] requirement" in the original application.**

The '271 patent traces back to the '527 application, which was filed more than a year *before* the restriction in the original application.  To find that the patent nevertheless issued on an application that was "filed as a result of" that restriction, the District Court held that a later *amendment* to the application qualifies as the *filing* of the application for purposes of the safe harbor.  That was legal error.

The District Court relied on the nearly four-decades old opinion in *Union Carbide v. Dow Chem. Co.*, 619 F. Supp. 1036 (D. Del. 1985), which in turn relied on a perceived lack of "practical distinction" between filing and amending an application.  But the Supreme Court has held that practicality is not a cognizable

8

reason to ignore the plain words of a statute. *See, e.g., Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 134 (2015) (explaining that courts "lack the authority to rewrite" statutory language even in face of "a harsh outcome"); *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 124-26 (2018). Furthermore, and significantly, the *Union Carbide* court did not have the benefit of this Court's later guidance requiring "a strict application of the plain language of § 121." *In re Janssen Biotech, Inc.*, 880 F.3d 1315, 1321 (Fed. Cir. 2018) (quoting *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1353 (Fed. Cir. 2009)). With the benefit of that guidance, the Patent Trial and Appeal Board ("PTAB") has correctly rejected the conflating of "filing" and "amending" as inconsistent with the statutory language. *Ex Parte Janssen Biotech, Inc. & New York Univ. Pat. Owner & Appellant*, No. APPEAL 2016-006590, 2016 WL 6921121, at \*6 (P.T.A.B. Nov. 14, 2016). This Court should likewise reject the District Court's erroneous statutory interpretation.

Moreover, Applicants admitted that the amendment was a result of a restriction in the '855 application (i.e., not the original application), affirmatively arguing that the claims added in the amendment were "substantially the same subject matter" as claims from the '855 application. In fact, the claims added in the amendment are virtually identical to the claims from the '855 application. Thus, even if "amending" could be equated with "filing" for purposes of the safe

9

harbor, the '271 patent still did not issue on an application that was "filed as a result of . . . a [restriction] requirement" in the *original* application (i.e., the '561 application).[2]

### 2.    The '271 patent did not issue on a divisional application that was "filed before the issuance of the patent" on the original application.

The amendment that recast the '527 application as a divisional of the original application did not occur until *after* the '740 patent had issued. Thus, even if the '271 patent had met the "filed as a result of" requirement discussed above, it still did not issue from a divisional application that was "filed before the issuance of the patent on the other application." 35 U.S.C. § 121.

Setting aside the plain statutory language, the District Court interpreted the safe-harbor provision as providing "paramount protection" to the original application such that the "filed before" requirement does not apply when the challenged patent issued from the original application. The statutory language contains no hint of any such "paramount protection," however, and no prior court has interpreted the statute this way. On the contrary, the statutory language plainly provides that patents issuing from the original and divisional applications are

---

[2] Although this argument was not raised below, this Court may consider a new legal argument on appeal. *See, e.g., Automated Merchandising Sys's, Inc. v. Lee*, 782 F.3d 1376, 1380 (Fed. Cir. 2015).

equally protected from each other.  A co-author of the 1952 Patent Act thus described the safe harbor as "provid[ing] that neither the original or divisional application (or patent), resulting from a requirement for restriction, shall affect the validity of the other merely because of their being divided into several applications or patents as a result of the requirement; however, the divisional application must be filed before the issuance of the patent on the other application."  P. J. Federico, *Commentary on the New Patent Act*, 35 U.S.C.A. 1-110 (1970).

## ARGUMENT

### I.    STANDARD OF REVIEW

#### A.    Summary Judgment

Summary judgment shall be granted when "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "This court reviews a ruling of summary judgment *de novo*."  *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1321 (Fed. Cir. 2008).

#### B.    Statutory Interpretation

The Federal Circuit reviews a district court's interpretation of statutory language *de novo*.  *See, e.g.*, *Syngenta Crop Prot., LLC v. Willowood, LLC*, 944 F.3d 1344, 1355 (Fed. Cir. 2019).

### C.     Obviousness-Type Double Patenting

Double patenting is a question of law that is reviewed without deference. *Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381, 1384 (Fed. Cir. 2010).

"The double patenting doctrine precludes one person from obtaining more than one valid patent for either (a) the 'same invention,' or (b) an 'obvious' modification of the same invention." *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1297 (Fed. Cir. 2012) (internal quotation omitted). "Thus, this doctrine polices the proper application of the patent term for each invention." *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1372 (Fed. Cir. 2005).

The "judicially created" OTDP doctrine has served since the 1800s to prohibit different expiries for two commonly owned patents (or two patents sharing an inventor) that claim obvious variants of the same invention. *Gilead*, 753 F.3d at 1212-1214 (discussing OTDP history). Post-URAA[3], "the doctrine of obviousness-type double patenting continues to apply where two patents that claim the same invention have different expiration dates." *AbbVie Inc. v. Mathilda & Terence Kennedy Institute of Rheumatology Trust*, 764 F. 3d 1366, 1374 (Fed. Cir. 2014). "Permitting any earlier expiring patent to serve as a double patenting

---

[3] The passage of the Uruguay Round Agreements Act ("URAA") on December 8, 1994 harmonized the patent term in the United States with that of most other nations by changing the term from 17 years from the date of issuance to 20 years from the earliest effective filing date in the United States. Pub. L. No. 103-465 § 532, 108 Stat. 4809 (1994) (codified as amended at 35 U.S.C. § 154(a)(2)).

reference for a patent subject to the URAA guarantees a stable benchmark that preserves the public's right to use the invention (and its obvious variants) that are claimed in a patent when that patent expires." *Gilead*, 753 F.3d at 1216.

The "fundamental" policy underlying the doctrine is that "'[t]he public should . . . be able to act on the assumption that upon the *expiration* of the patent it will be free to use not only the invention claimed in the patent but also modifications or variants which would have been *obvious* to those of ordinary skill in the art at the time the invention was made . . . .'" *In re Longi*, 759 F.2d 887, 892-93 (Fed. Cir. 1985) (quoting *In re Zickendraht*, 319 F.2d 225, 232 (C.C.P.A. 1963) (emphasis in original)). In addition, the OTDP doctrine also serves the important purpose of preventing "multiple infringement suits by different assignees asserting essentially the same patented invention." *In re Hubbell*, 709 F.3d 1140, 1145 (Fed. Cir. 2013).

The post-URAA 20-year patent term can be lengthened for patent office delays. 35 U.S.C. § 154(b)(1)(A). This is commonly referred to as "patent term adjustment" or "PTA." This Court has determined that an OTDP-challenge to a patent that has received PTA "must be based on the expiration date of the patent *after* PTA has been added." *In re: Cellect, LLC*, 81 F.4th at 1229 (emphasis added).

13

"A later patent claim is not patentably distinct from an earlier patent claim if the later claim is obvious over, or anticipated by, the earlier claim." *Eli Lilly & Co. v. Barr Lab'ys, Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001); *AbbVie*, 764 F.3d at 1374. For a double-patenting inquiry, a compound claim is deemed at least obvious in view of a method-of-use claim for that compound. *See Boehringer*, 592 F.3d at 1345.

### D.    The Safe-Harbor Provision

As discussed above, the OTDP doctrine has been law since the 19th century. *Supra* at 12. At times, the doctrine could interact improvidently with the patent office's administrative requirement that applicants pursue only one invention per patent. *See, e.g., St. Jude Med., Inc. v. Access Closure, Inc.*, 729 F.3d 1369, 1376 (Fed. Cir. 2013) (providing historical background). When a patent examiner determines that an application claims more than one patentably distinct invention, the examiner imposes a restriction requirement whereby the applicant must select one of the identified inventions to continue to pursue in the application. *Id.* The applicant may then file one or more divisional applications in which to pursue the other inventions. *See id.* at 1376-77. This could lead to unfairness if the patents that issued from the various applications were later used against each other in a double-patenting challenge. *Id.* at 1376.

In the 1952 Patent Act, Congress introduced the safe-harbor provision in

35 U.S.C. § 121 to solve this potential problem:

> If two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions. If the other invention is made the subject of a divisional application which complies with the requirements of section 120 it shall be entitled to the benefit of the filing date of the original application. *A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application.* The validity of a patent shall not be questioned for failure of the Director to require the application to be restricted to one invention.

35 U.S.C. § 121 (added emphasis highlighting safe-harbor provision).  However,

"[g]iven the potential windfall [a] patent term extension could provide to a

patentee, this court applies a strict test for application of § 121." *Geneva Pharm.,*

*Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1382 (Fed. Cir. 2003).  This means

that courts must provide "a strict application of the plain language of § 121." *In re*

*Janssen Biotech,* 880 F.3d at 1321 (quoting *Amgen*, 580 F.3d at 1353).

## II.    THE DISTRICT COURT LEGALLY ERRED IN HOLDING THAT ONLY EARLIER-FILED PATENTS CAN BE OTDP REFERENCES.

This Court established in *Gilead* that expiration dates are the determining factor for whether a patent can be an OTDP reference. As the Court explained, "[p]ermitting *any earlier expiring patent* to serve as a double patenting reference . . . guarantees a stable benchmark that preserves the public's right to use the invention (and its obvious variants) that are claimed in a patent when that patent expires." *Gilead*, 753 F.3d at 1216 (emphasis added). The Court has since affirmed that holding. *See AbbVie,* 764 F.3d at 1374 ("We now make explicit what was implicit in *Gilead*: the doctrine of obviousness-type double patenting continues to apply where two patents that claim the same invention have different expiration dates."); *Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.*, 909 F.3d 1355, 1358 (Fed. Cir. 2018) ("As the district court correctly summarized, we held in *Gilead* that the expiration date is the benchmark of obviousness-type double patenting.").

The District Court set aside this Court's binding precedent and created an erroneous threshold rule that "a patent must be earlier-filed to be available as an OTDP reference . . . ." Appx015. It therefore concluded that "the '271 patent does

not qualify as a proper reference against the '740 patent." *Id.*[4]  The District Court found the wellspring for its "earlier-filed" rule in a few references to "obvious variations of earlier-filed" claims in *In re Cellect*.  *Id.* at 14 (quoting *In re: Cellect, LLC*, 81 F.4th at 1230).[5]  Those references are *dicta*, however, and stand in contrast to the parts of the *In re Cellect* opinion that sets out the legal standard for OTDP and correctly emphasizes expiration dates as the relevant consideration.  *See In re: Cellect, LLC*, 81 F.4th at 1226 ("[A]n ODP determination depends on an assessment of obviousness, i.e., whether the claims of a *later-expiring* patent would have been obvious over the claims of an *earlier-expiring* patent owned by the same party.") (emphasis added); *see also id.* ("A crucial purpose of ODP is to prevent an inventor from securing a second, later-expiring patent for non-distinct claims."); *id.* at 1227-28 ("In *AbbVie*, we held that ODP continues to apply where two patents that claim the same invention have different expiration dates, including where the different expiration date is due to a grant of PTA.").

---

[4] The District Court did not discuss the fact that, although the applications that resulted in the '740 and '271 patents were filed at different dates, they claim priority to the same application and thus have the same "effective" filing date. *Supra* at n. 12.

[5] The opinion makes reference to "earlier-filed" claims two additional times. *See In re: Cellect*, 81 F.4th at 1226, 1231.

Furthermore, *In re Cellect* cannot be read to establish a new "earlier-filed" threshold for asserted OTDP references because it *affirmed* that the later-filed '036 patent was an invalidating OTDP reference to the earlier-filed '369 patent. *See id.* at 1220.[6]  Indeed, another Delaware district court has rejected the notion that the opinion somehow establishes an earlier-filed threshold requirement for OTDP references, explaining that "*In re Cellect* [held] that ODP depends solely on patent expiration . . . . [and] recognizes no exception to the rule it announced, whether for first-filed, first-issued claims or otherwise." *Allergan USA, Inc. v. MSN Lab'ys Priv. Ltd*., No. 19-1727, 2023 WL 6295496, at *22 (D. Del. Sept. 27, 2023)

The District Court also found support in its failure "to identify a case where, when challenged, a later-filed, later-issued, earlier-expiring patent was used as an [invalidating] OTDP reference. . . ." Appx013.  But that is precisely what happened in *Allergan*, where the court held that two later-filed and later-issued patents rendered a later-expiring patent invalid for OTDB.  *Allergan*, 2023 WL 6295496, at *22.  A second district court has also explicitly rejected the "earlier-

---

[6] The District Court pointed to the "tangled web of earlier-and later-filed patents" to explain this discrepancy with its reading of the opinion.  Appx014.  But the opinion presents the relationship between the challenged and reference patents with admirable clarity through a chart and a table, and specifically notes that "[t]he invalidation of all claims under ODP can be traced back to the [later-filed] '036 patent." *In re: Cellect,* 81 F.4th at 1220*.*

filed" threshold, explaining that "*Gilead* held that what is relevant is the patents expiration dates." *MLC Intell. Prop., LLC v. Micron Tech., Inc.,* No. 14-03657, 2017 WL 1493025, at *6 (N.D. Cal. Apr. 26, 2017).

Finally, the District Court argued that "the logic and purpose of OTDP is flipped on its head" if a later-filed patent is used as an OTDP reference because that "would operate to cut off a patent term that would have been valid but for a later-filed patent." Appx013. But that ignores the "bedrock principle" of patent law underlying the OTDP doctrine, namely that "when a patent expires, the public is free to use not only the same invention claimed in the expired patent but also obvious or patentably indistinct modifications of that invention." *Gilead*, 753 F.3d at 1214 (citing opinions). "And that principle is violated when a patent expires and the public is nevertheless barred from practicing obvious modifications of the invention claimed in that patent because the inventor holds another later-expiring patent with claims for obvious modifications of the invention." *Id.* The same is true here. The public is entitled to practice the invention claimed in the '271 patent as well as any obvious variations upon the expiration of *that patent*.

This Court should reject the District Court's novel and incorrect threshold rule that a patent must be earlier-filed to be available as an OTDP reference.

**III.   THE DISTRICT COURT LEGALLY ERRED IN INTERPRETING THE SAFE-HABOR PROVISION SO AS TO BLOCK THE '271 PATENT FROM BEING AN OTDP REFERENCE.**

Congress included conditions in the safe-harbor provision that must be fulfilled for a patent issuing from a divisional to be blocked from use as an ODTP reference. These conditions include that the divisional application was both (1) "filed" as a result of a restriction requirement in the application from which the challenged patent issued, and (2) "filed before" the challenged patent issued. Based on erroneous interpretations of the statutory language, the District Court failed to appropriately apply these conditions to the '271 patent.

**A.   The District Court Erred in Finding That the '271 Patent Issued on a Divisional Application That Was "Filed as a Result of . . . a [Restriction] Requirement" in the Original Application.**

**1.   The District Court legally erred in holding that *amending* an existing application qualifies as *filing* a new application for purposes of the safe harbor.**

The safe harbor provision exempts a patent from use as an OTDP reference if it issued on an application that was "filed" as a result of a restriction requirement in the original application. 35 U.S.C. § 121. Indeed, the safe harbor provision twice emphasizes that the application must be "filed":

> A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application *filed* as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional

application is *filed* before the issuance of the patent on the other application.

*Id*. (emphasis added).

Here, the '527 application that led to the '271 patent was filed in May 2006, more than a year *before* the restriction requirement was placed on the original '561 application. Appx067-071; *supra* at 4-5. It is self-evident that the '527 application cannot have been filed "as a result of" a restriction requirement that had not yet occurred. The '271 patent therefore did not issue "on an application filed as a result of" the restriction requirement in the '561 application and thus falls outside the safe harbor protection.

Despite the clear statutory language that a patent must issue "on an application *filed* as a result of" a restriction requirement, 35 U.S.C. § 121 (emphasis added), the District Court held that "precedent dictates that an *amendment* constitutes filing for purposes of 35 U.S.C. § 121. . . ." Appx010 (emphasis added). And because the Applicants amended the '527 patent specification at a point in time after the restriction in the original application, the District Court concluded that the '271 patent meets the "filing" requirement. Appx010-012.

The "precedent" the District Court relied on is *Union Carbide*, a nearly 40-year old district court opinion. Appx010 (citing *Union Carbide*, 619 F. Supp. at 1059-60). In *Union Carbide*, the court acknowledged that the "literal language of

section 121" requires that the application be "filed," but dismissed that language as a mere "formalistic rule" because it felt that "[n]o practical distinction exists" between a filing and an amendment. *Union Carbide*, 619 F. Supp. at 1059-60. That was legal error because practicality is not a basis on which a court may ignore the plain words of a statute. *See, e.g., Baker Botts*, 576 U.S. at 134 (explaining that courts "lack the authority to rewrite" statutory language even in face of "a harsh outcome"); *Nat'l Ass'n of Mfrs.*, 583 U.S. at 124-26 (refusing to classify a rule based on its "legal and practical effect" where doing so would "disregard[] the statutory text").

Moreover, *Union Carbide* was decided before this Court made it clear that, "[g]iven the potential windfall [a] patent term extension could provide to a patentee, this court applies a strict test for application of § 121." *Geneva Pharm.*, 349 F.3d at 1382. In other words, before this Court directed "a strict application of the plain language of § 121." *In re Janssen Biotech,* 880 F.3d at 1321 (quoting *Amgen*, 580 F.3d at 1353). With this guidance in mind, the PTAB rejected the contention that an amendment constitutes a "filing" under the safe harbor statute. *Ex Parte Janssen*, 2016 WL 6921121, at *6. PTAB explained that this contention is "inconsistent with the statutory language of Section 121," and that it "could not

identify a clear reason for construing the statute not to require the 'Divisional as filed' Rule." *Id.*[7]  No such reason exists.

Finally, the holding in *Union Carbide* depends significantly on claims in the application being "amended *in toto* to reflect the division of a copending application." *Union Carbide*, 619 F. Supp. at 1060 (emphasis added).  *See also id.* ("No practical distinction exists between an application filed for the first time as a result of a restriction requirement, and an application which is amended *in full* to comport with that requirement.") (emphasis added).  Here, by contrast, the amendment did not reflect the restriction in the original application "in toto" because, as Applicants admitted and affirmatively argued to the patent examiner, the amendment was based on subject matter from a restriction in an application *other* than the original application. *See supra* at 9.  Thus, even if it had been correct to conflate "filed" with "amended" when the amendment completely reflects or comports with the restriction in the original application as held in *Union Carbide*, it would be incorrect to do so here.

The District Court incorrectly believed that this Court's opinion in *Boehringer* provides support for the *Union Carbide* holding.  Appx010-012 (citing *Boehringer*, 592 F.3d at 1353).  First, the court described *Boehringer* as "holding

---

[7]  The Federal Circuit did not reach this issue on appeal from the PTAB.  *In re Janssen Biotech, Inc.*, 880 F.3d at 1325.

that two serially-filed divisional applications met the 'filed as a result of'
requirement *despite one of the divisional applications having been initially filed as
a continuation*." Appx010-011 (emphasis added). In fact, neither of the two
divisionals in *Boehringer* had been filed as a continuation. *See Boehringer*, 592
F.3d at 1344 (describing the filing history).[8]

Second, the District Court pointed to a statement in *Boehringer* that "§ 121
is 'not concerned with . . . how any [particular divisional] applications are filed.
To prevent loss of the safe harbor in dividing out claims to non-elected inventions,
what is required is consonance with the restriction requirement.'" Appx010
(quoting *Boehringer*, 592 F.3d at 1353). The District Court appears to have read
this to support *Union Carbide*'s appeal to practicability. But the issue in
*Boehringer* was not whether an amendment can constitute a filing under
Section 121; rather, it was whether an applicant must file a separate divisional for
each invention not selected in the restricted application, or if it is permissible to file
"two successive divisionals to different combinations of the inventions identified
in the restriction requirement." *Boehringer*, 592 F.3d at 1353. This is clear when
the partial quote the District Court provided is recited in full:

> Section 121 is not concerned with *any overlap in non-*
> *elected inventions prosecuted within any particular*

---

[8] Without citation, the District Court also mistakenly describes MSN as referencing
a "continuation in *Boehringer*. . . ." Appx012. MSN never did so for the simple
reason that *Boehringer* did not involve a continuation.

*divisional application or in* how any such applications are filed. To prevent loss of the safe harbor in dividing out claims to non-elected inventions, what is required is consonance with the restriction requirement.

*Id.* at 1353–54 (emphasis added). Thus, *Boehringer* offers no support for ignoring the plain language in Section 121 that requires an application to be "filed" as a result of the restriction requirement for the safe harbor to apply.

In sum, this Court should apply the plain statutory language requiring that a patent must issue from an application that is "filed" as a result of the restriction requirement in order for the Section 121 safe harbor to block it from use as a OTDP reference. The Court should thus hold that the '271 patent falls outside the safe harbor protection, reverse the summary judgment rulings below, and direct entry of summary judgment of invalidity.

> **2.    Even if *amending* could be conflated with *filing*, the '271 patent is outside the safe harbor because the amendment was not "a result of" of the restriction in the original application.**

As discussed, the safe harbor applies to a divisional application only if it is filed "as a result of . . . a [restriction] requirement" in the original application (i.e., the '561 application). 35 U.S.C. § 121. Thus, "the third sentence of [§ 121] provides a safe harbor . . . from attack based on . . . applications or patents similarly derived from *the same restriction requirement*." *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 518 F.3d 1353, 1360 (Fed. Cir. 2008) (emphasis added).

Furthermore, "[w]here there is no textual or contextual indication to the contrary, courts regularly read phrases like 'results from' to require but-for causality." *Burrage v. United States*, 571 U.S. 204, 212 (2014). *See also United States v. Seay*, No. 20-67, 2023 WL 171148, at *4 (S.D. Ohio Jan. 12, 2023) ("The phrase 'as a result of' falls within the class of phrases like . . . 'results from' . . . that *Burrage* identified as carrying a but-for causation connotation in ordinary parlance.") (citing *Burrage*, 571 U.S. at 213–14). To show that the safe harbor applies to the '271 patent, therefore, Acadia must demonstrate that *but for* the restriction in the original amendment, the amendment-*cum*-filing of the '527 application (the purported "divisional application") would not have occurred. *See Boehringer Ingelheim Int'l GmbH v. Barr Lab'ys, Inc.*, 562 F. Supp. 2d 619, 632 (D. Del. 2008), *rev'd*, 592 F.3d 1340 (Fed. Cir. 2010) ("The burden is on the patent holder to prove that Section 121 applies.") (citing *Geneva Pharms.*, 349 F.3d at 1381).

Acadia cannot meet this burden because Applicants represented to the Examiner that the claims added to the '527 application were "based on subject matter in restriction groups not elected in [the original application] *and [Application No.] 11/416,855 . . . .*" Appx072 (emphasis added); Appx385 (same).[9] Applicants further demonstrated that the new claims were "substantially

---

[9] The '855 application was a continuation of the '561 application. Appx385.

the same subject matter as claims 28-31 of the '855 application . . . . [because those claims] also recite methods of treating schizophrenia with [pimavanserin], or a pharmaceutically acceptable salt thereof, in combination with risperidone or haloperidol." Appx385. Thus, Applicants admitted that the amendment was based on a restriction in the '855 application.

To be sure, Applicants alleged that the subject matter of the new claims in the '527 application "is also within group IV (claims 40-47)" of the original application. *Id.* However, the new claims recite subject matter that is wholly absent from the Group IV claims. For example, the Group IV claims do not contain the limitations in the new claims directed to the ratio of pimavanserin to the patient's bodyweight, the administering of "a therapeutically effective amount" of pimavanserin, or the administering of "a pharmaceutically acceptable salt" of the compound, including a tartrate salt and a hydrochloride salt. *Compare* Appx380-383 (claims 17-40) *with* Appx191-192 (claims 40-47). Moreover, new claim 19 in the '527 application recites a "method for reducing an amount of haloperidol or risperidone . . . ." Appx380. No such method is recited in Group IV of the original application. Appx191-192. Just as Applicants argued, therefore, this subject matter must have originated from the non-elected claims in the '855 application.

Indeed, as shown in the table below, the new claims that were added to the

'527 application in the amendment are virtually identical to claims 28-30 in the

'855 application:

| '527 Application-New Claims[10] | '855 Application-Non-Elected Claims[11] |
|---|---|
| 17. (New) A method of treating schizophrenia in a patient, comprising administering to a patient having schizophrenia a therapeutically effective amount of (a) [pimavanserin] or a pharmaceutically acceptable salt thereof, and (b) risperidone.<br><br>20. (New) The method of claim 17, wherein the tartrate salt of [pimavanserin] is administered.<br><br>23. (New) The method of claim 17, wherein about 0.01 mg/kg of body weight to about 2 mg/kg body weight of [pimavanserin] or a pharmaceutically acceptable salt thereof is administered. | 28. (New) A method of treating schizophrenia in a patient, comprising administering to a patient having schizophrenia (a) about 0.01 mg/kg of body weight to about 2 mg/kg body weight of the tartrate salt of [pimavanserin] and (b) risperidone. |
| 18. (New) A method of treating schizophrenia in a patient, comprising administering to the patient having schizophrenia a | 29. (New) A method of treating schizophrenia in a patient, comprising administering to the patient having schizophrenia (a) about 0.01 mg/kg of |

---

[10] Appx380-381.

[11] The '855 application with the non-elected claims 28-31 is available at
https://patentcenter.uspto.gov/applications/11416855/ifw/docs?application (*see* "Claims" at Mail Room Date 02/12/2009) ("the '855 Application Claims"). This Court may take judicial notice of patent applications. *See Tubular Rollers, LLC v. Maximus Oilfield Prod., LLC*, No. 2021-2319, 2023 WL 4230371, at \*5 (Fed. Cir. June 28, 2023).

| '527 Application-New Claims[10] | '855 Application-Non-Elected Claims[11] |
|---|---|
| therapeutically effective amount of (a) [pimavanserin] or a pharmaceutically acceptable salt thereof, and (b) haloperidol.<br><br>21. (New) The method of claim 18, wherein the tartrate salt of [pimavanserin] is administered.<br><br>24. (New) The method of claim 18, wherein about 0.01 mg/kg of body weight to about 2 mg/kg body weight of [pimavanserin] or a pharmaceutically acceptable salt thereof is administered. | body weight to about 2 mg/kg body weight of the tartrate salt of [pimavanserin] and (b) haloperidol. |
| 19. (New) A method for reducing an amount of haloperidol or risperidone effective to treat psychosis in a schizophrenic patient, the method comprising administering a therapeutically effective amount of [pimavanserin], or a pharmaceutically acceptable salt thereof, to the schizophrenic patient with psychosis being treated with haloperidol or risperidone.<br><br>22. (New) The method of claim 19, wherein the tartrate salt of [pimavanserin] is administered.<br><br>25. (New) The method of claim 19, wherein about 0.01 mg/kg of body weight to about 2 mg/kg body weight of [pimavanserin] or a pharmaceutically acceptable salt thereof is administered. | 30. (New) A method for reducing an amount of haloperidol or resperidone (*sic*) effective to treat psychosis in a schizophrenic patient, the method comprising administering about 0.01 mg/kg of body weight to about 2 mg/kg body weight of [pimavanserin]  tartrate salt to the schizophrenic patient with psychosis being treated with haloperidol or risperidone. |

Similarly, the 10 mg to 50 mg pimavanserin dosage limitations in claims 26-37 added to the '527 application come from claims 25-27 in the '855 application. *Compare* Appx381 *with* the '855 Application Claims.  Only the hydrochloride salt of pimavanserin recited in the new claims 38-40 in the '527 application, *see* Appx383, is absent from claims in the '855 application.  However, the hydrochloride salt is also absent from the Group IV claims (claims 40-47) of the '527 application, *see* Appx191-192, and thus cannot provide the required but-for cause for the amendment.

In view of Applicants' admission that the new claims were "based on" and is "substantially the same subject matter as claims 28-31 of the '855 application," and the differences in subject matter between the new claims and those in Group IV of the original application, Acadia cannot demonstrate that the restriction requirement in the original application was a but-for cause of the amendment to the '527 application.  In other words, Acadia cannot demonstrate that the amendment would not have occurred if the only restriction had been in the '855 application.  Acadia consequently cannot meet its burden of proving that the safe harbor blocks the use of the '271 patent as an OTDP reference.

For these reasons as well, the Court should reverse the summary judgments below and direct entry of summary judgment of invalidity.

**B.    The District Court Legally Erred in
Interpreting the Safe Harbor Provision as Giving
"Paramount Protection" to the Original Application.**

In addition to requiring that a divisional application must have been filed as

a result of the restriction requirement to be prohibited from use as a double-

patenting reference, the safe-harbor provision also requires that "the divisional

application is filed before the issuance of the patent on the other application."  35

U.S.C. § 121.  Here, the amendment that recast the '527 continuation as a

divisional did not occur until *after* the '740 patent had issued from the '561

application.  Appx066, Appx073.   Thus, even if amending an existing application

could somehow qualify as "filing" an application in Section 121, which it cannot,

*supra* at 20-25, the '271 patent is still not barred from use as a double-patenting

reference.

The District Court rejected this straight-forward application of the statutory

language because it accepted Acadia's contention that the safe-harbor provision

provides "paramount protection" to the original application.  Appx006 (quoting

D.I. 261 at 5).  Based on this "paramount protection," the court concluded that "the

'filed before the issuance of the patent' requirement in the [] safe harbor is

inapplicable when the challenged patent issued from the original application."

Appx10.  There is, however, no support for the notion of "paramount protection"

in the statute or the case law.

Starting with the statute, neither its language nor its structure suggests a greater degree of protection for the original application than for any divisional thereof:

| 35 U.S.C. § 121 - Safe Harbor Provision | Function |
|---|---|
| A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on [a divisional][12] application filed as a result of such a requirement, shall not be used as a reference . . . | Defining the patents that shall not be used as OTDP references. |
| against a divisional application or against the original application or any patent issued on either of them, | Defining the patents and applications that may not be challenged by the earlier-defined references. |
| if the divisional application is filed before the issuance of the patent on the other application. | Temporal Requirement |

On the contrary, the language evidences a symmetrical relationship whereby original and divisional applications (and patents issuing from either) are equally protected from each other.

P.J. Federico, a co-author[13] of the 1952 Patent Act that introduced Section 121, captures this symmetry in his description of the safe harbor provision:

---

[12] As discussed below, it is well-settled that "an application filed as a result of such a requirement" refers solely to a divisional application. *Infra* at 34-35.

[13] Hon. Giles S. Rich, *In Memoriam: P.J. (Pat) Federico and His Works*, 64 JPOS 3 (Jan. 1982), *reprinted in* 85 J. Patent & Trademark Off. Soc'y 83, 85 (2003) (noting that Federico "single-handedly drafted the first version of the Patent Act of 1952").

> The third sentence of section 120 [*sic*] is the one which provides that neither the original or divisional application (or patent), resulting from a requirement for restriction, shall affect the validity of the other merely because of their being divided into several applications or patents as a result of the requirement; *however, the divisional application must be filed before the issuance of the patent on the other application.*

Federico, *supra* at 11 (emphasis added).  As with the statutory language itself, there is no suggestion in Federico's description that the Temporal Requirement is somehow inapplicable when the challenged patent issued from the original application.  The Reviser's Note similarly describes the safe harbor as providing that "neither of the resulting patents can be held invalid over the other merely because of their being divided in several patents."  35 U.S.C. § 121 (Reviser's Note).

The symmetry is also emphasized in a contemporary treatise:

> [T]he third sentence of § 121 provides that when the PTO issues a restriction requirement, the parent application and the divisional application filed as a result of the restriction requirement cannot be used as references against each other *if the divisional application is filed before the issuance of a patent from the parent application.*

3 Annotated Patent Digest § 16:15 (emphasis added).

The District Court pointed to the superficial mismatch between "divisional application" in the Temporal Requirement and "an application filed as a result of such a requirement" in the definition of the patents that shall not be used as OTDP

references.  Appx009.  In the court's view, reading "divisional application" as referring to "an application filed as a result of such a requirement" would "import[] additional limitations not present in the statutory language." *Id.*  But this objection ignores the well-settled understanding that the "[safe harbor] provision contemplates that it is divisional applications that are filed pursuant to a restriction. . . ." *St. Jude*, 729 F.3d at 1382 (Lourie, concurring).  *See also Boehringer*, 592 F.3d at 1351 (explaining that "a patent issuing on an application filed as a result of a restriction requirement" refers to one or more "divisional applications"); *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1353 (Fed. Cir. 2009) (explaining that "[t]he statute on its face applies only to divisional applications. . . .").

The understanding that the safe-harbor provision is directed to divisional applications follows straight-forwardly from the statutory language:

> Divisional applications
>
> If two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions.  If the other invention is made the subject of a divisional application which complies with the requirements of section 120 it shall be entitled to the benefit of the filing date of the original application.  A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference . . . against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application.

35 U.S.C. § 121.  As Judge Lourie pointed out, "[t]he very title of § 121 is 'Divisional applications' [and] [i]t refers to divisional applications three times, twice in relation to the immunity from double patenting issue." *St. Jude*, 729 F.3d at 1382.

Furthermore, when the third sentence in the statute discusses the "application filed as a result of such a [restriction] requirement," it is plainly referring back to the "divisional application" in which the "other invention is made the subject" discussed in the prior sentence.  35 U.S.C. § 121.  This is explicitly identified in Federico's commentary on the provision:

> After a requirement to restrict an application is made, the applicant may file a second application for the invention which was not elected to be retained in the first application. This second application, *which is referred to in the statute as a divisional application* . . . , is entitled to the benefit of the filing date of the first application if it complies with the requirements of section 120. . . .
>
> The third sentence of section 120 [*sic*] is the one which provides that neither the original *or divisional application (or patent), resulting from a requirement for restriction*, shall affect the validity of the other merely because of their being divided into several applications or patents as a result of the requirement; however, the divisional application must be filed before the issuance of the patent on the other application.

Federico, *supra* at 11 (emphasis added).

The symmetry in protection between the original application and any divisionals filed as a result of a restriction aligns with the purpose of the statute, which was to solve the unfairness that could arise when a restriction requirement results in multiple patents that are later used against each other in a double-patenting challenge. *See, e.g., St. Jude*, 729 F.3d at 1376–77. The goal was to ensure that *none* of the resulting patents were rendered invalid by any of the others due to the administrative restriction requirement imposed by the patent office. *Id.*; *see also Boehringer*, 592 F.3d at 1350 ("The safe harbor is provided to protect an applicant from losing rights when an application is divided."). That goal neither requires nor implies any "paramount" protection for the patent that issues from the original application.

Nor is there anything in the restriction and election process during prosecution that suggests additional protection for the original application. When the patent examiner identifies multiple "inventions" in an application and issues a restriction requirement, the patent applicant has complete freedom as to which "invention" to pursue in the original application and which to pursue in divisionals. No "invention" is identified as "paramount" by the examiner, and the original application is not given prosecutorial priority over any divisionals.

Furthermore, the safe harbor can apply in OTDP cases where the patent issuing from the original application is not involved as either a reference or a

challenged patent.  As this Court has explained, "the safe harbor is not limited to only one divisional application."  *Boehringer*, 592 F.3d at 1350.  "Thus, where the third sentence of § 121 refers to a patent issuing on an application filed as a result of a restriction requirement, it is referring to patents issuing from any number of multiple divisional applications and precludes any one from being used as a reference against any other."  *Id.* at 1351.  That the safe harbor applies when the original application is not even at issue is further evidence that it was not intended to give special protection to that original application.

Turning to the case law, prior to the District Court's opinion here, no court had interpreted Section 121 as giving paramount protection to the original application.  Indeed, even the District Court acknowledged that the case snippets it relied on are "dictum," "hardly dispositive," and "inconclusive."  Appx007.  In fact, none of the opinions cited by the District Court articulate a notion of paramount protection or even engage in any discussion of the issue.

The District Court first pointed to a parenthetical from *Amgen* describing Section 121 as "sheltering from attack 'a divisional application or . . . the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application.'"  *Id*. (quoting *Amgen,* 580 F.3d at 1353).  But *Amgen* considered only the requirements for a *challenged* patent to fall under the safe harbor, not the requirements for a patent to

be prohibited from use as a double-patenting *reference*. *See Amgen,* 580 F.3d at 1347-49. The parenthetical's partial quote from Section 121 therefore omitted the definition of prohibited references and, as with the *Amgen* opinion as a whole, is silent with respect to the issue here. *Pfizer* and *In re Janssen* – the other opinions discussed by the District Court – were also concerned only with the safe-harbor requirements for the *challenged* patent and not with the requirements for the *reference* patent. *See Pfizer*, 518 F.3d at 1357-58, 1362; *In re Janssen Biotech, Inc.*, 880 F.3d at 1323. As with *Amgen*, therefore, these opinions have no bearing on the issue at hand.

The language of the safe harbor provision, as informed by this Court's interpretations and authoritative commentary, establishes that the Temporal Requirement – i.e., that "the divisional application is filed before the issuance of the patent on the other application" – must be met by a putative reference patent in order for the safe harbor to block its use as an OTDP reference. By contrast, there is no basis for the District Court's erroneous interpretation of the provision as providing "paramount protection" to the original application such that the Temporal Requirement does not apply when the challenged patent issued from the original application. The Court should therefore reverse the summary judgment rulings below and direct entry of summary judgment of invalidity to MSN.

38

## **CONCLUSION**

For the reasons set out above, this Court should reverse the District Court's summary judgment rulings, and direct entry of summary judgment that claim 26 of the '740 patent is invalid for OTDP over claim 5 of the '271 patent.

Dated: March 29, 2024                Respectfully submitted,

                                     */s/ Chad A. Landmon*
                                     Chad A. Landmon
                                     Thomas K. Hedemann
                                     **AXINN, VELTROP & HARKRIDER LLP**
                                     90 State House Square
                                     Hartford, CT 06103
                                     (860) 275-8100
                                     clandmon@axinn.com
                                     thedemann@axinn.com

                                     *Attorneys for Defendants-Appellants*
                                     *MSN Laboratories Private LTD. and MSN*
                                     *Pharmaceuticals, Inc.*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

| Dkt. or Ex. No. | Docket Text | Date Filed | Appx Page No(s). |
|---|---|---|---|
| 275 | MEMORANDUM ORDER: IT IS HEREBY ORDERED that: 1. MSN's Motion for Summary Judgment of Invalidity of U.S. Patent No. 7,601,740 For Double Patenting (D.I. 260) is DENIED. 2. Acadia's Cross Motion for Summary Judgment and No Invalidity of Claim 26 of U.S. Patent No. 7,601,740 (D.I. 262) is GRANTED. Signed by Judge Gregory B. Williams on 12/13/23. (ntl) Modified on 12/19/2023 (ntl). (Main Document 275 replaced on 12/19/2023) (ntl). Modified on 12/19/2023 (ntl). (Entered: 12/13/2023) | 12/13/2023 | Appx001-Appx016 |
| 282 | FINAL ORDER: Final Judgment is entered in favor of Plaintiff Acadia and against Defendants MSN -- Party MSN Pharmaceuticals, Inc. and MSN Laboratories Private Limited terminated. Attorney James S. Green, Jr terminated. Signed by Judge Gregory B. Williams on 1/11/24. (ntl) (Entered: 01/11/2024) | 01/11/2024 | Appx017-Appx018 |
| 258-2 | Exhibit 2, U.S. Patent No. 7,601,740 | 10/13/2009 | Appx079-Appx108 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ACADIA PHARAMCEUTICALS INC.,

Plaintiff,

v.

AUROBINDO PHARMA LIMITED *et al.*,

Defendants.

C.A. No. 20-985-GBW

CONSOLIDATED

---

## MEMORANDUM ORDER

Defendants MSN Laboratories PVT. Ltd. and MSN Pharmaceuticals, Inc. (collectively,

"MSN") filed an Abbreviated New Drug Application ("ANDA") for a generic version of the

Parkinson's drug Nuplazid®.   The FDA tentatively approved MSN's ANDA.   Acadia

Pharmaceuticals, Inc. ("Acadia") asserted five patents against MSN but has voluntarily dismissed

or stipulated to non-infringement of four of them.  D.I. 144, 176.  Acadia also has resolved its

disputes with all other defendants, either by stipulating to dismissal or reaching an agreement to

be bound by the outcome of the present case.  D.I. 87; D.I. 236; D.I. 253; D.I. 254.  The parties

have reached an agreement to limit the dispute to just the invalidity of claim 26 of U.S. Patent No.

7,601,740 ("the '740 patent") and have stipulated to a set of undisputed facts to support a summary

judgment on this issue.  D.I. 256, D.I. 257, D.I. 258.  The Court heard oral argument on the parties'

cross-motions for summary judgment on September 26, 2023. Transcript. ("Tr."). For the reasons

given below, the Court denies MSN's motion for summary judgment and grants Acadia's cross-

motion for summary judgment.[1]

---

[1] MSN argues that Acadia has not properly requested leave to file a cross-motion.  D.I. 263 at 1.
Because the parties stipulated to resolution of the case on summary judgment, D.I. 256, the Court
holds that Acadia's cross-motion is proper.

1

## I.    BACKGROUND

The facts are not in dispute for this motion.  D.I. 158 ("Joint Statement of Undisputed Facts").[2]  MSN challenges the '740 patent based on U.S. Patent No. 9,566,271 ("the '271 patent").  The challenged '740 patent traces back to U.S. Patent Application No. 10/759,561 ("the '561 application"), which was filed on January 15, 2004.  JSUF ¶ 16.  The reference '271 patent traces back to U.S. Patent Application No. 11/416,527 ("the '527 application") filed on May 3, 2006.  *Id.* at ¶ 21.  The '527 application was initially filed as a continuation of the '561 application.  *Id.* at ¶ 33.  On July 5, 2007, the Examiner issued a restriction requirement on the '561 application.  *Id.* at ¶ 26.  Acadia elected a subset of claims to pursue in the '561 application.  *Id.* at ¶ 27.  Acadia cancelled its pending claims in the '527 application and replaced them with reserved claims from the '561 application.  *Id.* at ¶ 36-37.  On July 1, 2009, Acadia stated an intention to change the '527 application to a divisional of the '561 application.  *Id.* at ¶ 37.  The '561 application issued as the '740 patent on October 13, 2009.  *Id.* at ¶ 16.  The PTO calculated that it delayed issuance of the initially examined '740 patent and granted 980 days of patent term adjustment (PTA).  *Id.* at ¶ 17-19.  The '740 patent also received a 1,315-day patent term extension (PTE) for FDA delay.  *Id.* at ¶ 20.  On January 26, 2010, the Examiner allowed the cancellation of the existing claims of the '527 application.  *Id.* at ¶ 38.  On April 13, 2010, Acadia amended the '527 specification, changing it from a "continuation" to a "divisional" of the '561 application.  *Id.* at ¶ 39.  The '271 patent issued on February 14, 2017 and expires on January 15, 2004.  *Id.* at ¶ 21-22.

---

[2] The paragraphs of the Joint Statement of Undisputed Facts, D.I. 258, are cited as "JSUF ¶ __ " and the Bates-numbered JSUF exhibits are cited with their exhibit and Bates numbers, as "JSUF Ex. _ at 0___."

The following timeline, Exhibit A from Acadia's Answering Brief (D.I. 261), is

clarifying:



**Exhibit A**
**Timeline of Relevant Prosecution Events**

Claim 5 of the '271 patent is directed to a method for treating hallucinations by

administering the tartrate salt of pimavanserin. JSUF ¶ 11. Claim 26 of the '740 patent is directed

to tartrate salt of pimavanserin. *Id.* at ¶ 8. Both parties agree that, if the '271 patent is a proper

obvious-type double patenting (OTDP) reference to the '740 patent, and OTDP can cut off a PTA

on a first-filed, first-issued patent, then claim 5 of the '271 patent anticipates claim 26 of the '740

patent. D.I. 259 at 9.

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).

3

After the implementation of the Uruguay Round Agreements Act ("URAA"), a U.S. patent issued on an application filed on or after June 8, 1995 has a patent term that "end[s] 20 years from the date on which the application for the patent was filed in the United States or, if the application contains a specific reference to an earlier filed application or applications ..., from the date on which the earliest such application was filed." 35 U.S.C. § 154(a)(2), as amended by Pub. L. 103-465, Title V, § 532(a)(1), Dec. 8, 1994, 108 Stat. 4809, 4983; *Gilead Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208, 1215 (Fed. Cir. 2014). The 20-year patent term can be lengthened for "1 day for each day after the end of the period specified in clause [(i)-(iv) for patent office delays]." 35 U.S.C. § 154(b)(1)(A) (commonly referred to as "patent term adjustment" or "PTA"). In addition, and separately from a PTA, the term of a patent within certain categories relating to an FDA-approved pharmaceutical product can be extended under 35 U.S.C. § 156 to compensate for FDA delays. This is commonly referred to as "patent term extension" or "PTE."

A patent confers exclusive rights only "for limited Times." U.S Const., art. I, § 8; *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 451 (2015) ("Patents endow their holders with certain superpowers, but only for a limited time."). Once a patent expires, the public is entitled to free use of the invention described in the patent—this is the grand bargain of the entire patent scheme. *Singer Mfg. Co., v. June Mfg. Co.*, 163 U.S. 169, 185 (1896); *Kimble*, 576 U.S. at 451; *Gilead*, 753 F.3d at 1212. The "judicially created" OTDP doctrine prohibits different expiries for two commonly owned patents (or two patents sharing an inventor) that claim obvious variants of the same invention. *Gilead*, 753 F.3d at 1212-14 (discussing OTDP history). OTDP "is designed to prevent an inventor from securing a second, later expiring patent for the same invention." *AbbVie Inc. v. Mathilda & Terence Kennedy Institute of Rheumatology Trust*, 764 F.3d 1366, 1373 (Fed. Cir. 2014). OTDP was created "to prevent unjustified timewise extension of the right to exclude

4

granted by a patent no matter how the extension is brought about." *Eli Lilly & Co. v. Barr Labs. Inc.*, 251 F.3d 955, 967-68 (Fed. Cir. 2001) (internal quotations omitted). Post-URAA, "the doctrine of obviousness-type double patenting continues to apply where two patents that claim the same invention have different expiration dates." *AbbVie*, 764 F.3d at 1374. "The ban on double patenting ensures that the public gets the benefit of the invention after the original period of monopoly expires." *Id.* at 1373.

For a parent application and its divisional application claiming overlapping patented subject matters, a "safe harbor" was established to protect them from OTDP. 35 U.S.C. § 121; Pub. L. No. 82-593, 66 Stat. at 800-01 (1952).

> If two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions. If the other invention is made the subject of a divisional application which complies with the requirements of section 120 it shall be entitled to the benefit of the filing date of the original application. A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application. The validity of a patent shall not be questioned for failure of the Director to require the application to be restricted to one invention.

*Id.* "The safe harbor provision arose from difficulties created by restriction requirements imposed by the [PTO] during examination, followed by double patenting challenges in the courts. . . . This conflicting result was recognized as inherently unfair, and the safe harbor was created to preclude it." *St. Jude Med., Inc. v. Access Closure, Inc.*, 729 F.3d 1369, 1376–77 (Fed. Cir. 2013). Courts "follow[] 'a strict application of the plain language of § 121.'" *In re Janssen Biotech, Inc.*, 880 F.3d 1315, 1321 (Fed. Cir. 2018) (quoting *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1353 (Fed. Cir. 2009)).

## III.    DISCUSSION

### A. 35 U.S.C. § 121 Distinguishes Challenges to Original and Divisional Applications.

The parties dispute the proper reading of 35 U.S.C. § 121. The parties disagree on whether the language in § 121, which requires the divisional patent be filed "before the issuance of the patent on the other application" and "as a result" of a restriction requirement, applies when the challenged patent is the original patent, not the divisional patent. Careful bolding helps set clear the parties' respective positions. Acadia argues that the statute should be read as granting "paramount" protection to original applications. D.I. 261 at 5. Acadia reads the statute as follows:

> If two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions. If the other invention is made the subject of a divisional application which complies with the requirements of section 120 it shall be entitled to the benefit of the filing date of the original application. **A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts** against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application. The validity of a patent shall not be questioned for failure of the Director to require the application to be restricted to one invention.

35 U.S.C. § 121. In Acadia's view, the bolded portions discuss two types of reference patents—a patent issuing on an application with respect to which a requirement for restriction has been made, or patents issuing on applications filed as a result of such a requirement. The underlined portions, meanwhile, describe challenged patents/applications—divisional applications, and original applications. As such, in Acadia's reading the "filed before the issuance of the patent" requirement applies exclusively to a challenged divisional patent, not a challenged original application.

On the other hand, MSN reads the statute as follows:

> If two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions. If the **other invention is made the subject of a divisional application** which complies with the requirements of section 120 it shall be entitled to the benefit of

6

the filing date of the original application. A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application **filed as a result of such a requirement**, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, **if the divisional application is filed before the issuance of the patent on the other application**. The validity of a patent shall not be questioned for failure of the Director to require the application to be restricted to one invention.

35 U.S.C. § 121. In essence, MSN argues that the second sentence defines a divisional application. MSN argues that, within the meaning of the statute, a divisional application is an application filed "as a result" of a restriction requirement because it contains the "other invention." Thus, in MSN's view, "the divisional application" can refer to the reference patent, which is "filed as a result of a restriction requirement." Therefore, a divisional application can be used as a reference patent only if it is filed as a result of a restriction requirement "before the issuance of the patent on the other application."

The clearest Federal Circuit statement on this issue is that it described, in a parenthetical, 35 U.S.C. § 121 as "sheltering from attack 'a divisional application or . . . the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application.'" *Amgen*, 580 F.3d at 1353 (omission in original). This dictum supports Acadia's interpretation that the "divisional application" that must be filed pre-issuance is a challenged patent, not a reference patent. However, this is hardly dispositive. Similarly inconclusive is the Federal Circuit's statement in *Pfizer, Inc. v. Teva Pharms. USA, Inc.* that "safe harbor, by its literal terms, protects only 'divisional application[s]' (or the original application) and patents issued on such applications . . . [T]he drafters of section 121 chose to refer specifically and only to divisional (and original) applications." 518 F.3d 1353, 1360, 1362 (Fed. Cir. 2008). Again, this could indicate that the "divisional application" that needs to be filed pre-issuance of the other patent is a challenged patent, not a reference patent.

7

MSN argues that "the Federal Circuit has held that a later-filed child patent can, and did, invalidate an earlier-filed parent patent under OTDP." D.I. 263 at 2. MSN cites *In re Janssen Biotech, Inc.*, where it claims the "'195 patent from a [continuation-in-part] child application [was] used as a reference to invalidate the parent '471 patent under OTDP." 880 F.3d at 1318-19. However, in *Janssen*, the challenged '471 patent was not the original patent (the '413 was the application which received a restriction requirement), and the reference patent was a continuation-in-part of multiple patents. The opinion described the relationship between the relevant patents in a helpful diagram:



*Janssen*, 880 F.3d at 1318. Unlike the application at issue in the present action, neither the '093 application nor the '799 application in *Janssen* could have benefitted from any "original" protection, since the '413 application was the original application and the one that received the restriction requirement. *Id.* *Janssen* also arguably contains language which makes clear that the "before the issuance of the patent" requirement applies to the challenged patent, not the reference patent: "For a *challenged* patent to receive safe-harbor protections, the application must be properly designated as a divisional application, at the very latest, by *the time the challenged*

8

*patent issues on that application*." 880 F.3d at 1323 (emphasis added). A ruling in MSN's favor today would thus go beyond what the Federal Circuit held in *Janssen*.

On balance, the Court is persuaded that Acadia's position is the correct interpretation of § 121. Under this interpretation of the statute, the statute describes reference patents under the portion stating a "patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference." 35 U.S.C. § 121. The statute then describes challenged patents by the portion stating, "against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application." *Id.* On the other hand, MSN's interpretation, where "divisional application" refers to an "application filed as a result of such a requirement," imports additional limitations not present in the statutory language. *Id.* The Court's reading is supported by the limited Federal Circuit precedent. *Janssen*, MSN's primary case, indicates that the "filed before" requirement applies to challenged patents, not reference patents. 880 F.3d at 1323. While the "safe harbor provision [is] not a model of clarity," the Court's interpretation is consistent with the statutory language and the Federal Circuit's precedent. *St. Jude*, 729 F.3d at 1377.

MSN argues that it is arbitrary which group of claims Acadia chose to prosecute in the original application. D.I. 263 at 2. MSN further argues that it is "mere happenstance" which branch of the patent family would result in a patent grant first. *Id.* at 3. In reply, the Court first notes that there is no requirement that Congress construct a perfectly rational schema. Moreover, Congress in crafting the safe harbor provision could rationally have been focused on preserving original rights, such that a restriction requirement would not harm the inventor in any instance. Also, that it is happenstance which branch issues first weighs against a finding of gamesmanship,

9

insofar as Acadia could not have predicted a particularly advantageous outcome by choosing to amend an existing application rather than filing a new divisional application.

Therefore, the Court holds that the "filed before the issuance of the patent" requirement in the 35 U.S.C. § 121 safe harbor is inapplicable when the challenged patent issued from the original application.

### B. The '740 Patent is Protected by the Safe Harbor Provision.

Having adopted Acadia's reading of 35 U.S.C. § 121, the Court now must analyze whether the reference patent was "filed as a result of" a requirement for restriction. Because precedent dictates that an amendment constitutes filing for purposes of 35 U.S.C § 121, the Court holds that 35 U.S.C § 121 provides a safe harbor to the '740 patent.

This Court previously held that an application is "filed as a result of" the restriction requirement when an initially non-divisional application is amended to comport with a restriction requirement in another patent. *Union Carbide Corp . v. Dow Chem. Co.*, 619 F. Supp. 1036, 1059-60 (D. Del. 1985). Specifically, the Court, in *Union Carbide*, held that an "amended application is one 'filed as a result of such a requirement' as set forth in § 121" when "the claims of an application are amended in toto to reflect the division of a copending application." *Id.* at 1060. The court explained that "[n]o practical distinction exists between an application filed for the first time as a result of a restriction requirement, and an application which is amended in full to comport with that requirement." *Id.* This interpretation also complies with Federal Circuit precedent which states that § 121 is "not concerned with . . . how any [particular divisional] applications are filed. To prevent loss of safe harbor in dividing out claims to non-elected inventions, what is required is consonance with the restriction requirement." *Boehringer Ingelheim Intern. GmbH v. Barr Labs., Inc.*, 592 F.3d 1340, 1353-54 (Fed. Cir. 2010) (holding that two serially-filed divisional

applications met the "filed as a result of" requirement despite one of the divisional applications having been initially filed as a continuation).

MSN's attempt to distinguish *Union Carbide* is unavailing. MSN argues that *Union Carbide* relied on a mistaken reading of the law, in that "the text of § 121 actually does not require the challenged patent to be filed 'as a result of a restrict requirement,' and therefore, "[t]he district court's discussion in *Union Carbide* . . . is based on an expansive reading of the 'as a result of' requirement on the challenged patent." D.I. 263 at 8. However, the Federal Circuit has explicitly held that "the 'as a result of' requirement must be satisfied by both the [reference] patent and the [challenged] patent." *Boehringer*, 592 F.3d at 1352. *Union Carbide* clearly indicates that an amendment constitutes filing for the purposes of § 121.

For the first time at oral argument, MSN argued that *Union Carbide* would only apply to pre-URAA patents. Tr. 8:15-9:22. However, the rationale of *Union Carbide* is not based on a rationale that would only apply to pre-URAA patents, but on a plain reading of the unaltered text and purpose of § 121. *See* 619 F. Supp. at 1059-60; *compare* 35 U.S.C. § 121 (1984) *with* 35 U.S.C. § 121 (identical text, except that the modern version replaces "Commissioner" with "Director" and removes an option to forego an applicant's signature). The text of the safe harbor provision makes no distinction between pre-URAA and post-URAA patents. Once again, there is no "practical distinction" between an application filed for the first time as a result of a restriction requirement, and one amended in full to comport with that requirement. *Union Carbide*, 619 F. Supp. at 1060. MSN has not provided any reason to distinguish between pre-URAA and post-URAA patents for purposes of the safe harbor analysis.

MSN similarly fails to distinguish *Boehringer*. MSN argues that its reading of § 121 leaves "the choice of how to prosecute non-elected inventions" "up to the applicant" as *Boehringer* states,

11

but the applicant will still just face the consequences. D.I 263 at 8 (quoting *Boehringer*, 592 F.3d at 1353 n.3). MSN also notes that the continuation in *Boehringer* was filed after the restriction requirement and amended to a divisional application later. 592 F.3d at 1343-44. In contrast, the continuation in the instant claim was filed before the restriction requirement, then amended to a divisional application. Drawing these distinctions ignores the plain language of *Boehringer* that what is relevant is not "how any such applications are filed," but the application being "due to the administrative requirements imposed by the [PTO], in the sense that, absent the restriction requirement, the applicant could have retained in the [original application] the claims prosecuted in the [descendant] application." 592 F.3d at 1353-54. There is no dispute that this requirement is satisfied in this action. D.I. 263 at 7 ("Acadia could have filed a divisional application for those claims that it eventually chose to add to the '527 Application in 2009."). Prior precedent thus makes clear that the filing requirement can be satisfied by amendment.

The cases that MSN provides to the contrary do not change this conclusion. MSN cites *In re Janssen* for the proposition that amendment is permissible, but an amendment outside the safe harbor window does not trigger the safe harbor protection. 880 F.3d at 1322-24. It similarly cites *G.D. Searle LLC v. Lupin Pharms., Inc.*, for the proposition that retroactive designation as a divisional does not trigger Section 121. 790 F.3d 1349, 1354-55 (Fed. Cir. 2015). Both *Janssen* and *G.D. Searle* address attempts by patentees to re-designate challenged patents after they issued, a straightforward case of gamesmanship absent in the present action. *Janssen*, 880 F.3d at 1223; *G.D. Searle*, 790 F.3d at 1354-55. *Union Carbide* and *Boehringer* address the more analogous cases of amendment during prosecution and indicate that it is a permissible "filing." 619 F. Supp. 1059-60; 592 F.3d at 1353-54. Thus, the Court finds that the reference '271 patent was filed "as a result of" the original '740 patent, within the meaning of the statutory safe harbor.

12

**C. In the Alternative, the '271 Patent Does Not Qualify as a Proper Reference Against the '740 Patent.**

"[C]laims in the challenged patents are entitled to their full term, including the duly granted PTA, unless they are found to be later-filed obvious variations of earlier-filed, commonly-owned claims." *In re Cellect*, No. 2022-1293, 2023 WL 5519716, at *10 (Fed. Cir. Aug. 28, 2023). The Court has been unable to identify a case where, when challenged, a later-filed, later-issued, earlier-expiring patent was used as an OTDP reference to invalidate an earlier-filed, earlier-issued, later-expiring patent. Here, the claims in the challenged patent were earlier-filed and thus are entitled to their full term, including the PTA.

That only earlier-filed patents are proper references is equitable, since the purpose of OTDP doctrine is to "prevent a patent owner from extending his exclusive rights to an invention through claims in a later-filed patent that are not patentably distinct from claims in the earlier-filed patent." *Proctor & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 99 (Fed. Cir. 2009); *see also Cellect*, 2023 WL 5519761, at *7 (OTDP "limits the term of a patent or, at least, ties later-filed commonly owned, obvious variations to the expiration date of an earlier-filed reference patent."). If a later-filed patent is used as a reference, the logic and purpose of OTDP is flipped on its head: rather than preventing a patent owner from unjustifiably extending the term of a patent, OTDP would operate to cut off a patent term that would have been valid but for a later-filed patent.

Whether a patent qualifies as an OTDP reference is a threshold issue. *See Novartis AG v. Ezra Ventures LLC*, 909 F.3d at 1375 n.4 (Fed. Cir. 2018) ("Because we find that the '565 patent is not a double patenting reference for the '229 patent, we need not address Ezra's arguments as to whether the '229 patent is patentably indistinct from the '565 patent"). Only after the reference determination has been made does the Court conduct an OTDP analysis. *See Novartis Pharms. Corp. v. Breckenridge Pharma. Inc.*, 909 F.3d 1355, 2359 (Fed. Cir. 2018). That this

13

determination must be made in each instance explains why the Federal Circuit in *Cellect*, despite its clear statement that OTDP only applies to "later-filed obvious variations of earlier-filed, commonly owned claims," invalidated an earlier-filed patent. 2023 WL 5519716, at *10. Cellect opted not to challenge the availability of the reference patents being used in an OTDP challenge, and "instead focused its argument on whether or not O[T]DP could cut short a grant of PTA."[3] *Id.* at *3. Accordingly, the court did not independently consider whether the reference patents were available. *Cf. In re Fallaux*, 546 F.3d 1313, 1315 n.1 ("Neither party raised or argued the question of whether a patent may be used as a reference for an obviousness-type double patenting rejection . . . . This opinion should not be read to decide or endorse the PTO's view on this issue."). The Federal Circuit instead merely reiterated the standard that challenged patents must be "later-filed obvious variations of earlier filed, commonly owned claims" and held it had "no basis for the consideration of that issue here." *Cellect*, 2023 WL 5519716, at *10.[4]

The cases that MSN cites do not change the conclusion that putative OTDP references must be earlier-filed to be available as a reference. MSN points to *Gilead Scis., Inc. v. Natco Pharma Ltd.* for the proposition that "it is the comparison of [the] patent expiration dates that should control, not merely the issuance dates." 753 F.3d 1208, 1210 (Fed. Cir. 2014). *Gilead* addressed the "narrow question" of "[c]an a patent that issues after but expires before another patent qualify

---

[3] *Cellect* involved a tangled web of earlier- and later-filed patents, and the patentee seems to have focused its arguments on those positions applicable to all challenged patents. 2023 WL 5519716, at *1-2.

[4] The Court recognizes that another court in this district has interpreted *Cellect* to cut off OTDP even for first-filed, first-issued patents. *Allergan USA, Inc. v. MSN Laboratories Private Ltd., et al.*, C.A. No. 19-1727-RGA, D.I. 483 (D. Del. Sept. 27, 2023). The arguments dispositive in this case do not appear to have been briefed in *Allergan*, and the *Allergan* Court did not analyze the language in *Cellect* discussing "later-filed obvious variations of earlier-filed, commonly-owned claims." 2023 WL 5519716, at *10. Accordingly, the Court does not find itself persuaded by *Allergan*.

as a double patenting reference" and limited its decision to the "circumstances of this case." *Id.* at 1211-12. It therefore did not address filing dates, the relevant inquiry under *Cellect* and before this Court. Indeed, the reference patent in *Gilead* was earlier-filed. *Id.* The Federal Circuit in *Gilead* relied heavily on the idea that issue dates are "too arbitrary, uncertain, and prone to gamesmanship;" thus, the Court instead compared the expiration dates of the patents. *Id.* at 1216. Like expiration dates, but unlike issue dates, filing dates are not prone to gamesmanship. Accordingly, the chief concerns of *Gilead* do not apply to this case, nor does *Gilead* overcome the clear language of *Cellect*.

Similarly unpersuasive is *AbbVie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.* 764 F.3d 1366 (Fed. Cir. 2014). *AbbVie* addressed a challenge to a later-filed, later-expiring patent, and thus again did not reach the issue of whether a later-filed patent may be used as an invalidating reference. *Id.* at 1369. *AbbVie* applied the *Gilead* rationale, making clear that the availability of OTDP remained viable to prevent gamesmanship in certain narrow instances. *Id.* at 1373. The Federal Circuit in *Ezra* distinguished *AbbVie* because there no "concern that [a patent owner], once its [] patent issued, sought to subsequently 'secur[e] a second, later expiring patent for the same invention.'" 909 F.3d at 1375 (quoting *AbbVie*, 764 F.3d at 1373). The same circumstances are present in this action, in that the Court finds no concern that Acadia was subsequently securing a second, later-expiring patent. The '740 patent retains the same expiration date it has always had.

Because a patent must be earlier-filed to be available as an OTDP reference, the Court finds that the '271 patent does not qualify as a proper reference against the '740 patent. This is an independent basis for the Court's decision and does not rely on or alter the Court's interpretation of the safe-harbor statute.

15

## IV.   CONCLUSION

For all of the foregoing reasons, the Court grants summary judgment to Acadia.

\* \* \*

WHEREFORE, at Wilmington this 13th day of December, 2023, **IT IS HEREBY**

**ORDERED** that:

1. MSN's Motion for Summary Judgment of Invalidity of U.S. Patent No. 7,601,740 For
   Double Patenting (D.I. 260) is **DENIED.**

2. Acadia's Cross Motion for Summary Judgment and No Invalidity of Claim 26 of U.S.
   Patent No. 7,601,740 (D.I. 262) is **GRANTED.**

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ACADIA PHARMACEUTICALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:20-cv-00985-GBW |
| | ) | |
| | ) | (Consolidated) |
| AUROBINDO PHARMA LIMITED, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| ACADIA PHARMACEUTICALS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:20-cv-01029-GBW |
| | ) | |
| MSN LABORATORIES PRIVATE LTD. | ) | |
| and MSN PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**~~[PROPOSED]~~ FINAL ORDER**

This matter having come before the Court on the merits of all remaining issues in the above-captioned case as it relates to Plaintiff Acadia Pharmaceuticals Inc.'s ("Acadia") and Defendants MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc.'s (collectively, "MSN"), pursuant to Rule 58 of the Federal Rules of Civil Procedure, and for the reasons stated in the Court's Memorandum Order dated December 13, 2023 denying MSN's Motion for Summary Judgment of Invalidity of Claim 26 of U.S. Patent No. 7,601,740 for Double Patenting and granting Acadia's Cross Motion for Summary Judgment and No Invalidity of Claim 26 of U.S. Patent No.

7,601,740 (D.I. 275), and all prior rulings, orders, judgments, and findings, it is hereby ordered, adjudged, and decreed as follows:

1.      Final judgment is entered in favor of Acadia and against MSN on Acadia's claim that MSN's submission of ANDA No. 214925 was an act of infringement of claim 26 of U.S. Patent No. 7,601,740 ("the '740 patent") under 35 U.S.C. § 271(e)(2).

2.      Final judgment is entered in favor of Acadia and against MSN on MSN's counterclaims for non-infringement and invalidity of claim 26 of the '740 patent.

3.      In the event that a party appeals this Final Judgment, any motion for attorneys' fees and/or costs under Fed. R. Civ. P. 54 and/or Local Rules 54.1 or 54.3, or any motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed and served within fourteen (14) days after final disposition of any such appeal.

Dated: January 11 , 2024
            Wilmington, Delaware

The Honorable Gregory B. Williams
United States District Court Judge

2

# Exhibit 2

US007601740B2

(12) **United States Patent**
Weiner et al.

(10) Patent No.: **US 7,601,740 B2**
(45) Date of Patent: **Oct. 13, 2009**

(54) **SELECTIVE SEROTONIN 2A/2C RECEPTOR INVERSE AGONISTS AS THERAPEUTICS FOR NEURODEGENERATIVE DISEASES**

(75) Inventors: **David M. Weiner**, San Diego, CA (US); **Robert E. Davis**, San Diego, CA (US); **Mark R. Brann**, Rye, NH (US); **Carl-Magnus A. Andersson**, Hjärup (SE); **Allan K. Uldam**, Ballerup (DK)

(73) Assignee: **Acadia Pharmaceuticals, Inc.**, San Diego, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 899 days.

(21) Appl. No.: **10/759,561**

(22) Filed: **Jan. 15, 2004**

(65) **Prior Publication Data**
US 2004/0213816 A1    Oct. 28, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/441,406, filed on Jan. 16, 2003, provisional application No. 60/479,346, filed on Jun. 17, 2003.

(51) **Int. Cl.**
*A61K 31/47* (2006.01)
*A61K 31/445* (2006.01)
*C07D 211/56* (2006.01)

(52) **U.S. Cl.** ........................ **514/310**; 514/317; 546/224

(58) **Field of Classification Search** ................. 514/310, 514/317; 546/224
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,983,234 A | 9/1976 | Sayers |
| 4,138,492 A | 2/1979 | Noverola et al. |
| 4,255,432 A | 3/1981 | Kluge et al. |
| 4,332,804 A | 6/1982 | Clark |
| 4,353,900 A | 10/1982 | Clark |
| 4,353,901 A | 10/1982 | Clark |
| 4,367,232 A | 1/1983 | Boix-Igleasias et al. |
| 4,853,394 A | 8/1989 | King et al. |
| 5,025,013 A | 6/1991 | Barreau et al. |
| 5,214,055 A | 5/1993 | Peglion et al. |
| 5,216,165 A | 6/1993 | Mobilio et al. |
| 5,461,066 A | 10/1995 | Gericke et al. |
| 5,595,872 A | 1/1997 | Wetterau, II et al. |
| 5,621,010 A | 4/1997 | Sueda et al. |
| 5,707,798 A | 1/1998 | Brann |
| 5,795,894 A | 8/1998 | Shue et al. |
| 5,869,488 A | 2/1999 | Shue et al. |
| 5,877,173 A | 3/1999 | Farber et al. |
| 5,912,132 A | 6/1999 | Brann |
| 5,955,281 A | 9/1999 | Brann |
| 6,107,324 A | 8/2000 | Behan et al. |
| 6,140,509 A | 10/2000 | Behan et al. |
| 6,150,393 A | 11/2000 | Behan et al. |
| 6,358,698 B1 | 3/2002 | Brann et al. |

| | | | |
|---|---|---|---|
| 6,479,480 B1 | 11/2002 | Moyes et al. |
| 6,486,153 B1 | 11/2002 | Castro et al. |
| 6,756,393 B2 | 6/2004 | Andersson et al. |
| 6,815,458 B2 | 11/2004 | Andersson et al. |
| 6,911,452 B2 | 6/2005 | Schlienger |
| 7,022,698 B2 | 4/2006 | Hamied et al. |
| 7,041,667 B1 | 5/2006 | Armour et al. |
| 7,115,634 B2 | 10/2006 | Thurieau et al. |
| 2002/0004513 A1 | 1/2002 | Andersson et al. |
| 2002/0156068 A1 | 10/2002 | Behan et al. |
| 2002/0165225 A1 | 11/2002 | Kankan et al. |
| 2004/0006081 A1 | 1/2004 | Burrows et al. |
| 2004/0106600 A1 | 6/2004 | Andersson et al. |
| 2004/0213816 A1 | 10/2004 | Weiner et al. |
| 2005/0014757 A1 | 1/2005 | Andersson et al. |
| 2005/0148018 A1 | 7/2005 | Weiner et al. |
| 2005/0244862 A1 | 11/2005 | Brann |
| 2005/0256108 A1 | 11/2005 | Schlienger |
| 2006/0094758 A1 | 5/2006 | Andersson et al. |
| 2006/0106063 A1 | 5/2006 | Thygesen et al. |
| 2006/0111399 A1 | 5/2006 | Thygesen et al. |
| 2006/0194778 A1 | 8/2006 | Andersson et al. |
| 2006/0194834 A1 | 8/2006 | Andersson et al. |
| 2006/0199794 A1 | 9/2006 | Schlienger |
| 2006/0199818 A1 | 9/2006 | Andersson et al. |
| 2006/0199842 A1 | 9/2006 | Weiner et al. |
| 2006/0205710 A1 | 9/2006 | Schlienger et al. |
| 2006/0205722 A1 | 9/2006 | Andersson et al. |
| 2006/0205780 A1 | 9/2006 | Thygesen et al. |
| 2006/0205781 A1 | 9/2006 | Thygesen et al. |
| 2006/0264465 A1 | 11/2006 | Weiner et al. |
| 2006/0264466 A1 | 11/2006 | Weiner et al. |
| 2006/0286610 A1 | 12/2006 | Brann |
| 2006/0292606 A1 | 12/2006 | Brann |

(Continued)

FOREIGN PATENT DOCUMENTS

| CA | 984843 | 3/1976 |
|---|---|---|

(Continued)

OTHER PUBLICATIONS

Goodman and Gilman's The Pharmacological Basis of Therapeutics, 7th edition, pp. 340-343 and 403-404.*

(Continued)

*Primary Examiner*—Jennifer M Kim
(74) *Attorney, Agent, or Firm*—Jones Day

(57) **ABSTRACT**

Behavioral pharmacological data with the compound of formula (I), a novel and selective 5HT2A/2C receptor inverse agonist, demonstrate in vivo efficacy in models of psychosis and dyskinesias. This includes activity in reversing MK-801 induced locomotor behaviors, suggesting that this compound may be an efficacious anti-psychotic, and activity in an MPTP primate model of dyskinesias, suggesting efficacy as an anti-dyskinesia agent. These data support the hypothesis that 5HT2A/2C receptor inverse agonism may confer antipsychotic and anti-dyskinetic efficacy in humans, and indicate a use of the compound of formula (I) and related agents as novel therapeutics for Parkinson's Disease, related human neurodegenerative diseases, and psychosis.

**26 Claims, 4 Drawing Sheets**

JSUF0006
Appx080

**US 7,601,740 B2**

Page 2

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 005 318 A1 | 11/1979 |
| EP | 0 061 333 A1 | 9/1982 |
| EP | 0 379 441 A1 | 7/1990 |
| EP | 0 548 015 A1 | 6/1993 |
| EP | 0 260 070 B1 | 8/1993 |
| EP | 0 625 507 A2 | 11/1994 |
| FR | 2802206 A1 | 6/2001 |
| HU | 157325 | 3/1998 |
| JP | 51052176 | 5/1976 |
| JP | 5208517 A | 7/1977 |
| WO | WO 94/27967 A1 | 12/1994 |
| WO | WO 97/08166 A1 | 3/1997 |
| WO | WO 97/11940 A1 | 4/1997 |
| WO | WO 97/38665 A2 | 10/1997 |
| WO | WO 97/38984 A1 | 10/1997 |
| WO | WO 98/11128 A1 | 3/1998 |
| WO | WO 98/17646 A1 | 4/1998 |
| WO | WO 98/44921 A1 | 10/1998 |
| WO | WO 98/50534 A1 | 11/1998 |
| WO | WO 99/52927 A1 | 10/1999 |
| WO | WO 00/23076 A1 | 4/2000 |
| WO | WO 00/56335 A1 | 9/2000 |
| WO | WO 00/59497 A1 | 10/2000 |
| WO | WO 00/69810 A1 | 11/2000 |
| WO | WO 01/44191 A1 | 6/2001 |
| WO | WO 01/66521 A1 | 9/2001 |
| WO | WO 0166521 | 9/2001 |
| WO | WO0166521 A1 * | 9/2001 |
| WO | WO 01/87839 A1 | 11/2001 |
| WO | WO 02/24649 | 3/2002 |
| WO | WO 02/076464 A1 | 10/2002 |
| WO | WO 02/079186 A1 | 10/2002 |
| WO | WO 03/057698 A2 | 7/2003 |
| WO | WO 03/057698 A3 | 7/2003 |
| WO | WO 03/062206 A2 | 7/2003 |
| WO | WO 03/070246 A1 | 8/2003 |
| WO | WO 03/086400 A1 | 10/2003 |
| WO | WO 2004/000808 A2 | 12/2003 |
| WO | WO 2004/000808 A3 | 12/2003 |
| WO | WO 2004/039322 A2 | 5/2004 |
| WO | WO 2004/064738 A2 | 8/2004 |
| WO | WO 2004/064753 A2 | 8/2004 |
| WO | WO 2005/053796 A1 | 6/2005 |
| WO | WO 2005/063254 A2 | 7/2005 |
| WO | WO 2005/112927 A | 12/2005 |
| WO | WO 2006/036874 A1 | 4/2006 |
| WO | WO 2006/037043 A1 | 4/2006 |
| WO | WO 2006/104826 | 10/2006 |

### OTHER PUBLICATIONS

R&D Focus Drug News (Nov. 12, 2001). pimvanserin Acadia preclinical data.*

R&D Focus Drug News (Jan. 24, 2000). pimvanserin Acadia lead compounds identified.*

Adam, et al. 1989. Effects of repeated ritanserin on middle-aged poor sleepers. *Psychopharmacology*, 99:219-221.

Adell, et al. 2005. Strategies for producing faster acting antidepressants. *Drug Discovery Today*, 10(8):578-585.

Akin, et al. 2004. Decreased serotonin 5-HT$_{2A}$ receptor-stimulated phosphoinositide signaling in fibroblasts from melancholic depressed patients. *Neuropsychopharmacology*, 29:2081-2087.

Alvisi, N. 1892, Sulla formazione di derivati pirazolici dalle dicloridrine e dalla tribromidrina della glicerina ordinaria, *Gazz. Chem. Ital.* 22:158-168.

Antilla, et al. 2001. Copper-catalyzed coupling of arylboronic acids and amines. *Organic Letters*, 3(13):2077-2079.

Antilla, et al. 2002. The copper-catalyzed N-arylation of indoles. *J. Am. Chem. Soc.*, 124:11684-11688.

Archibald, et al., 1974 "Benzamidopiperdines. 2. Heterocyclic Compounds Related to Indoramin" *J. Medicinal Chemistry*, 17(7):736-739.

Archibald, et al., 1974 "Benzamidopiperdines. 3. Heterocyclic Compounds Related to Indoramin" J. Medicinal Chemistry, 17(7):-739-744.

Archibald, et al., 1974 "1,4-Bis-(2-indol-3-ylethyl(piperdines" J. Medicinal Chemistry, 17(7):-745-747.

Artico, et al. 1992. Aromatic hydrazides as specific inhibitors of bovine serum amine oxidase. *Eur. J. Med. Chem.*, 27:219-228.

Bakshi, et al. 1994. Clozapine antagonizes phencyclidine-induced deficits in sensorimotor gating of the startle response. *The Journal of Pharmacology and Experimental Therapeutics*, 271(2):787-794.

Bassus, et al. 1974. Psychotropes potentiels. X. Synthèse de butyrophénones à cycle pipéridine-spiro-tétrahydrooxazinone douées d'activité neuroleptique. *Eur. J. Med. Chem.—Chimica Therapeutica*, 9(4):416-423.

Bhatia, et al. 1996. 5-Lipoxygenase inhibitors: Synthesis and structure-activity relationships of a series of 1-Aryl-2H,4H-tetrahydro-1,2,4-triazin-3-ones. *J. Med. Chem.*, 39:3938-3950.

Biagi, et al. 1988. 1,2,3-Triazoles: Structural changes on two effective inhibitors of the prostaglandin synthesis in vitro, *Farmaco Ed. Sci.*, 43:597-612.

Blakley, et al. 2001. Bidirectional changes in ethanol consumption in rats with site-specific antisense down-regulation of 5-hydroxytryptamine$_{2A}$ receptors in brain. *The Journal of Pharmacology and Experimental Therapeutics*, 299(1):277-289.

Blier, et al. 2001. Putative mechanisms of action of antidepressant drugs in affective and anxiety disorders and pain. *Journal of Psychiatry & Neuroscience*, 26(1):37-43.

Blier, et al. 2005. Potential mechanisms of action of atypical antipsychotic medications in treatment-resistant depression and anxiety. *J. Clin. Psychiatry*, 66(suppl 8):30-40.

Brown, et al. 1924. Catalytic alkylation of aniline, *J. Am. Chem. Soc.*, 46(8):1836-1839.

Buchi et al. 1969. Synthesis of (±)-nuciferal. *J. Org. Chem.*, 34(4):1122-1123.

Buu-Hoi, et al. 1951. Further studies in the alkylation of phenols and thiophenols, *J. Org. Chem.*, 16:988-994.

Cacchi, et al. 2003. Palladium-catalyzed reaction of aryl iodides with acetic anhydride. A carbon monoxide-free synthesis of acetophenones. *Organic Letters*, 5(3):289-291.

Carman, et al. 1998. A further synthesis of an analogue of the antifungal/antiherbivore lipid from avocado. *Aust. J. Chem.*, 51:955-959.

Caroon, et al. 1981. Synthesis and antihypertensive activity of a series of 8-substituted 1-Oxa-3,8-diazaspiro[4.5]decan-2-ones. *J. Med. Chem.*, 24:1320-1328.

Carroll, et al. 1992. Synthesis and muscarinic receptor activity of ester derivatives of 2-substituted 2-azabicyclo[2.2.1]heptan-5-ol and −6-ol *J. Med. Chem.*, 35:2184-2191.

Catarzi, et al. 2001. Synthesis, ionotropic glutamate receptor binding affinity, and structure-activity relationships of a new set of 4,5-dihydro-8-heteroaryl-4-oxo-1,2,4-triazolo[1,5-a]quinoxaline-2-carboxylates analogues of TQX-173. *J. Med. Chem.*, 44:3157-3165.

Chemical Abstracts, 73:25305. Benke, et al. 1970.

Cherkasov, et al. 1985. Organothiophosphorus reagents in organic synthesis. *Tetrahedron*, 41(13):2567-2624.

Clark et al. 1983. Antihypertensive 9-substituted 1-Oxa-4,9-diazaspiro[5.5]undecan-3-ones. *J. Med. Chem.*, 26:855-861.

Clifton, et al. 1982. Arylethanolamines Derived from Salicylamide with α- and β-Adrenoceptor Blocking Activities. Preparation of Labetalol, its Enantiomers, and Related Salicylamides. *J. Med. Chem.*, 25:670-679.

DeClerck, et al. 1987. Increase in slow-wave sleep in humans with the serotonin-S$_2$ antagonist ritanserin. *Current Therapeutic Research*, 41(4):427-432.

Dunn, et al. 1986. Analgetic and antiinflammatory 7-aroylbenzofuran-5-ylacetic acids and 7-aroylbenzothiophene-5-ylacetic acids. *J. Med. Chem.*, 29:2326-2329.

Emerson, et al. 1938. The reductive alkylation of aniline. *J. Am. Chem. Soc.*, 60:2023-2025.

## US 7,601,740 B2

Page 3

Ermakov, et al. 1981. Use of Mass spectrometry in structural and stereochemical studies. *Chemistry of Heterocyclic Compounds*, 1:72-77.

Finar, et al. 1954. The preparation and properties of some derivatives of 1-phenylpyrazole, *J. Chem. Soc.*, pp. 2293-2298.

Fišera, et al. 1994. Synthesis of spiro-substituted 1,3-oxazines by a new sequence leading to spiroheterocycles. *Monatshefte für Chemie*, 125:909-919.

Gainetdinov, et al. 2001. Genetic animal models: Focus on schizophrenia. *Trends in Neurosciences*, 24(9)527-533.

Gawley, R. E., & Aubè, J. 1996. *Principles of Asymmetric Synthesis*. New York: Pergamon.

Gillman, P. K. 2005. Monoamine oxidase inhibitors, opioid analgesics and serotonin toxicity. *British Journal of Anaesthesia*, 95(4):434-441.

Gooßen, et al. 2001. Palladium-catalyzed synthesis of aryl ketones from boronic acids and carboxylic acids or anhydrides. *Angew. Chem. Int. Ed.*, 40:3458-3460.

Gstach et al. 1990. Rearrangement of 3,3-disubstituted 1-aryl-4,5-dihydro-5-oxo-3*H*-1,2,4-triazolium tetrafluoroborates; Part 1. A versatile synthesis of 1,5-disubstituted 2-aryl-1,2-dihydro-3*H*-1,2,4-triazol-3-one tetrafluoroborates. *Synthesis*, pp. 803-808.

Guthrie, et al. 1993. The tetrahedral intermediate from the hydration of *N*-methylformanilide. *Can. J. Chem*l., 71:2109-2122.

Harper, et al. 1964. The chemistry and pharmacology of some 4-aminopiperidines and their derivatives. *J. Med. Chem.*, 44:729-732.

Hartwig, J. F. 1998. Transition metal catalyzed synthesis of arylamines and aryl ethers from aryl halides and triflates: Scope and mechanism. *Angew. Chem. Int. Ed.*, 37:2047-2067.

Hickinbottom, W. J. 1930. The preparation of secondary alkylarylamines and their purification. *J. Chem. Soc.*, pp. 992-994.

Hirst, et al. 1895. A method for preparing the formyl derivatives of the aromatic amines. *J. Chem. Soc.*, 67:829-831.

Idzikowski, et al. 1991. A dose response study examining the effects of ritanserin on human slow wave sleep. *Br. J. Clin. Pharmac.*, 31:193-196.

Irikura, et al., 1971 "New Anticulcer Agents. 1. Synthesis and Biological Activities of 1-Acyl-2-,-3-, -4-substituted Benzamidopiperdines" *J. Medicinal Chemistry* 14(4): 357-361.

Jaeger, et al. 1941. Two ketones of the stilboestrol group. *J. Chem. Soc.*, 744-747.

Kanayama, et al. 2005. New treatment of lumbar disc herniation involving 5-hydroxytryptamine$_{2A}$ receptor inhibitor: A randomized controlled trial. *J. Neurosurg: Spine*, 2:441-446.

Klapars, et al. 2001. A general and efficient copper catalyst for the amidation of aryl halides and the *N*-arylation of nitrogen heterocycles. *J. Am. Chem. Soc.*, 123:7727-7729.

Klapars, et al. 2002. A general and efficient copper catalyst for the amidation of aryl halides. *J. Am. Chem. Soc.*, 124:7421-7428.

Kuehne, et al. 1991(a). Enantioselective syntheses of vinblastine, leurosidine, vincovaline, and 20'-*epi*-vincovaline. *J. Org. Chem.*, 56(2):513-528.

Kuehne, et al. 1991(b). Total syntheses of *Yohimbe* alkaloids, with stereoselection for the normal, allo, and 3-epiallo series, based on annelations of 4-methoxy-1,2-dihydropyridones. *J. Org. Chem.*, 56(8):2701-2712.

Kwong, et al. 2002(a). Copper-catalyzed coupling of alkylamines and aryl iodides: An efficient system even in an air atmosphere. *Organic Letters*, 4(4):581-584.

Kwong, et al. 2002(b). A general, efficient, and inexpensive catalyst system for the coupling of aryl iodides and thiols. *Organic Letters*, 4(20):3517-3520.

Kwong, et al. 2003. Mild and efficient copper-catalyzed animation of aryl bromides and primary alkylamines. *Organic Letters*, 5(6):793-796.

Landini, et al. 1974. A convenient synthesis of primary and secondary dialkyl and aryl alkyl sulfides in the presence of phase-transfer catalysts. *Synthesis*, pp. 565-566.

Landolt, et al. 1999. Serotonin-2 receptors and human sleep: Effect of a selective antagonist on EEG power spectra. *Neuropsychopharmacology*, 21(3):455-466.

Li, G. Y. 2002 Highly active, air-stable palladium catalysts for the C-C and C-S bond-forming reactions of vinyl and aryl cholrides: Use of commercially available [(*t*-Bu)$_2$P(OH)]$_2$PdCl$_2$, [(*t*-Bu)$_2$P(OH)PdCl$_2$]$_2$, and [[(*t*-Bu)$_2$PO . . . H . . . OP(*t*-Bu)$_2$]PdCl]$_2$ as catalysts. *J. Org. Chem.*, 67:3643-3650.

Lowe, et al. 1994. Aza-tricyclic substance P antagonists. *J. Med. Chem.*, 37:2831-2840.

Mansbach, et al. 1988. Dopaminergic stimulation disrupts sensorimotor gating in the rat. *Psychopharmacology*, 94:507-514.

Marek, et al. 2003. Synergistic action of 5-HT$_{2A}$ antagonists and selective serotonin reuptake inhibitors in neuropsychiatric disorders. *Neuropsychopharmacology*, 28:402-412.

Marek, et al. 2005. The selective 5-HT$_{2A}$ receptor antagonist M100907 enhances antidepressant-like behavioral effects of the SSRI fluoxetine. *Neuropsychopharmacology*, 30:2205-2215.

Mavunkel, et al. 1996. Synthesis and characterization of pseudopeptide bradykinin B2 receptor antagonists containing the 1,3,8-triazaspiro[4.5]decan-4-one ring system. *J. Med. Chem.*, 39:3169-3173.

Mayer, et al. 2003. Ritanserin improves sleep quality in narcolepsy. *Pharmacopsychiatry*, 364:150-155.

Meltzer, H. Y. 1999. The role of serotonin in antipsychotic drug action. *Neuropsychopharmacology*, 21(2S):106S-115S.

Meng, et al. 1991. Synthetic approaches toward glidobamine, the core structure of the glidobactin antibiotics. *Tetrahedron*, 47(32):62510-6264.

Micovic, et al. 1991. A simple method for preparation of secondary aromatic amines. *Synthesis*, 11:1043-1045.

Miyata, et al. 2000. Sarpogrelate, a selective 5-HT$_{2A}$ serotonergic receptor antagonist, inhibits serotonin-induced coronary artery spasm in a porcine model. *Journal of Cardiovascular Pharmacology*, 35(2) 294-301.

Möhrle, et al. 1990. Sodium mercury edetate dehydrogenation of N-aliphatic substituted 1,2,3,6-tetrahydropyridine derivatives. *Arch. Pharm. (Weinheim)*, 323:109-115.

Moune, et al. 1997. Total synthesis of dolatrienoic acid: A subunit of dolastatin 14. *J. Org. Chem.*, 62:3332-3339.

Mullen et al. 2000. (-)-Spiro[1-azabicyclo[2.2.2]octane-3,5'-oxazolidin-2'one], a conformationally restricted analogue of acetyl-choline, is a highly selective full agonist at the α7 nicotinic acetyl-choline receptor. *J. Med. Chem.*, 43:4045-4050.

Muri, et al. 1998. Synthesis of new benzylic ethers of oximes derived from 1-phenyl-pyrazole compounds. *Synthetic Communications*, 28(7):1299-1321.

Nigam, et al. 1957a. Studies with acetylenes. Part II. Some reactions of Grignard reagents with propargylic halides. Model linoleic acid and linolenic acid systems. *J. Chem. Soc.*, pp. 3868-3873.

Nigam, et al. 1957b. The conversion of fatty acids into aldehydes. *J. Chem. Soc.*, pp. 3320-3321.

Ogawa, et al. 2005. Effects of R-102444 and its active metabolite R-96544, selective 5-HT2A receptor antagonists, on experimental acute and chronic pancreatitis: Additional evidence for possible involvement of 5-HT2A receptors in the development of experimental pancreatitis. European Journal of Pharmacology, 521:156-163.

Olah, et al. 1956. Notiz über die *n*-formylierung von aminen mit formylfluorid. *Chem. Ber.*, 89:2211-2212.

Old, et al. 2002. Efficient palladium-catalyzed *n*-arylation of indoles. *Organic Letters*, 2(10):1403-1406.

Paiva, et al. 1988. Effects of ritanserin on sleep disturbances of dysthymic patients. *Psychopharmacology*, 96:395-399.

Patel, et al. 2004. The highly selective 5-hydroxytryptamine (5-HT)$_{2A}$ receptor antagonist, EMD 281014, significantly increases swimming and decreases immobility in male congenital learned helpless rats in the forced swim test. *Synapse*, 52:73-75.

Pierce, et al. 1995. 5-hydroxytryptamine-induced synovial plasma extravasation is mediated *via* 5-hydroxytryptamine2A receptors on sympathetic efferent terminals. *The Journal of Pharmacology and Experimental Therapeutics*, 275(1):502-508.

Read, W. T. 1922. Researches on hydantoins. Synthesis of the soporific, 4,4-phenylethyl-hydantoin(nirvanol). *J. Am. Chem. Soc.*, 44:1746-1755.

Ricci, A. 2000. *Modern Animation Methods*. New York: Wiley-VCH.

**US 7,601,740 B2**

Page 4

Rice, et al. 1955. Raney nickel catalyzed n-alkylation of aniline and benzidine with alcohols. *J. Am. Chem. Soc.*, 77:4052-4054.

Rubiralta, M., Giralt, E., & Diez, A. 1991. *Studies in Organic Chemistry 43. Piperidine: Structure, Preparation, Reactivity and Synthetic Applications of Piperidine and its Derivatives*. New York: Elsevier.

Scheibye, et al. 1978. Studies on organophosphorus compounds XXI. The dimer of *p*-methoxyphenylthionophosphine sulfide as thiation reagent. A new route to thiocarboxamides. *Bull. Soc. Chim. Belg.*, 87:229-238.

Schins, et al. 2003. Increased coronary events in depressed cardiovascular patients: 5-HT$_{2A}$ receptor as missing link? *Psychosomatic Medicine*, 65:729-737.

Screttas, et al. 1978. Hydrolithiation of α-olefins by a regiospecific two-step process. Transformation of alkyl phenyl sulfides to alkyllithium reagents. *J. Org. Chem.*, 43(6):1064-1071.

Sharpley, et al. 1994. Slow wave sleep in humans: Role of 5-HT$_{2A}$ and 5-HT$_{2C}$ receptors. *Neuropharmacology*, 33(3/4):467-471.

Smith, et al. 1995. New spiropiperdines as potent and selective nonpeptide tachykinin NK$_2$ receptor antagonists. *J. Med. Chem.*, 38(19):3772-3779.

Stefancich, et al. 1984. Agenti antiinfiammatori non-steroidei: Nola III—sintesi ed attivita analgesica-antiinfiammatoria di 4-(pirrol-1-il)-fenilacetamidi e di 4-(pirrol-1-il)fenetilamine. *Farmaco Ed. Sci.*, 39(9):752-764.

Stryjer, et al. 2003. Treatment of neuroleptic-induced akathisia with the 5-HT$_{2A}$ antagonist trazodone. *Clinical Neuropharmacology*, 26(3):137-141.

Tolstikov et al.1991 "Synthesis and Reactivity of N-substituted aminoamides, antiarrhythmic and local anaesthetic activity" *Russian Chemical Reviews* 60(4):420434.

Tsukamoto, et al. 1995. Synthesis and structure-activity studies of a series of 1-oxa-2,8-diazaspiro[4.5]decan-3-ones and related compounds as M$_1$ muscarinic agonists. *Chem. Pharm. Bull.*, 43(9):1523-1529.

Van Laar, et al. 2001. Subchronic effects of the GABA-agonist lorazepam and the 5-HT$_{2A/2C}$ antagonist ritanserin on driving performance, slow wave sleep and daytime sleepiness in healthy volunteers. *Psychopharmacology*, 154:189-197.

Varma, et al. 1999. Microwave-accelerated solvent-free synthesis of thioketones, thiolactones, thioamides, thionoesters, and thioflavonoids. *Organic Letters*, 1(5):697-700.

Viola, et al. 2002. Ritanserin, a serotonin-2 receptor antagonist, improves ultradian sleep rhythmicity in young poor sleepers. *Clinical Neurophysiology*, 113:429-434.

Vogel, A. I. 1948. Physical properties and chemical constitution. Part XIX. Five-membered and six-membered carbon rings. *J. Chem. Soc.*, pp. 1809-1813.

Vogl, et al. 2002. Palladium-catalyzed monoarylation of nitroalkanes. *J. Org. Chem.*, 67(1):106-111.

Wade, et al. 2000. Application of base cleavable safety catch linkers to solid phase library production. *J. Comb. Chem.*, 2(3):266-275.

Whitmore, et al. 1942. Abnormal Grignard reactions. XII. Sterically hindered aliphatic carbonyl compounds. II. Ketones containing the dineopentylcarbinyl group. *J. Am. Chem. Soc.*, 64:1247-1251.

Whitmore, et al. 1947. Higher hydrocarbons. IV. Six phenyleicosanes and six cyclohexyleicosanes. *J. Am. Chem. Soc.*, 69:235-237.

Wolf, V. V. 1952. Über alkin-amine I. Aryl-propargyl-amine. *Liebigs Ann. Chem.*, 576:35-45.

Wolfe, et al. 1996. An improved catalyst system for aromatic carbonnitrogen bond formation: The possible involvement of bis(phosphine) palladium complexes as key intermediates. *J. Am. Chem. Soc.*, 118:7215-7216.

Yamada, et al. 1998. Alternative synthesis of TTF donors with a dioxolane ring, and synthesis of their dithiolane and oxathiolane analogues. *Tetrahedron Letters*, 39:7709-7712.

Yang, et al. 1999. Palladium-catalyzed amination of aryl halides and sulfonates. *Journal of Organometallic Chemistry*, 576:125-146.

Yasuhara, et al. 2000. An activated phosphate for an efficient amide and peptide coupling reagent. *J. Chem. Soc., Perkins Trans. 1*, 17:2901-2902.

Yin, et al. 2002. Pd-catalyzed intermolecular amidation of aryl halides: The discovery that xantphos can be trans-chelating in a palladium complex. *J. Am. Chem. Soc.*, 124:6043-6048.

Notice of Allowance and Fee(s) Due and Notice of Allowability dated May 15, 1997, from U.S. Appl. No. 08/273,669, filed Jul. 12, 1994, now U.S. Pat. No. 5,707,798.

Office Action dated Mar. 27, 1998, from U.S. Appl. No. 08/954,724, filed Oct. 20, 1997, now U.S. Pat. No. 5,912,132.

Notice of Allowance and Fee(s) Due and Notice of Allowability dated Sep. 4, 1998, from U.S. Appl. No. 08/954,724, filed Oct. 20, 1997, now U.S. Pat. No. 5,912,132.

Office Action dated Sep. 14, 1998, from U.S. Appl. No. 08/965,947, filed Nov. 7, 1997, now U.S. Pat. No. 5,955,281.

Interview Summary dated Nov. 17, 1998, from U.S. Appl. No. 08/965,947, filed Nov. 7, 1997, now U.S. Pat. No. 5,955,281.

International Search Report dated Jul. 17, 2001 for PCT/US01/07187.

Written Opinion dated Sep. 22, 2002 for PCT/US01/07187.

Office Action dated Feb. 28, 2001, from U.S. Appl. No. 09/413,626, filed Oct. 6, 1999, now U.S. Pat. No. 6,358,698.

Notice of Allowance and Fee(s) Due and Notice of Allowability dated Nov. 20, 2001, from U.S. Appl. No. 09/413,626, filed Oct. 6, 1999, now U.S. Pat. No. 6,358,698.

Office Action dated Jan. 17, 2006, from U.S. Appl. No. 11/154,083, filed Jun. 26, 2005.

International Search Report dated May 8, 2003 for PCT/US02/41476.

International Search Report dated Jan. 30, 2006, for PCT/US2005/034813.

Written Opinion of the International Searching Authority dated Jan. 30, 2006, for PCT/US2005/034813.

International Search Report dated Jan. 30, 2006, for PCT/US2005/034376.

Written Opinion of the International Searching Authority dated Jan. 30, 2006, for PCT/US2005/034376.

Office Action dated Nov. 4, 2004, from U.S. Appl. No. 10/601,070, filed Jun. 20, 2003.

International Preliminary Report on Patentability dated Mar. 27, 2007, for PCT/US2005/034376.

International Preliminary Report on Patentability dated Mar. 27, 2007, for PCT/US2005/034813.

Office Action dated Apr. 6, 2007, from U.S. Appl. No. 11/418,322, filed May 3, 2006.

Office Action dated May 8, 2007, from U.S. Appl. No. 11/417,866, filed May 3, 2006.

Notice of Allowance and Fee(s) Due and Notice of Allowability dated Mar. 5, 2007, from U.S. Appl. No. 10/601,070, filed Jun. 20, 2003.

Office Action dated Feb. 5, 2007, from U.S. Appl. No. 11/299,566, filed Dec. 12, 2005.

Notice of Allowance and Fee(s) Due and Notice of Allowability dated Jun. 19, 2007, from U.S. Appl. No. 11/418,322, filed May 3, 2006.

International Search Report and Written Opinion from PCT/US2005/017808 mailed Sep. 29, 2005.

Kalgutkar, et al. 1995. Selective inhibitors of monoamine oxidase (MAO-A and MAO-B) as probes of its catalytic site and mechanism. *Medicinal Research Reviews*, 15(4)325-388. XP002034298.

Office Action dated Apr. 25, 2002, from U.S. Appl. No. 09/800,096, now U.S. Pat. No. 6,815,458.

Office Action dated Jan. 21, 2003, from U.S. Appl. No. 09/800,096, now U.S. Pat. No. 6,815,458.

Office Action dated Jul. 15, 2003, from U.S. Appl. No. 09/800,096, now U.S. Pat. No. 6,815,458.

Notice of Allowability dated Dec. 8, 2003, from U.S. Appl. No. 09/800,096, filed Mar. 6, 2001, now U.S. Pat. No. 6,815,458.

Notice of Allowance and Fee(s) Due and Notice of Allowability dated Dec. 5, 2003, from U.S. Appl. No. 10/409,782, filed Apr. 7, 2003, now U.S. Pat. No. 6,756,393.

International Preliminary Examination Report dated Mar. 18, 2003, for PCT/US01/07187.

Office Action dated May 21, 2004, from U.S. Appl. No. 10/329,719, filed Dec. 23, 2002, now U.S. Pat. No. 6,911,452.

Notice of Allowance and Fee(s) Due and Notice of Allowability dated Feb. 11, 2005, from U.S. Appl. No. 10/329,719, filed Dec. 23, 2002, now U.S. Pat. No. 6,911,452.

Office Action dated Jun. 26, 2006, from U.S. Appl. No. 11/154,083, filed Jun. 26, 2005.

**US 7,601,740 B2**

Page 5

Notice of Allowability, Notice of Allowance and Fee(s) Due, and Interview Summary dated Dec. 15, 2006, from U.S. Appl. No. 11/154,083, filed Jan. 16, 2005.

Office Action dated Oct. 5, 2006, from U.S. Appl. No. 11/418,322, filed May 3, 2006.

Office Action dated Jan. 23, 2007, from U.S. Appl. No. 11/418,322, filed May 3, 2006.

Written Opinion dated Sep. 9, 2003, for PCT/US02/41476.

International Preliminary Examination Report dated Jan. 15, 2004, for PCT/US02/41476.

Office Action dated Nov. 4, 2004, from U.S. Appl. No. 10/601,070, filed Jun. 20, 2003.

Notice of Allowance and Fee(s) Due and Notice of Allowability dated Jul. 12, 2005, from U.S. Appl. No. 10/601,070, filed Jun. 20, 2003.

Notice of Allowance and Fee(s) Due and Notice of Allowability dated Mar. 29, 2006, from U.S. Appl. No. 10/601,070, filed Jun. 20, 2003.

International Search Report for PCT/US03/19797 dated Dec. 3, 2003.

Written Opinion for PCT/US03/19797 dated Apr. 5, 2004.

International Preliminary Examination Report for PCT/US03/19797 dated Jul. 28, 2004.

International Search Report for PCT/US2004/001234 dated Sep. 8, 2004.

International Written Opinion for PCT/US2004/001234 dated Sep. 8, 2004.

International Preliminary Report on Patentability for PCT/US2004/001234 dated Apr. 14, 2005.

Friedman, J.H., "Clozapine Treatment of Psychosis in Patients with Tardive Dystonia: Report of Three Cases." (Movement Disorders Official Journal of the Movement Disorder Society), May 1994, vol. 9, No. 3:321-324.

Yoshida, K. et al. "Marked Improvement of Tardive Dystonia After Replacing Haloperidol with Risperidone in a Schizophrenic Patient." (Clinical Neuropharmacology), 1998, vol. 21, No. 1:68-69.

Delecluse, F. et al. "A Case of Tardive Tremor Successfully Treated with Clozapine." (Movement Disorders Official Journal of the Movement Disorder Society), Sep. 1998, vol. 13, No. 5: 846-847.

Factor, S.A., et al. "Clozapine Prevents Recurrence of Psychosis in Parkinson's Disease." (Movement Disorders Official Journal of the Movement Disorder Society), 1992, vol. 7, No. 2: 125-131.

Factor, et al. "Clozapine for the Treatment of Drug-Induced Psychosis in Parkinson's Disease: Results of the 12 Week Open Label Extension in the PSYCLOPS Trial." (Movement Disorders Official Journal of the Movement Disorder Society), Jan. 2001, vol. 16, No. 1: 135-139.

Herrick-Davis, et al. "Inverse Agonist Activity of Atypical Antipsychotic Drugs at Human 5-Hydroxytryptamine2C Receptors" (The Journal of Pharmacology and Experimental Therapeutics),Oct. 2000, vol. 295, No. 1: 226-232.

Delecluse, et al. "A Case of Tardive Tremor Successfully Treated with Clozapine" (Movement Disorders Official Journal of the Movement Disorder Society), 1998, vol. 13, No. 5: 846-847.

International Search Report mailed on Sep. 8, 2004.

Written Opinion mailed on Dec. 15, 2004.

Barchas, et al., Serotonin and Behavior, pp. 483-498, 523-560 (1973).

Birkmayer, W., Danielczyk, W., Neumayer, E., and Riederer, P., "Nucleus Ruber and L-Dopa Psychosis: Biochemical Post-Mortem Findings," Journal of Neural Transmission, 35:93-116 (1974).

Bouillin, Serotonin In Mental Abnormalities, pp. 119-181 (1978).

Eichelbaum, et al., "Proceedings of the Australasian Society of Clinical and Experimental Pharmacologists and Toxicologists: Influence of Pharmacogenetics on Drug Disposition and Response," Clin. Exp. Pharmacol. Physiol., 23:983-985 (1996).

Barnes, N.M., et al., "A review of central 5-HT receptors and their function," Neuropharmacology, 38:1083,1152 (1999).

Barr, A.J., et al., "Agonist-independent Activation of $G_z$ by the 5-Hydroxytryptamine$_{1A}$ Receptor Co-expressed in Spodoptera frugiperda Cells," J. Biol. Chem. 272:32979-87 (1997).

Bennett, J. P., Landow, E., R., and Shuh, L., A. (1993) "Suppression of dyskinesias in advanced Parkinson's Disease. II Increasing daily clozapine doses suppress dyskinesias and improve parkinsonism symptoms," Neurology, 43: 1551-1555.

Bibbiani, F., Oh, F., D., and Chase, T., C. (2001) "Serotonin 5-HT1A agonist improves motor complications in rodent and primate parkinsonian models," Neurology, 57: 1829-1834.

Bond, et al., "Physiological effects of inverse agonists in transgenic mice with myocardial overexpression of the $\beta_2$-adrenoceptor," Nature 374:272 (1995).

Brann, "Identificaion of ligands by selective amplification of cells transfected with receptors and marker enzymes," Chem. Abstr. 128:111548 (1998) and citations therein.

Butcher, L., Engel, J., and Fuxe, K. (1970) "L-Dopa induced changes in central monoamine neurons after peripheral decarboxylase inhibition," J. Pharm. Pharmac., 22: 313-316.

Cerione et al., "The Mammalian $\beta_2$-Adrenergic Receptor: Reconstitution of Functional Interactions between Pure Receptor and Pure Stimulatory Nucleotide Binding Protein of the Adenylate Cyclase System," Biochemistry 23:4519-25 (1984).

Durif, F., Vidailhet, M., Assal, F., Roche, C., Bonnet, A., M., and Agid, Y. (1997) "Low-dose clozapine improves dyskinesias in Parkinson's disease," Neurology, 48: 658-662.

Everett, G., M., and Borcherding, J., W. (1970) "L-dopa: Effect on Concentrations of Dopamine, Norepinephrine, and Serotonin in Brains of Mice," Nature, 168: 849-850.

The French Clozapine Study Group (1999) "Clozapine in drug-induced psychosis in Parkinson's disease," Lancet, 353: 2041-2042.

Friedman, J. H., and Factor., S., A. (2000) "Atypical Antipsychotics in the Treatment of Drug-Induced Psychosis in Parkinson's Disease," Mov. Disord, 15(2): 201-211.

Fuller, R.W., "Drugs Acting on Serotonergic Neuronal Systems," Biology of Serotonergic Transmission, 1982, pp. 221-247.

Gamma, A., Buck, A., Berthold, T., Liechti, M., E., and Vollenweider, F., X. (2000) "3,4-Methylenedioxymethamphetamine (MDMA) Modulates Cortical and Limbic Brain Activity as Measured by [$H_2^{15}$O]-PET in Healthy Humans," Neuropsychopharmacology, 23(4): 388-395.

Gershon, et al. "5-Hydroxytryptamine and enteric neurones," The Peripheral Actions of 5-Hydroxytryptamine, pp. 247-273 (1989).

Glennon, "Serotonin Receptors: Clinical Implications," Neurosci. Biobehavioral Rev., 14:35-47 (1990).

Julius et al., "The 5HT2 receptor defines a family of structurally distinct but functionally conserved serotonin receptors," Proc. Natl. Acad. Sci. USA 87:928-932.

Leysen, J., E., Niemegeers, C., J., Tollenaraere, J., P., and Laduron, P., M. (1978) "Serotonergic component of neuroleptic receptors," Nature (Lond) 272: 168-171.

Liechti, M., E., Geyer, M., A., Hell, D., and Vollenweider, F., X. (2001) "Effects of MDMA(ecstasy) on Prepulse Inhibition and Habituation of Startle in Humans after Pretreatment with Citalopram, Haloperidol, or Ketanserin," Neuropsychopharmacology, 24(3): 240-252.

Linder, "Pharmacogenetics: a laboratory tool for optimizing therapeutic efficiency," Clin. Chem. 43:254-66 (1997).

Meltzer, "The Role of Serotonin in Antipsychotic Drug Action," Neuropsychopharmacology, 21:106S-115S (1999).

Meltzer, H., Y., Kennedy, J., Dai, J., Parsa, M., and Riley, D. (1995) "Plasma Clozapine Levels and the Treatment of L-DOPA-Induced Psychosis in Parkinson's Disease. A High Potency Effect of Clozapine," Neuropsychopharmacology, 12(1): 39-45.

Moulignier, A., "Récepteurs Centraux de la Sérotonine Principaux Aspects Fondamentaux et fonctionnels Applications Thérapeutiques," Rev. Neurol. 150:3-15, (1994).

Ng, K., Y., Chase, T., N., Colburn, R., W., and Kopin, I., J., (1970) "L-Dopa Induced Release of Cerebral Monoamines," Science, 170: 76-77.

Nordstrom, A., L., Farde, L., and Halldin, C. (1993) "High 5-HT2 receptor occupancy in clozapine treated patients as demonstrated by PET," Psychopharmacology, 110(3): 365-367.

Pace et al., "A mutant $\alpha$ subunit of $G_{i2}$ induces neoplastic transformation of Rat-1 cells," Proc. Natl. Acad. Sci. USA 88:7031-35 (1991).

The Parkinson Study Group (1999) "Low-Dose Clozapine for the Treatment of Drug-Induced Psychosis in Parkinson's Disease," New Eng. J. Med., 340(10): 757-763.

**US 7,601,740 B2**

Page 6

Sadzot, B., Baraban, J., M., Glennon, R., A., Lyon, R., A., Leonhardt, S., Jan, C., R., and Tietler, M. (1989) "Hallucinogenic drug interactions at human brain 5-HT$_2$ receptors; implications for treating LSD-induced hallucinogenesis," *Psychopharmacology*, 98(4): 495-499.

Saltzman et al., "Cloning of the Human Serotonin 5-HT2 and 5-HT1C Receptor Subtypes," *Biochem. Biophys. Res. Comm.* 181:1469-78.

Saxena, et al, "Cardiovascular Effects of Serotonin Agonists and Antagonists," *J. Cardiovascular Pharmacol.* 15: Supp. 7 (1990), pp. S17-S34.

Vallat et al., "Altered G$_s$ and adenylate cyclase activity in human GH-secreting pituitary adenomas," *Nature* 330:556-58 (1987).

Weiner, D., M., Burstein, E., S., Nash, N., Croston, G., E., Currier, E., A., Vanover, K., E., Harvey, S., C., Donohue, E., Hansen, H., C., Andersson, C., M., Spalding, T., A., Gibson, D., F., Krebs-Thomson, K., Powell, S., B., Geyer, M., A., Hacksell, U., and Brann, M., R. (2001) "5-Hydroxytryptamine$_{2A}$ Receptor Inverse Agonists as Antipsychotics," *J Pharmacol Exp Ther.*, 299(1): 268-76.

Borman et al., "5-HT$_{2B}$ receptors play a key role in mediating the excitatory effects of 5-HT in human colon in vitro," *Br. J. Pharmacol.*, vol. 135, No. 5, pp. 1144-1151 (2002).

Choi et al., "5HT2B receptor-mediated serotonin morphogenic functions in mouse cranial neural crest and myocardiac cells," *Development*, vol. 124, pp. 1745-1755, (1997).

Cox, R., "Medicinal Chemistry- 28th International Symposium: Jun. 8-12, 2002, San Diego, CA, USA," *IDrugs*, vol. 5, No. 7, pp. 626-632 (2002).

Fitzgerald et al., "Possible Role of Valvular Serotonin 5-HT$_{2B}$ Receptors in the Cardiopathy Associated with Fenfluramine," *Molecular Pharmacol.* vol. 57, pp. 75-81 (1999).

Glazer, W.M., "Extrapyramidal side effects, tardive dyskinesia, and the concept of atypicality," *J. Clin. Psychiatry*, vol. 61, Supp. 3, pp. 16-21 (2000).

Ito et al., "Prediction of Human Drug Clearance from in Vitro and Preclinical Data Using Physiologically Based and Emperical Approaches," *Pharm. Res.*, vol. 22, No. 1, pp. 103-112 (2005).

Johnston et al., "Drugs in Development for Parkinson's Disease: An Update," *Current Opin. Investig. Drugs*, vol. 7, No. 1, pp. 25-32 (2006).

Kay, G.G., "The effects of antihistamines in cognition and performance," *J. Allergy Clin. Immunol.*, vol. 105, No. 6, Pt. 2, pp. S622-S627 (2000).

Maubach, K., "Psychiatric Drug Discovery and Development," *Expert Opin. Investig. Drugs.*, vol. 12, No. 9, pp. 1571-1575 (2003).

Meltzer et al., "Serotonin Receptors: Their Key Role in Drugs to Treat Schizophrenia," *Progress in Neuro-Psychopharmacology & Biol. Psych.*, vol. 27, pp. 1159-1172 (2003).

Morgan et al., "Emerging Drugs for Parkinson's Disease," *Expert Opin. Emerging Drugs.*, vol. 11, No. 3, pp. 403-417 (2006).

Naritomi et al., "Prediction of human hepatic clearance from in vivo animal experiments and in vitro metabolic studies with liver microsomes from animals and humans," *Drug Metab. Dispos.*, vol. 29, No. 10, pp. 1316-1324 (2001).

Negibil et al., "Serotonin 2B receptor is required for heart development," *PNAS*, vol. 97, No. 17, pp. 9508-9513 (2000).

Negibil et al., "Ablation of Serotonin 5-HT2B Receptors in Mice Leads to Abnormal Cardiac Structure and Function," *Circulation*, vol. 103, pp. 2973-2979 (2001).

Negibil et al., "Serotonin is a novel survival factor of cardiomyocytes: mitochondria as a target of 5-HT$_{2B}$ receptor signaling," *FASEB J.*, vol. 27, No. 10, pp. 1373-1375 (2003).

Obach et al., "The Prediction of Human Pharmacokinetic Parameters from Preclinical and In Vitro Metabolism Data," *J. Pharm. Exp. Therap.*, vol. 283, No. 1, pp. 46-58 (1997).

Roberts, C. "Drug Evaluation: ACP-103, a 5-HT2A Receptor Inverse Agonist," *Current Opin. Investig. Drugs*, vol. 7, No. 7, pp. 653-660 (2006).

Scriabine, A., "Psychiatric Drug Discovery and Development," *CNS Drug Rev.*, vol. 9, No. 3, pp. 319-326 (2003).

Sica, D.A., "Alpha$_1$-Adrenergic Blockers: Current Usage Considerations," *J. Clin. Hypertension*, vol. 7, pp. 757-762 (2005).

Stoner et al., "Integrated oral bioavailability projection using in vitro screening data as a selection tool in drug discovery," *Int. J. Pharm.*, vol. 269, No. 1, pp. 241-249 (2004).

Vanover et al., "ACP-103, A 5-HT2A Receptor Inverse Agonist, A Novel Potential Treatment for Psychosis," *Schizophrenia Research*, vol. 60, No. 1, Supp. [S], p. 317 (2003).

Vanover et al., "ACP-103, A 5-HT2A Receptor Inverse Agonist: Safety, Tolerability and Pharmacokinetics in Healthy Volunteers," *International J. Neuropsychopharmacology*, vol. 7, No. Supp. 2, pp. S253 (2004).

Vanover et al., "Pharmacological Characterization of AC-90179[2-(4-Methoxy-phenyl)-N-(4-methyl-benzyl)-N-(1-methyl-piperidiny-4-yl)-acetamide Hydrochloride]: A Selective Serotonin 2A Receptor Inverse Agonist," *J. Pharmacology & Experimental Therapeutics*, vol. 310, No. 3, pp. 943-951 (2004).

Vanover et al., "Pharmacological and Behavioral Profile of N-(4-fluorophenylmethyl)-N-(1-methylpiperidin'4-yl)-N'-(4-(2-methylpropyloxy)phenylmethyl) Carbamide (2R, 3R)-Dihydroxybutanedioate (2:1) (ACP-103), a Novel 5-Hydroxytrptamine 2A Receptor Inverse Agonist," *J. Pharmacology & Experimental Therapeutics*, vol. 317, No. 2, pp. 910-918 (2006).

Wirshing et al., "Novel Antipsychotics: Comparison of Weight Gain Liabilities," *J. Clin. Psychiatry*, vol. 21, No. 6, pp. 579-587 (1999).

R & D Focus Drug News, vol. 9, No. 3, pp. 1-12 (Jan. 24, 2000).

R & D Focus Drug News, vol. 10, No. 44, pp. 1-6 (Nov. 12, 2001).

Office Action dated Aug. 22, 2007 in U.S. Appl. No. 11/122,293, filed May 4, 2005.

Letter in response to Written Opinion of the Preliminary Examining Authority in PCT/US2004/001234, dated Mar. 14, 2005.

Reply to Communication in European Patent Application No. 04702584.6-2123, dated Aug. 16, 2006.

Reply to Communication in European Patent Application No. 04702584.6-2123, dated May 4, 2007.

Written Opinion of the Preliminary Authority in in PCT/US2004/001234, dated Dec. 15, 2004.

Official Communication in European Patent Application No. 04702584.6-2123, dated Apr. 5, 2006.

Official Communication in European Patent Application No. 04702584.6-2123, dated Feb. 23, 2007.

* cited by examiner

Case 1:20-cv-00985-GBW   Document 258-2   Filed 04/28/23   Page 8 of 30 PageID #: 4840

**U.S. Patent**        Oct. 13, 2009        Sheet 1 of 4                US 7,601,740 B2



Figure 1A                      Figure 1B

JSUF0012



## Figure 2A



## Figure 2B

**U.S. Patent**          Oct. 13, 2009          Sheet 3 of 4          US 7,601,740 B2



Figure 3

Case 1:20-cv-00985-GBW   Document 258-2   Filed 04/28/23   Page 11 of 30 PageID #: 4843

**U.S. Patent**      Oct. 13, 2009      Sheet 4 of 4      US 7,601,740 B2



**Figure 4**

JSUF0015

US 7,601,740 B2

# SELECTIVE SEROTONIN 2A/2C RECEPTOR INVERSE AGONISTS AS THERAPEUTICS FOR NEURODEGENERATIVE DISEASES

## RELATED APPLICATIONS

This application claims priority to U.S. Provisional Application No. 60/441,406, filed Jan. 16, 2003, and U.S. Provisional Application No. 60/479,346, filed Jun. 17, 2003, both by Weiner et al. and entitled "SELECTIVE SEROTONIN 2A/2C RECEPTOR INVERSE AGONISTS AS THERAPEUTICS FOR NEURODEGENERATIVE DISEASES," both of which are hereby incorporated by reference in their entireties.

## FIELD OF THE INVENTION

The present invention relates to the therapeutic use of N-(1-methylpiperidin-4-yl)-N-(4-flourophenylmethyl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and related serotonin 2A/2C receptor inverse agonists to treat a variety of human neurodegenerative diseases including Parkinson's Disease, Huntington's Disease, Lewy Body Dementia, and Alzheimer's Disease. Specifically, these agents improve motor function in Parkinson's Disease, and Huntington's Disease. Specifically, N-(1-methylpiperidin-4-yl)-N-(4-flourophenylmethyl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and related compounds can be used to control the behavioral and neuropsychiatric manifestations present in all of these disease states. Pharmaceutical compositions comprised of a combination of N-(1-methylpiperidin-4-yl)-N-(4-flourophenylmethyl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide and existing therapeutic agents are also disclosed.

## BACKGROUND OF THE INVENTION

Neurodegenerative disorders (NDs) are a group of related human maladies that share a common pathophysiological feature, the progressive degeneration of selective neuronal populations over the course of time. These neurodegenerative diseases include but are not limited to Alzheimer's Disease and related dementias, Parkinson's Disease, Huntington's Disease, Lewy Body Disease and related movement disorders, and Friedrich's Ataxia and related Spinocerebellar Ataxia's. Each of these disorders has unique clinical aspects including age of onset, time course of progression, neurological signs and symptoms, neuropsychiatric symptoms, and sensitivity to known therapeutic agents. In addition, the pathophysiological basis of each of these disorders is caused by genetic mechanisms unique to each disease.

Despite significant progress in elucidating the genetic causes underlying these disparate disorders, relatively little is known about the biochemical mechanisms that cause the selective neuronal degeneration common to all of them. In addition, for the most common of these disorders, including Parkinson's Disease and Alzheimer's Disease, the genetic factors that cause the rare familial forms of these diseases have been discovered, but the pathophysiological basis of the vast majority of sporadic cases is still unknown. Because of this, no specific therapeutic agents currently exist that can directly modify disease progression. Instead, clinicians utilize a variety of existing agents to provide symptomatic relief of the motor, cognitive, and neuropsychiatric manifestations that characterize these disorders. None of these existing agents were designed and developed to specifically treat patients with NDs.

Of the various neurological symptoms that characterize the NDs, abnormalities of motor function, including bradykinesias, dyskinesias and chorea, and the emergence of neuropsychiatric symptoms, including psychosis, and affective symptoms such as anxiety and depression, are common and severely impact upon the patient's functional status and quality of life. Unfortunately, most existing therapeutic agents, including antipsychotics and antidepressants, often demonstrate efficacy, yet are very poorly tolerated in these patients. In addition, the available therapeutic agents for Parkinson's Disease, including L-dopa and dopamine agonists, while generally effective, cause the emergence of severe treatment-limiting side effects that are currently intractable to pharmacotherapy.

Multiple factors, both disease and drug related, are primarily responsible for the limited tolerability of these agents. First, patients with neurodegenerative disease are particularly sensitive to most therapeutic agents that are designed to cross the blood-brain barrier and interact with neuronal targets that confer efficacy against adverse motoric or neuropsychiatric symptoms. For instance, atypical antipsychotics are generally well tolerated by healthy volunteers, or in patients with primary psychiatric disorders like schizophrenia; brain states that are not characterized by neuronal degeneration. In contrast, when these agents are administered to patients with Parkinson's or Huntington's Disease, they display severe, treatment-limiting adverse effects on motor function, cause severe sedation, and can worsen cognitive functioning. The direct effects of the neuronal loss characteristic of NDs, and the adaptive changes that occur secondarily to this are both posited to create a neurochemical and/or neurophysiological state in ND patients that confer this extra sensitivity.

Second, the known mechanisms of action of these drugs, including antagonism of dopamine receptors, is not tolerated in some patient populations secondary to specific alterations in distinct neuronal systems. For instance, Parkinson's patients have a relatively selective degeneration of the ascending dopaminergic neuronal systems, and as a consequence of this they are deficient in central dopamine neurotransmission. It is therefore not surprising that drugs that further attenuate dopaminergic neurotransmission, by blocking dopamine receptors, are not well tolerated.

Lastly, nearly all presently known therapeutic agents lack specificity in their mechanisms of action. Antipsychotic and antidepressant drugs possess a multitude of pharmacologically relevant interactions with critical neuronal proteins including a host of cell surface receptors, ion channels, and re-uptake transporters. This lack of drug target specificity is known to confer a variety of adverse effects in non-ND patient populations, which are qualitatively and quantitatively worse in ND patients.

These observations highlight the need to develop novel therapeutic agents that are specifically designed to not only demonstrate efficacy against these particular disabling symptoms but to also possess tolerability in these specific patient populations. This can be achieved by improving the selectivity of the drug target interactions of new therapeutic agents. Specifically, the development of agents with novel mechanisms of action that avoid the known pitfalls associated with existing agents is desired. In addition, improved selectivity can avoid the known adverse effects associated with interactions with non-efficacy conferring drug targets.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows plots of $D_2$ and 5-HT2A receptor agonist activity of Parkinson's Disease therapeutics as determined by

JSUF0016

US 7,601,740 B2

**3**

the physiologicaly predictive, cell-based, in vivo R-SAT assay. FIG. **1**A plots drug activity at human D₂ receptors. FIG. **1**B plots drug activity at human Serotonin 2A receptors.

FIG. **2**A is a plot of the efficacy of the compound of formula (I) in reducing MK-801 induced locomotor behaviors in rats against a control after s.c. administration over a ten (10) minute time period. FIG. **2**B is a plot of the efficacy of the compound of formula (I) in reducing MK-801 induced locomotor behaviors in rats against a control after oral administration over a thirty (30) minute time period.

FIG. **3** shows a bar graph that indicates three dosage levels of the compound of formula (I) and the effect of each dosage on reducing dyskinesia in a primate model.

FIG. **4** shows the affect of the compound of formula (I) on amphetamine induced hyperactivity in mice when used in combination with varying doses of Haloperidol.

SUMMARY OF THE INVENTION

Disclosed herein is a composition comprising a compound of Formula (I):



and a pharmaceutically acceptable carrier. In some embodiments, the composition further comprises an additional therapeutic agent. In some embodiments the additional therapeutic agent is selected from levodopa (SINEMET™, SINEMET-CR™, bromocriptine (PARLODEL™), pergolide (PERMAX™), ephenedrine sulfate (EPHEDRINE™), pemoline CYLERT™), mazindol (SANOREX™), d,1-α-methylphen-ethylamine (ADDERALL™), methylphendyate (RITALIN™), pramipexole (MIRAPEX™), modafinil (PROVIGIL™), and ropinirole (REQUIP™). In other embodiments, the additional therapeutic agent is an anti-dyskinesia agent selected from baclofen (Lioresal™), botulinum toxin (Botox™), clonazepam (Klonopin™), and diazepam (Valium™). In other embodiments, the additional therapeutic agent is an anti-dystonia, anti-myoclonus, or anti-tremor agent selected from baclofen (LIORESAL™), botulinum toxin (BOTOX™), clonazepam (KLONOPIN™), and diazepam (VALIUM™). In other embodiments, the additional therapeutic agent is an anti-psychotic agent with dopaminergic receptor antagonism. In other embodiments, the additional therapeutic agent is an anti-psychotic agent selected from chlorpromazine (THORAZINE™), haloperodol (HALDOL™), molindone (MOBAN™), thioridazine (MELLARIL™), a phenothiazine, a butyrophenome, diphenulbutylpiperinde (pimozide), thioxanthines (fluphenthixol), substituted benzamides (sulpiride), sertindole, amisulpride, risperidone, clozapine, olanzapine, ziprasidone, aripiprazole, and their active metabolites (N-desmethylclozapine, N-desmethylolanzapine, 9-OH-risperidone)).

**4**

Also disclosed herein is a method for treating a neurodegernative disease comprising: identifying a patient suffering from a neurodegenerative disease and administering to the patient an effective amount of an inverse agonist selective for a serotonin receptor; whereby the dopaminergic therapy associated dyskinesia is reduced. In some embodiments, the neurodegenerative disease is Parkinson's disease, Huntington's disease, Alzheimer's disease, Spinocerebellar Atrophy, Tourette's Syndrome, Friedrich's Ataxia, Machado-Joseph's disease, Lewy Body Dementia, Dystonia, Progressive Supranuclear Palsy, or Frontotemporal Dementia. In one embodiment, the serotonin receptor is a 5HT2A receptor. In another embodiment, the serotonin receptor is a 5HT2C receptor. In some embodiments, the inverse agonist binds to a 5HT2A receptor or a 5HT2C receptor. In some embodiments, the inverse agonist is the compound of formula (I). One embodiment further comprises administering a dopaminergic agent in combination with the compound of formula (I). In some embodiments, the reagent increases dopaminergic activity and is selected from the group consisting of levodopa, SINAMET™, SINAMETCR™, bromocriptine (PARLODEL™), pergolide (PERMAX™), ephenedrine sulfate (EPHEDRINE™), pemoline CYLERT™), mazindol (SANOREX™), d,1-α-methylphenethylamine (ADDERALL™), methylphendyate (RITALIN™), pramipexole (MIRAPEX™), modafinil (PROVIGIL™), and ropinirole (REQUIP™).

Also disclosed herein is, a method for treating dyskinesia associated with dopaminergic therapy comprising: identifying a patient suffering from dopaminergic therapy associated dyskinesia and administering to the patient an effective amount of an inverse agonist selective for a serotonin receptor; whereby the dopaminergic therapy associated dyskinesia is reduced. In one embodiment the serotonin receptor is a 5HT2A receptor. In another embodiment the serotonin receptor is a 5HT2C receptor. In some embodiments, the inverse agonist binds to a 5HT2A receptor and a 5HT2C receptor. In one embodiment, the inverse agonist is the compound of formula (I). Some embodiments further comprise administering an anti-dyskinesia agent in combination with the compound of formula (I). In some embodiments, the anti-dyskinesia agent is selected from the group consisting of baclofen (Lioresal™), botulinum toxin (Botox™), clonazepam (Klonopin™), and diazepam (Valium™). In some embodiments, the patient suffers from a neurodegenerative disease selected from the group consisting of Parkinson's disease, Huntington's disease, Alzheimer's disease, Spinocerebellar Atrophy, Tourette's Syndrome, Friedrich's Ataxia, Machado-Joseph's disease, Lewy Body Dementia, Dystonia, Progressive Supranuclear Palsy, and Frontotemporal Dementia.

Further disclosed herein is a method for treating dystonia, myoclonus, or tremor associated with dopaminergic therapy comprising: identifying a patient suffering from dopaminergic therapy associated dystonia, myoclonus, or tremor; and administering to the patient an effective amount of an inverse agonist selective for a serotonin receptor; whereby the dopaminergic therapy associated dystonia, myoclonus, or tremor is reduced. In one embodiment the serotonin receptor is a 5HT2A receptor. In another embodiment, the serotonin receptor is a 5HT2C receptor. In some embodiments, the inverse agonist binds to a 5HT2A receptor and a 5HT2C receptor. In some embodiments, the inverse agonist is the compound of formula (I). Some embodiments further comprise an anti-dystonia, anti-myoclonus, or anti-tremor agent in combination with the compound of formula (I). In some embodiments, the anti-dystonia, anti-myoclonus, or anti-tremor agent is selected from the group consisting of baclofen

JSUF0017

US 7,601,740 B2

5

(LIORESAL™), botulinum toxin (BOTOX™), clonazepam (KLONOPIN™), and diazepam (VALIUM™).

Also disclosed herein is a method for treating psychosis associated with dopaminergic therapy comprising: identifying a patient suffering from dopaminergic therapy associated psychosis; and administering to the patient an effective amount of an inverse agonist selective for a serotonin receptor; whereby symptoms of dopaminergic therapy associated psychosis is reduced. In one embodiment the serotonin receptor is a 5HT2A receptor. In another embodiment the serotonin receptor is a 5HT2C receptor. In some embodiments the inverse agonist binds to a 5HT2A receptor and a 5HT2C receptor. In some embodiments the inverse agonist is the compound of formula (I). Some embodiments further comprise an anti-psychotic agent in combination with the compound of formula (I). In some embodiments, the anti-psychotic agent is selected from the group consisting of chlorpromazine (THORAZINE™), haloperodol (HALDOL™), molindone (MOBAN™), thioridazine (MELLARIL™), a phenothiazine, a butyrophenome, diphenulbutylpiperinde (pimozide), thioxanthines (fluphenthixol), substituted benzamides (sulpiride), sertindole, amisulpride, risperidone, clozapine, olanzapine, ziprasidone, aripiprazole, and their active metabolites (N-desmethylclozapine, N-desmethylolanzapine, 9-OH-risperdone)). In some embodiments, the patient suffers from a neurodegenerative disease selected from the group consisting of Parkinson's disease, Huntington's disease, Alzheimer's disease, Spinocerebellar Atrophy, Tourette's Syndrome, Friedrich's Ataxia, Machado-Joseph's disease, Lewy Body Dementia, Dystonia, Progressive Supranuclear Palsy, and Frontotemporal Dementia.

Also disclosed herein is a method for treating a neuropsyhiatric disease comprising: identifying a patient suffering from a neuropsyhiatric disease; and administering to the patient an effective amount of an inverse agonist selective for a serotonin receptor. In some embodiments, the neuropsychiatric disease is selected from the group consisting of schizophrenia, schizoaffective disorders, mania, behavioral disturbances associated with dementia and psychotic depression. In some embodiments the serotonin receptor is a 5HT2A receptor. In some embodiments the serotonin receptor is a 5HT2C receptor. In some embodiments the inverse agonist binds to a 5HT2A receptor or a 5HT2C receptor. In one embodiment, the inverse agonist is the compound of formula (I). Some embodiments further comprise administering an antipsychotic agent in combination with the inverse agonist, the anti-psychotic agent selected from the group consisting of chlorpromazine (THORAZINE™), haloperodol (HALDOL™), molindone (MOBAN™), thioridazine (MELLARIL™), a phenothiazine, a butyrophenome, diphenulbutylpiperinde (pimozide), thioxanthines (fluphenthixol), substituted benzamides (sulpiride), sertindole, amisulpride, risperidone, clozapine, olanzapine, ziprasidone, aripiprazole, and their active metabolites (N-desmethylclozapine, N-desmethylolanzapine, 9-OH-risperdone)).

Also disclosed herein is a compound having the structure of Formula (I):

(I)



6

Additionally disclosed herein is a method of inhibiting an activity of a monoamine receptor comprising contacting the monoamine receptor or a system containing the monoamine receptor with an amount of the compound of formula (I) that is effective in inhibiting the activity of the monoamine receptor. In some embodiments, the monoamine receptor is a serotonin receptor. In one embodiment the serotonin receptor is the 5-HT2A subclass. In some embodiments the serotonin receptor is in the central nervous system. In some embodiments the serotonin receptor is in the peripheral nervous system. In some embodiments the serotonin receptor is in blood cells or platelets. In some embodiments the serotonin receptor is mutated or modified. In some embodiments the activity is signaling activity. In some embodiments the activity is constitutive. In some embodiments the activity is associated with serotonin receptor activation.

Also disclosed herein is a method of inhibiting an activation of a monoamine receptor comprising contacting the monoamine receptor or a system containing the monoamine receptor with an amount of the compound of formula (I) that is effective in inhibiting the activation of the monoamine receptor. In some embodiments, the activation is by an agonistic agent. In some embodiments the agonistic agent is exogenous. In some embodiments the agonistic agent is endogenous. In some embodiments the activation is constitutive. In some embodiments the monoamine receptor is a serotonin receptor. In some embodiments the serotonin receptor is the 5-HT2A subclass. In some embodiments the serotonin receptor is in the central nervous system. In some embodiments the serotonin receptor is in the peripheral nervous system. In some embodiments the serotonin receptor is in blood cells or platelets. In some embodiments the serotonin receptor is mutated or modified.

Also disclosed herein is a method of treating a disease condition associated with a monoamine receptor comprising administering to a subject in need of such treatment a therapeutically effective amount of the compound of formula (I). In some embodiments the disease condition is selected from the group consisting of schizophrenia, psychosis, migraine, hypertension, thrombosis, vasospasm, ischemia, depression, anxiety, sleep disorders and appetite disorders. In some embodiments the disease condition is associated with dysfunction of a monoamine receptor. In some embodiments, the disease condition is associated with activation of a monoamine receptor. In some embodiments, the disease condition is associated with increased activity of monoamine receptor. In some embodiments, the monoamine receptor is a serotonin receptor. In some embodiments the serotonin receptor is the 5-HT2A subclass. In some embodiments the serotonin receptor is in the central nervous system. In some embodiments the serotonin receptor is in the peripheral nervous system. In some embodiments the serotonin receptor is in blood cells or platelets. In some embodiments, the serotonin receptor is mutated or modified.

Also disclosed herein is a method of treating schizophrenia comprising administering to a subject in need of such treatment a therapeutically effective amount of the compound of formula (I).

Also disclosed herein is a method of treating migraine comprising administering to a subject in need of such treatment a therapeutically effective amount of the compound of formula (I).

Also disclosed herein is a method of treating psychosis comprising administering to a subject in need of such treatment a therapeutically effective amount of the compound of formula (I).

JSUF0018

US 7,601,740 B2

7

Also disclosed herein is a method for identifying a genetic polymorphism predisposing a subject to being responsive the compound of formula (I), comprising: administering to a subject a therapeutically effective amount of said compound; measuring the response of said subject to said compound, thereby identifying a responsive subject having an ameliorated disease condition associated with a monoamine receptor; and identifying a genetic polymorphism in the responsive subject, wherein the genetic polymorphism predisposes a subject to being responsive to said compound. In some embodiments the ameliorated disease condition is associated with the 5-HT class or 5-HT2A subclass of monoaminergic receptors.

Additionally disclosed herein is a method for identifying a subject suitable for treatment with the compound of formula (I), comprising detecting the presence of a polymorphism in a subject wherein the polymorphism predisposes the subject to being responsive to the compound, and wherein the presence of the polymorphism indicates that the subject is suitable for treatment with the compound of formula (I).

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Definitions

For the purpose of the current disclosure, the following definitions shall in their entireties be used to define technical terms, and shall also, in their entireties, be used to define the scope of the composition of matter for which protection is sought in the claims.

"Constitutive activity" is defined as the elevated basal activity of a receptor that is independent of the presence of an agonist. Constitutive activity of a receptor may be measured using a number of different methods, including cellular (e.g., membrane) preparations (see, e.g., Barr &. Manning, *J. Biol. Chem.* 272:32979-87 (1997)), purified reconstituted receptors with, or without the associated G-protein in phospholipid vesicles (Cerione et al., *Biochemistry* 23:4519-25 (1984)), and functional cellular assays (U.S. Patent Application Ser. No. 60/103,317) or any other method known in the art.

"Agonist" is defined as a compound that increases the basal activity of a receptor when it contacts the receptor.

An "antagonist" is defined as a compound that competes with an agonist or inverse agonist for binding to a receptor, thereby blocking the action of an agonist or inverse agonist on the receptor. However, an antagonist (also known as a "neutral" antagonist) has no effect on constitutive receptor activity.

An "inverse agonist" is defined as a compound that decreases the basal activity of a receptor (i.e., signaling mediated by the receptor). Such compounds are also known as negative antagonists. An inverse agonist is a ligand for a receptor that causes the receptor to adopt an inactive state relative to a basal state occurring in the absence of any ligand. Thus, while an antagonist can inhibit the activity of an agonist, an inverse agonist is a ligand that can alter the conformation of the receptor in the absence of an agonist. The concept of an inverse agonist has been explored by Bond et al. in *Nature* 374:272 (1995). More specifically, Bond et al. have proposed that unliganded $\beta_2$-adrenoceptor exists in an equilibrium between an inactive conformation and a spontaneously active conformation. Agonists are proposed to stabilize the receptor in an active conformation. Conversely, inverse agonists are believed to stabilize an inactive receptor conformation. Thus, while an antagonist manifests its activity by virtue of inhibiting an agonist, an inverse agonist can addi-

8

tionally manifest its activity in the absence of an agonist by inhibiting the spontaneous conversion of an unliganded receptor to an active conformation.

The "5-HT2A receptor" is defined as a receptor, having an activity corresponding to the activity of the human serotonin receptor subtype, which was characterized through molecular cloning and pharmacology as detailed in Saltzman et al., *Biochem. Biophys. Res. Comm.* 181:1469-78; and Julius et al., *Proc. Natl. Acad. Sci. USA* 87:928-932, the disclosures of which are incorporated herein by reference in their entireties.

The term "subject" refers to an animal, preferably a mammal, most preferably a human, who is the object of treatment, observation or experiment.

"Selective" is defined as a property of a compound whereby an amount of the compound sufficient to effect a desired response from a particular receptor type, subtype, class or subclass with significantly less or substantially little or no effect upon the activity other receptor types. For example, a selective compound may have at least a 10-fold greater effect on activity of the desired receptor than on other receptor types. In some cases, a selective compound may have at least a 20-fold greater effect on activity of the desired receptor than on other receptor types, or at least a 50-fold greater effect, or at least a 100-fold greater effect, or at least a 1000-fold greater effect, or at least a 10,000-fold greater effect, or at least a 100,000-fold greater effect, or more than a 100,000-fold greater effect. "Selectivity" or "selective," as an inverse agonist is understood as a property of the compound of the invention whereby an amount of compound that effectively inversely agonizes the 5-HT2A receptor, and thereby decreases its activity, causes little or no inverse agonistic or antagonistic activity at other, related or unrelated, receptors. In particular, in one embodiment, a compound has surprisingly been found not to interact strongly with other serotonin receptors (5-HT 1A, 1B, 1D, 1E, 1F, 2B, 2C, 4A, 6, and 7) at concentrations where the signaling of the 5-HT2A receptor is strongly or completely inhibited. In one embodiment, the compound is also selective with respect to other monoamine-binding receptors, such as the dopaminergic, histaminergic, adrenergic and muscarinic receptors. Compounds that are highly selective for 5-HT2A receptors may have a beneficial effect in the treatment of psychosis, schizophrenia or similar neuropsychiatric disorders, while avoiding adverse effects associated with drugs hitherto suggested for this purpose.

Some embodiments described herein relate to serotonin 2A or 2C receptor inverse agonists, including compositions and methods for treating certain side-effects caused or exacerbated by dopaminergenic agent-associated therapies commonly used in treating neurodegenerative diseases. For example, the compounds disclosed herein have utility in reducing dyskinesia and psychosis associated with dopaminergic therapies used in treating Parkinson's disease, a neurodegenerative disease. According to one embodiment, the compound N-(1-methylpiperidin-4-yl)-N-(4-flourophenyl-methyl)-N'-(4-(2-methylpropyloxy)phenylmethyl)carbamide having the structure of formula (I) is provided:

(I)

**9**

One embodiment relates to a composition comprising the compound of formula (I) and a pharmaceutically acceptable carrier. The composition may also contain other compounds such as compounds for treating dyskinesia, dystonia, or psychosis.

According to one embodiment, the tartrate salt of the compound, N-(1-methylpiperidin-4-yl)-N-(4-flourophenylmethyl)-N'-(4-(2-methylpropyloxy)phenylmethyl) carbamide is a potent, selective, orally bioavailable 5-HT2A receptor inverse agonist. One embodiment includes the hydrochloride salt of N-(1-methylpiperidin-4-yl)-N4-flourophenylmethyl)-N'-(4-(2-methylpropyloxy)phenylmethyl) carbamide. The compound of formula (I) also possesses lesser potency as a 5-HT2C receptor inverse agonist and lacks intrinsic activity at the remaining monoaminergic receptor subtypes. Perhaps most notably, the compound of formula (I) lacks activity at dopamine receptor subtypes. (See U.S. patent application Ser. No. 09/800,096, which is hereby incorporated by reference in its entirety). Extensive behavioral pharmacological profiling of the compound of formula (I), including pre-clinical models of antipsychotic and anti-dyskinetic drug actions, support the therapeutic use of the compound in Parkinson's Disease and related human neurodegenerative diseases.

Parkinson's Disease (PD) is a common and progressive neurodegenerative disease. Current estimates suggest that nearly 900,000 individuals in the United States have PD and that the prevalence is increasing as the US population ages. Dopamine receptor agonists are used to alleviate the symptoms of PD, such as motoric dysfunction. Unfortunately, the protracted use of these dopaminergic agents causes, over time, neuropsychiatric (psychosis) and troublesome motor (dyskinesia) side effects in 30 to 80% of patients, respectively.

Antipsychotics and dopamine receptor antagonists can be effective in ameliorating these adverse effects. Unfortunately, many of these compounds significantly worsen motor function in PD patients secondary to their hypo-dopaminergic state. Biochemical and pharmacological data support the hypothesis that potentiation of serotonergic neurotransmission may be pathophysiologically related to the development of dyskinesias and psychosis in these patients. While not being bound by this theory, the compounds disclosed herein were selected to exploit the relationship of serotonergic activity and the negative side-effects associated with dopaminergic therapy.

L-dopa is a typical dopaminergic compound used to treat PD. L-dopa has been shown to increase central serotonin release, turnover, and metabolite concentrations in rodent brain. Direct acting dopamine receptor agonists like pergolide possess, in additional to their dopamine receptor agonist properties, potent agonist activity at serotonin 2A (5-HT2A) and 2C (5-HT2C) receptors as demonstrated by various in vitro pharmacological assays.

In one embodiment, the compounds disclosed herein can be used to treat many side-effects that arise from dopaminergic therapy. For example, the disclosed compounds are also useful for treatment of dyskinesia or psychosis caused or exacerbated as a side-effect of other therapeutic agents such as L-dopa. In one embodiment, the compounds are preferably used for the treatment of dyskinesia or psychosis associated with L-dopa treatment.

The compounds may be used to treat existing dyskinesia or psychosis or may be used prophylactic fashion when for example, it is considered necessary to initiate L-dopa therapy and it is feared that dyskinesia or psychosis may develop.

The compounds may be used to treat dyskinesia or psychosis as a monotherapy or as an adjunct to medicaments to prevent or treat dyskinesia or psychosis side-effects caused

**10**

by the medicament or alternatively the compounds may be given in combination with other compounds which also reduce dyskinesia.

In some embodiments, the compounds described herein can be formulated into compositions for administration to patients in need thereof. Appropriate compositions can take a number of different forms depending on how the composition is to be used. For example, the composition may be in the form of a powder, tablet, capsule, liquid, ointment, cream, gel, hydrogel, aerosol. spray, micelle, liposome or any other pharmaceutically acceptable form. One of ordinary skill in the art would readily appreciate that an appropriate vehicle for use with the disclosed compounds of the invention should be one that is well tolerated by a recipient of the composition. The vehicle should also readily enable the delivery of the compounds to appropriate target receptors. For example, one of ordinary skill in the art would know to consult *Pharmaceutical Dosage Forms and Drug Delivery Systems*, by Ansel, et al., Lippincott Williams & Wilkins Publishers; 7th ed. (1999) or a similar text for guidance regarding such formulations.

The composition of the invention may be used in a number of ways. For instance, systemic administration may be required in which case the disclosed compounds can be formulated into a composition that can be ingested orally in the form of a tablet, capsule or liquid. Alternatively the composition may be administered by injection into the blood stream. Injections may be intravenous (bolus or infusion) or subcutaneous (bolus or infusion). The disclosed compounds can also be administered centrally by means of intracerebral, intracerebroventricular, or intrathecal delivery.

The compound may also be used with a time delayed release device. Such devices may, for example, be inserted under the skin and the compound may be released over weeks or months. Such a device may be particularly useful for patients with long term dyskinesia such as patients on continuous L-dopa therapy for the treatment of PD. The devices may be particularly advantageous when a compound is used which would normally require frequent administration (e.g., frequent injection).

It will be readily appreciated that the amount of a compound required is determined by biological activity and bioavailability which in turn depends on the mode of administration, the physicochemical properties of the compound employed and whether the compound is being used as a monotherapy or in a combined therapy. The frequency of administration will also be influenced by the above mentioned factors and particularly the half-life of the compound within the subject being treated.

One of ordinary skill in the art would appreciate that specific formulations of compositions and precise therapeutic regimes (such as daily doses of the compounds and the frequency of administration) can be determined using known procedures. Such procedures conventionally employed by the pharmaceutical industry include in vivo experimentation and clinical trials.

Generally, a daily dose of between 0.01 µg/kg of body weight and 1.0 g/kg of body weight of a serotonin 2A/2C receptor inverse agonist can be used with the methods disclosed herein. In one embodiment, the daily dose is between 0.01 mg/kg of body weight and 100 mg/kg of body weight, or any milligram or half-milligram quantity in this disclosed range, e.g., 1.5, 2, 2.5, etc.

Daily doses may be given as a single administration (e.g. a daily tablet for oral consumption or as a single daily injection). Alternatively the compound used may require administration twice or more times during a day, depending on the

US 7,601,740 B2

**11**

kinetics of the drug associated with the individual patient. Alternatively a slow release device may be used to provide optimal doses to a patient without the need to administer repeated doses.

Biochemical Evidence

The cornerstone of current pharmacological intervention in PD remains L-dopa based therapies. L-dopa readily crosses the blood brain barrier, is taken up by neurons and undergoes rapid enzymatic conversion to dopamine, via L-aromatic acid decarboxylase (LAAD) activity in dopaminergic neurons. The increased availability and release of dopamine from these neurons clearly leads to increased dopaminergic transmission, and clinical efficacy in reversing the motoric effects of the hypo-dopaminergic state observed in PD. However, L-dopa lacks specificity for dopaminergic systems, and LAAD is widely expressed in brain. Early biochemical observations in rat brain noted that L-dopa substantially reduced central serotonergic stores, and increased the concentration of the principle serotonin metabolite of 5-hydroxyindoleacetic acid (5-HIAA) (1). Histochemical approaches have demonstrated that L-dopa accumulates in serotonergic neurons, and neurotransmitter release experiments have demonstrated that L-dopa markedly increased the release of both dopamine and serotonin, that release of serotonin is dependent upon LAAD activity, and that it is not eliminated by the selective destruction of dopaminergic neurons (2,3). These observations suggest that the administration of L-dopa to PD patients results in marked increases in the release of central serotonin, potentiating serotonergic neurotransmission. Finally, post-mortem biochemical analysis of PD patients that developed psychosis, when compared to a matched group that did not develop neuropsychiatric disturbances, found that the patients with psychosis had significant elevations in serotonin and 5-HIAA levels in multiple cortical and sub-cortical structures, most notably various mesencephalic nuclei including the red nucleus (4).

Serotonin or 5-hydroxytryptamine (5-HT) plays a significant role in the functioning of the mammalian body. In the central nervous system, 5-HT is an important neurotransmitter and neuromodulator that is implicated in such diverse behaviors and responses as sleeping, eating, locomotion, perceiving pain, learning and memory, sexual behavior, controlling body temperature and blood pressure. In the spinal column, serotonin plays an important role in the control systems of the afferent peripheral nociceptors (Moulignier, *Rev. Neurol.* 150:3-15, (1994)). Peripheral functions in the cardiovascular, hematological, and gastrointestinal systems have also been ascribed to 5-HT. 5-HT has been found to mediate a variety of contractile, secretory, and electrophysiologic effects including vascular and nonvascular smooth muscle contraction, and platelet aggregation. (Fuller, *Biology of Serotonergic Transmission,* 1982; Botillin, *Serotonin In Mental Abnormalities* 1:316 (1978); Barchas, et al., *Serotonin and Behavior,* (1973)). The 5-HT2A receptor subtype (also referred to as subclass) is widely yet discretely expressed in the human brain, including many cortical, limbic, and forebrain regions postulated to be involved in the modulation of higher cognitive and affective functions. This receptor subtype is also expressed on mature platelets where it mediates, in part, platelet aggregation, one of the initial steps in the process of vascular thrombosis.

Given the broad distribution of serotonin within the body, it is understandable that tremendous interest in drugs that affect serotonergic systems exists (Gershon, et at, *The Peripheral Actions of* 5-*Hydroxytryptamine,* 246 (1989); Saxena, et at, *J. Cardiovascular Pharmacol.* 15: Supp. 7 (1990)). Sero-

**12**

tonin receptors are members of a large human gene family of membrane-spanning proteins that function as transducers of intercellular communication. They exist on the surface of various cell types, including neurons and platelets, where, upon their activation by either their endogenous ligand serotonin or exogenously administered drugs, they change their conformational structure and subsequently interact with downstream mediators of cellular signaling. Many of these receptors, including the 5-HT2A subclass, are G-protein coupled receptors (GPCRs) that signal by activating guanine nucleotide binding proteins (G-proteins), resulting in the generation, or inhibition of, second messenger molecules such as cyclic AMP, inositol phosphates, and diacylglycerol. These second messengers then modulate the function of a variety of intracellular enzymes, including kinases and ion channels, which ultimately affect cellular excitability and function.

At least 15 genetically distinct 5-HT receptor subtypes have been identified and assigned to one of seven families (5-HT1-7). Each subtype displays a unique distribution, preference for various ligands, and functional correlate(s). Serotonin may be an important component in various types of pathological conditions such as certain psychiatric disorders (depression, aggressiveness, panic attacks, obsessive compulsive disorders, psychosis, schizophrenia, suicidal tendency), certain neurodegenerative disorders (Alzheimer-type dementia, Parkinsonism, Huntington's chorea), anorexia, bulimia, disorders associated with alcoholism, cerebral vascular accidents, and migraine (Meltzer, *Neuropsychopharmacology,* 21:106S-115S (1999); Barnes & Sharp, *Neuropharmacology,* 38:1083-1152 (1999); Glennon, *Neurosci. Biobehavioral Rev.,* 14:35 (1990)). Recent evidence strongly implicates the 5-HT2 receptor subtype in the etiology of such medical conditions as hypertension, thrombosis, migraine, vasospasm, ischemia, depression, anxiety, psychosis, schizophrenia, sleep disorders and appetite disorders.

Schizophrenia is a particularly devastating neuropsychiatric disorder that affects approximately 1% of the human population. It has been estimated that the total financial cost for the diagnosis, treatment, and lost societal productivity of individuals affected by this disease exceeds 2% of the gross national product (GNP) of the United States. Current treatment primarily involves pharmacotherapy with a class of drugs known as antipsychotics. Antipsychotics are effective in ameliorating positive symptoms (e.g., hallucinations and delusions), yet they frequently do not improve negative symptoms (e.g., social and emotional withdrawal, apathy, and poverty of speech).

Currently, nine major classes of antipsychotics are prescribed to treat psychotic symptoms. Use of these compounds is limited, however, by their side effect profiles. Nearly all of the "typical" or older generation compounds have significant adverse effects on human motor function. These "extrapyramidal" side effects, so termed due to their effects on modulatory human motor systems, can be both acute (e.g., dystonic reactions, a potentially life threatening but rare neuroleptic malignant syndrome) and chronic (e.g., akathisias, tremors, and tardive dyskinesia). Drug development efforts have, therefore, focused on newer "atypical" agents free of these adverse effects.

Antipsychotic drugs have been shown to interact with a large number of central monoaminergic neurotransmitter receptors, including dopaminergic, serotonergic, adrenergic, muscarinic, and histaminergic receptors. It is likely that the therapeutic and adverse effects of these drugs are mediated by distinct receptor subtypes. The high degree of genetic and pharmacological homology between these receptor subtypes has hampered the development of subtype-selective com-

JSUF0021

US 7,601,740 B2

13                                                                                         14

pounds, as well as the determination of the normal physiologic or pathophysiological role of any particular receptor subtype. Thus there is a need to develop drugs that are selective for individual receptor classes and subclasses amongst monoaminergic neurotransmitter receptors.

The prevailing theory for the mechanism of action of antipsychotic drugs involves antagonism of dopamine D2 receptors. Unfortunately, it is likely that antagonism of dopamine D2 receptors also mediates the extrapyramidal side effects. Antagonism of 5-HT2A is an alternate molecular mechanism for drugs with antipsychotic efficacy, possibly through antagonism of heightened or exaggerated signal transduction through serotonergic systems. 5-HT2A antagonists are therefore good candidates for treating psychosis without extrapyramidal side effects.

Traditionally, these receptors have been assumed to exist in a quiescent state unless activated by the binding of an agonist (a drug that activates a receptor). It is now appreciated that many, if not most, of the GPCR monoamine receptors, including serotonin receptors, can exist in a partially activated state in the absence of their endogenous agonists. This increased basal activity (constitutive activity) can be inhibited by compounds called inverse agonists. Both agonists and inverse agonists possess intrinsic activity at a receptor, in that they alone can activate or inactivate these molecules, respectively. In contrast, classic or neutral antagonists compete against agonists and inverse agonists for access to the receptor, but do not possess the intrinsic ability to inhibit elevated basal or constitutive receptor-responses.

We have elucidated an important aspect of 5-HT2A receptor function by applying the Receptor Selection and Amplification Technology (U.S. Pat. No. 5,707,798, 1998; *Chem. Abstr.* 128:111548 (1998) and citations therein), to the study of the 5-HT2 subclass of serotonin receptors. R-SAT is a phenotypic assay of receptor function that involves the heterologous expression of receptors in mammalian fibroblasts. Using this technology we were able to demonstrate that native 5-HT2A receptors possess significant constitutive, or agonist-independent, receptor activity (U.S. patent application Ser. No. 60/103,317, herein incorporated by reference). Furthermore, by directly testing a large number of centrally acting medicinal compounds with known clinical activity in neuropsychiatric disease, we determined that compounds with antipsychotic efficacy all shared a common molecular property. Nearly all of these compounds, which are used by psychiatrists to treat psychosis, were found to be potent 5-HT2A inverse agonists. This unique clinico-pharmacologic correlation at a single receptor subtype is compelling evidence that 5-HT2A receptor inverse agonism is a molecular mechanism of antipsychotic efficacy in humans.

Detailed pharmacological characterization of a large number of antipsychotic compounds revealed that they possess broad activity at multiple related receptor subtypes. Most of these compounds display agonist, competitive antagonist, or inverse agonist activity at multiple monoaminergic receptor subtypes, including serotoninergic, dopaminergic, adrenergic, muscarinic and histaminergic receptors. This broad activity is likely responsible for the sedating, hypotensive, and motor side effects of these compounds. It would therefore be of great advantage to develop compounds that are selective inverse agonists of the 5-HT2A receptor, but which have little or no activity on other monamine receptor subtypes, especially dopamine D2 receptors. Such compounds may be useful in the treatment of human disease (e.g., as anti-psychotics), and may avoid the adverse side effects associated with non-selective receptor interactions.

The compound of formula (I) is active at monoamine receptors, specifically serotonin receptors. In one embodiment, the compound acts as inverse agonist at the 5-HT2A receptor. Thus, experiments performed on cells transiently expressing the human phenotype of said receptor have shown that the compound of formula (I) attenuates the signaling of such receptors in the absence of additional ligands acting upon the receptor. The compound has thus been found to possess intrinsic activity at this receptor and is able to attenuate the basal, non-agonist-stimulated, constitutive signaling responses that the 5-HT2A receptor displays. The observation that the compound of formula (I) is an inverse agonist also indicates that the compound has the ability to antagonize the activation of 5-HT2A receptors that is mediated by endogenous agonists or exogenous synthetic agonist ligands.

In one embodiment, the compound of formula (I) shows a relatively high degree of selectivity towards the 5-HT2A subtype of serotonin receptors relative to other subtypes of the serotonin (5-HT) family of receptors as well as to other receptors, most particularly the monoaminergic G-protein coupled receptors, such as dopamine receptors.

The compound of formula (I) may therefore be useful for treating or alleviating symptoms of disease conditions associated with impaired function, in particular elevated levels of activity, of especially 5-HT2A receptors, whether this impaired function is associated with improper levels of receptor stimulation or phenotypical aberrations.

Others have previously hypothesized that certain neuropsychological diseases might be caused by altered levels of constitutive activity of monoamine receptors. Such constitutive activity might be modified via contacting the relevant receptor with a synthetic inverse agonist. By directly testing a large number of centrally acting medicinal compounds with known clinical activity in neuropsychiatric disease, we determined that compounds with antipsychotic efficacy all shared a common molecular property. Nearly all of these compounds that are used by psychiatrists to treat psychosis were found to be potent 5-HT2A inverse agonists. This correlation is compelling evidence that 5-HT2A receptor inverse agonism is a molecular mechanism of antipsychotic efficacy in humans.

Detailed pharmacological characterization of a large number of antipsychotic compounds in our laboratory revealed that they possess broad activity at multiple related receptor subtypes. Most of these compounds display either agonist, competitive antagonist, or inverse agonist activity at multiple monoaminergic receptor subtypes including serotoninergic, dopaminergic, adrenergic, muscarinic and histaminergic receptors. This broad activity is likely responsible for the sedating, hypotensive, and motor side effects of these compounds. In one embodiment, the compound of formula (I) possesses efficacy as, for example, a novel antipsychotic, but will have fewer or less severe side effects than existing compounds.

In one embodiment a method is provided to inhibit activity of a monoamine receptor. This method comprises contacting a monoamine receptor or a system containing the monoamine receptor, with an effective amount of the compound of formula (I). According to one embodiment, the monoamine receptor is a serotonin receptor. In one embodiment, the compound is selective for the 5-HT2A receptor subclass. In another embodiment, the compound has little or substantially no activity to other types of receptors, including other serotonergic receptors and most particularly, monoaminergic G-protein coupled receptors, such as dopaminergic receptors.

The system containing the monoamine receptor may, for example, be a subject such as a mammal, non-human primate

US 7,601,740 B2

**15**

or a human. The receptor may be located in the central or peripheral nervous system, blood cells or platelets.

The system may also be an in vivo or in vitro experimental model, such as a cell culture model system that expresses a monamine receptor, a cell-free extract thereof that contains a monoamine receptor, or a purified receptor. Non-limiting examples of such systems are tissue culture cells expressing the receptor or extracts or lysates thereof. Cells that may be used in the present method include any cells capable of mediating signal transduction via monoamine receptors, especially the 5-HT2A receptor, either via endogenous expression of this receptor (e.g., certain types of neuronal cells lines, for example, natively express the 5-HT2A receptor), or following transfection of cells with plasmids containing the receptor gene. Such cells are typically mammalian cells (or other eukaryotic cells, such as insect cells or Xenopus oocytes), because cells of lower organisms generally lack the appropriate signal transduction pathways for the present purpose. Examples of suitable cells include: the mouse fibroblast cell line NIH 3T3 (ATCC CRL 1658), which responds to transfected 5-HT2A receptors by stimulating growth; RAT 1 cells (Pace et al., *Proc. Natl. Acad. Sci. USA* 88:7031-35 (1991)); and pituitary cells (Vallar et al., *Nature* 330:556-58 (1987). Other useful mammalian cells for the present method include HEK 293 cells, CHO cells, and COS cells.

One embodiment provides methods of inhibiting activity of a native, mutated or modified monoamine receptor. Also provided are kits for performing the same. In one embodiment, the activity of the receptor is a signaling activity. In another embodiment, the activity of the receptor is the constitutive basal activity of the receptor.

In one embodiment, the activity of the receptor is a response, such as a signaling response, to an endogenous agonist, such as 5-HT, or an exogenous agonistic agent, such as a drug or other synthetic ligand. The compound of formula (I) may act by either inversely agonizing or antagonizing the receptor.

In one embodiment, the compound of formula (I) is an inverse agonist selective for the 5-HT2A receptor and the compound has little or substantially no activity toward other serotonergic or other monoaminergic receptors, such as dopaminergic receptors.

In a further embodiment, a method is provided for inhibiting an activation of a monoamine receptor comprising contacting the monoamine receptor, or a system containing the monoamine receptor, with the compound of formula (I). The activation of the receptor may be due to an exogenous or endogenous agonist agent, or may be the constitutive activation associated with a native, mutated or modified receptor. The receptor may be purified or present in an in vitro or in vivo system. The receptor may also be present in the central or peripheral nervous system, blood cells or platelets of a non-human or human subject. Also provided are kits for performing the same.

In one embodiment, the compound of formula (I) is selective for 5-HT class serotonin receptors, such as the 5-HT2A subclass of serotonin receptors. In another embodiment, the compound has little or substantially no anti-dopaminergic activity.

One embodiment provides methods of treating a disease condition associated with a monoamine receptor comprising administering to a mammal in need of such treatment an effective amount of the compound of formula (1). One embodiment provides methods for treating or alleviating disease conditions associated with improper function or stimulation of native, as well as mutated or otherwise modified, forms of central serotonin receptors, particularly the 5-HT

**16**

class of such receptors, comprising administration of an effective amount of a selective inverse agonist of formula (I) to a host in need of such treatment. Also provided are kits for performing the same.

In one embodiment, the receptor is the 5-HT2A subclass. In one embodiment, the disease condition is associated with dysfunction of the serotonin receptor. In another embodiment, the disease condition is associated with activation of the serotonin receptor, for instance, inappropriately elevated or constitutive activation, elevated serotonergic tone, as well as disease conditions associated with secondary cellular functions impaired by such pathologies.

Examples of diseases for which such treatment using the compound of formula (I) is useful include, but are not limited to, neuropsychiatric diseases such as schizophrenia and related idiopathic psychoses, anxiety, sleep disorders, appetite disorders, affective disorders such as major depression, bipolar disorder, and depression with psychotic features, and Tourette's Syndrome, drug-induced psychoses, psychoses secondary to neurodegenerative disorders such as Alzheimer's or Huntington's Disease. It is anticipated that the compound of formula (I), a particularly selective inverse agonist of 5-HT2A that shows little or no activity on dopaminergic receptors, may be especially useful for treating schizophrenia. Treatment using the compound of formula (I) may also be useful in treating migraine, vasospasm, hypertension, various thrombotic conditions including myocardial infarction, thrombotic or ischemic stroke, idiopathic and thrombotic thrombocytopenic purpura, and peripheral vascular disease.

In a further embodiment the present invention provides methods for treating or alleviating a disease condition associated with improper function, dysfunction, or stimulation of native, as well as mutated or otherwise modified, forms of central or peripheral monoamine receptors, such methods comprising administration of an effective amount of a compound of formula (I) to a host in need of such treatment. In one embodiment, the monamine receptor is serotonin receptor in the peripheral nervous system, blood or platelets. In some embodiments, the serotonin receptor is a 5-HT2A subclass receptor. In additional embodiments, the disease condition is associated with increased activity or activation of a serotonin receptor. Also provided are kits for performing the same.

Some embodiments also pertain to the field of predictive medicine in which pharmacogenomics is used for prognostic (predictive) purposes. Pharmacogenomics deals with clinically significant hereditary variations in the response to drugs due to altered drug disposition and abnormal action in affected persons. See e.g., Eichelbaum, *Clin Exp Pharmacol. Physiol.,* 23:983-985 (1996), and Linder, *Clin. Chem.* 43:254-66 (1997). In general, two types of pharmacogenetic conditions can be differentiated: genetic conditions transmitted as a single factor altering the way drugs act on the body (altered drug action), and genetic conditions transmitted as single factors altering the way the body acts on drugs (altered drug metabolism). These pharmacogenetic conditions can occur as naturally occurring polymorphisms.

One pharmacogenomics approach to identifying genes that predict drug response, known as "a genome-wide association," relies primarily on a high-resolution map of the human genome consisting of already known gene-related markers (e.g., a "bi-allelic" gene marker map that consists of 60,000-100,000 polymorphic or variable sites on the human genome, each of which has two variants). Such a high-resolution genetic map can be compared to a map of the genome of each of a statistically significant number of patients taking part in a Phase II/III drug trial to identify markers associated with a

JSUF0023

US 7,601,740 B2

**17**

particular observed drug response or side effect. Alternatively, such a high-resolution map can be generated from a combination of some ten-million known single nucleotide polymorphisms (SNPs) in the human genome. As used herein, a "SNP" is a common alteration that occurs in a single nucleotide base in a stretch of DNA. For example, a SNP may occur once per every 1,000 bases of DNA. A SNP may be involved in a disease process; however, the vast majority may not be disease-associated. Given a genetic map based on the occurrence of such SNPs, individuals can be grouped into genetic categories depending on a particular pattern of SNPs in their individual genome. In such a manner, treatment regimens can be tailored to groups of genetically similar individuals, taking into account traits that may be common among such genetically similar individuals.

Alternatively, a method termed the "candidate gene approach" can be utilized to identify genes that predict drug response. According to this method, if a gene that encodes a drug's target is known (e.g., a protein or a receptor of the present invention), all common variants of that gene can be fairly easily identified in the population and it can be determined if having one version of the gene versus another is associated with a particular drug response.

Alternatively, a method termed the "gene expression profiling", can be utilized to identify genes that predict drug response. For example, the gene expression of an animal dosed with a drug (e.g., a molecule or modulator of the present invention) can give an indication whether gene pathways related to toxicity have been turned on.

Information generated from more than one of the above pharmacogenomics approaches can be used to determine appropriate dosage and treatment regimens for prophylactic or therapeutic treatment of an individual. This knowledge, when applied to dosing or drug selection, can avoid adverse reactions or therapeutic failure and thus enhance therapeutic or prophylactic efficiency when treating a subject with a molecule or modulator of the invention, such as a modulator identified by one of the exemplary screening assays described herein. As we have described previously, this approach can also be used to identify novel candidate receptor or other genes suitable for further pharmacological characterization in vitro and in vivo.

Accordingly, one embodiment provides methods and kits for identifying a genetic polymorphism predisposing a subject to being responsive to the compound of formula (I). The method comprises administering to a subject an effective amount of the compound; identifying a responsive subject having an ameliorated disease condition associated with a monamine receptor; and identifying a genetic polymorphism in the responsive subject, wherein the genetic polymorphism predisposes a subject to being responsive to the compound. It is anticipated that this method may be useful both for predicting which individuals are responsive to therapeutic effects of the compound and also for predicting those likely to experience adverse side effect responses. This approach may be useful for identifying, for example, polymorphisms in a serotonin receptor that lead to constitutive activation and are thus amenable to inverse agonist therapy. In addition, this method may be useful for identifying polymorphisms that lead to altered drug metabolism whereby toxic byproducts are generated in the body. Such a mechanism has been implicated in the rare, but potentially life threatening side effects of the atypical antipsychotic, clozapine.

In a related embodiment, a method for identifying a subject suitable for treatment with the compound of formula (I) is provided. According to the method, the presence of a polymorphism that predisposes the subject to being responsive to

**18**

the compound is detected, the presence of the polymorphism indicating that the subject is suitable for treatment. Also provided are kits for performing the same.

The compound of formula (I) preferably shows selective inverse agonist activity towards the 5-HT2A receptor. Such activity is defined by an ability of the ligand to attenuate or abolish the constitutive signaling activity of this receptor. Selectivity in the present context is understood as a property of a compound of the invention whereby an amount of compound that effectively inversely agonizes the 5-HT2A receptor and thereby decreases its activity causes little or no inverse agonistic or antagonistic activity at other, related or unrelated, receptors. In particular, the compound of formula (I) has surprisingly been found not to interact strongly with other serotonin receptors (5-HT 1A, 1B, 1D, 1E, 1F, 2B, 2C, 4A, 6, and 7) at concentrations where the signaling of the 5-HT2A receptor is strongly or completely inhibited. In one embodiment, the compound is also selective with respect to other monoamine-binding receptors, such as the dopaminergic, histaminergic, adrenergic and muscarinic receptors.

One embodiment of the present invention relates to a method of alleviating or treating a disease condition in which modification of monoamine receptor activity, in particular 5-HT2A serotonergic receptor activity, has a beneficial effect by administering a therapeutically effective amount of the compound of formula (I) to a subject in need of such treatment. Such diseases or conditions may, for instance arise from inappropriate stimulation or activation of serotonergic receptors. It is anticipated that by using a compound that is selective for a particular serotonin receptor subtype, in particular 5-HT2A, the problems with adverse side effects observed with the known antipsychotic drugs, such as extrapyramidal effects, may be avoided substantially.

The term "therapeutically effective amount" as used herein means an amount of an active compound or pharmaceutical agent that elicits the biological or medicinal response in a tissue, system, animal or human that is being sought by a researcher, veterinarian, medical doctor or other clinician, which includes alleviation, amelioration, or lessening of the symptoms of the disease being treated, or prevents or slows the progress of the disease or increase of the symptoms.

In one embodiment, the compound of formula (I) may be administered in a single daily dose, or the total daily dosage may be administered in divided doses, for example, two, three or four times daily. Furthermore, the compound of formula (I) may be administered in intranasal form via topical use of suitable intranasal vehicles, via transdermal routes, using those forms of transdermal skin patches well known to persons skilled in the art, by implantable pumps; or by any other suitable means of administration. To be administered in the form of a transdermal delivery system, for example, the dosage administration will, of course, be continuous rather than intermittent throughout the dosage regimen.

The dosage regimen utilizing the compound of formula (I) is selected in accordance with a variety of factors including type, species, age, weight, sex and medical condition of the patient; the severity of the condition to be treated; the route of administration; the renal and hepatic function of the patient; and the particular compound employed. A physician or veterinarian of ordinary skill can readily determine and prescribe the effective amount of the drug required to prevent, counter or arrest the progress of the disease or disorder that is being treated.

For oral administration, compositions containing the compound of formula (I) are preferably provided in the form of tablets containing 0.01, 0.05, 0.1, 0.5, 1.0, 2.5, 5.0, 10.0, 15.0, 25.0 or 50.0 mg of the active ingredient for the symptomatic

US 7,601,740 B2

**19**

adjustment of the dosage to the patient to be treated. In one embodiment, a unit dose contains from about 0.001 mg to about 50 mg of the active ingredient. In another embodiment a unit dose contains from about 1 mg to about 10 mg of active ingredient.

The compound of formula (I) may be used alone at appropriate dosages defined by routine testing in order to obtain optimal pharmacological effect on a monoaminergic receptor, in particular the 5-HT2A serotonergic receptor subtype, while minimizing any potential toxic or otherwise unwanted effects. In addition, co-administration or sequential administration of other agents that improve the effect of the compound may, in some cases, be desirable.

In one embodiment, the compound of formula (I) may be combined with an additional therapeutic agent. Additional therapeutic agents may include: levodopa (SINEMET™, SINEMET-CR™, bromocriptine (PARLODEL™), pergolide (PERMAX™), ephenedrine sulfate (EPHEDRINE™), pemoline CYLERT™), mazindol (SANOREX™), d,1-α-methylphenethylamine (ADDERALL™), methylphenydate (RITALIN™), pramipexole (MIRAPEX™), modafinil (PROVIGIL™), ropinirole (REQUIP™), an anti-dyskinesia agent, an anti-dystonia, an anti-myoclonus, an anti-tremor agent, or an anti-psychotic agent. In some embodiments, the anti-dyskinesia agent is selected from baclofen (Lioresal™), botulinum toxin (Botox™), clonazepam (Klonopin™), or diazepam (Valium™). In some embodiments, the anti-dystonia, anti-myoclonus, or anti-tremor agents are selected from baclofen (LIORESAL™), botulinum toxin (BOTOX™), clonazepam (KLONOPIN™), or diazepam (VALIUM™). In some embodiments, the anti-psychotic agent is selected from chlorpromazine (THORAZINE™), haloperodol (HALDOL™), molindone (MOBAN™), thioridazine (MELLARIL™), a phenothiazine, a butyrophenone, diphenulbutylpiperinde (pimozide), thioxanthines (fluphenthixol), substituted benzamides (sulpiride), sertindole, amisulpride, risperidone, clozapine, olanzapine, ziprasidone, aripiprazole, or their active metabolites (N-desmethylclozapine, N-desmetholylolanzapine, 9-OH-risperidone)).

The pharmacological properties and the selectivity of the compound of formula (I) for specific serotonergic receptor subtypes may be demonstrated by a number of different assay methods using recombinant receptor subtypes, preferably of the human receptors if these are available, e.g. conventional second messenger or binding assays. A particularly convenient functional assay system is the receptor selection and amplification assay disclosed in U.S. Pat. No. 5,707,798, which describes a method of screening for bioactive compounds by utilizing the ability of cells transfected with receptor DNA, e.g., coding for the different serotonergic subtypes, to amplify in the presence of a ligand of the receptor. Cell amplification is detected as increased levels of a marker also expressed by the cells.

Treatment of Neuropsychiatric Disorders

In one embodiment, the compound of formula (I) and related serotonin 2A and/or 2C receptor inverse agonists alone or in combination with other antipsychotic drugs, particularly those with dopamine antagonist properties, are used to treat a variety of human neuropsychiatric diseases including schizophrenia, schizoaffective disorders, mania and psychotic depression. Specifically, the compound of formula (I) and related serotonin 2A/2C receptor inverse agonists can improve psychotic symptoms (feelings of being controlled by outside forces, hearing, seeing, smelling or feeling things which are not there, hallucinations and unusual beliefs, delu-

**20**

sions), negative symptoms (loss of normal behavior including tiredness, loss of concentration and lack of energy and motivation, and cognitive function in psychotic patients when used alone or in combination with other antipsychotic drugs. These agents also reduce the side-effects associated with the use of existing antipsychotic drugs and reduce the dose of exisiting agent that is required to achieve antipsychotic efficacy. Specifically, the compound of formula (I) and related compounds alone or in combination with existing antipsychotic drugs can be used to control the behavioral and neuropsychiatric manifestations present in all of these disease states. In some embodiments, pharmaceutical compositions comprised of a combination of the compound of formula (I) and existing antipsychotic agents are used.

Neuropsychiatric disorders associated with psychosis affect a large proportion of the human population. Psychosis appears as a dominating symptom in diverse disorders, including schizophrenia, schizoaffective states, mania, psychotic depression among others. Current treatment options primarily involve pharmacotherapy with a class of drugs known as antipsychotics. Antipsychotics are effective in ameliorating positive symptomotology of these disorders, yet they frequently do not improve and may worsen negative and cognitive symptoms. Signiifcant treatment limiting side effects are common with the use of antipsychotic drugs.

Drugs that possess antipsychotic properties have been in clinical use since the early 1950's. Antipsychotic drugs are widely prescribed to treat psychotic symptoms irrespective of their etiology. Clinical use of these compounds is limited, however, by their side effect profiles. Nearly all of the "typical" or first generation compounds have significant adverse effects on human motor function. These "extrapyramidal" side effects, so termed due to their effects on human motor systems, can be both acute and chronic in nature. Acute effects include dystonic reactions, and a potentially life threatening but rare symptom constellation; neuroleptic malignant syndrome. Chronic side effects include akathisias, tremors, and tardive dyskinesia. Due in large part to these disabling side effects, antipsychotic drug development has been focused on newer "atypical" agents (clozapine, olanzapine, quetiapine, risperidal, arapiprazole) that appear to have reduced liability for inducing adverse motoric effects. These newer "atypical" antipsychotic drugs, however, suffer from other limiting side-effects, including induction of cardiovascular abnormalities, extreme sedation, morbid obesity, type II diabetes, blood dyscrasias and pancreatitis among others.

While the precise molecular mechanisms mediating antisychotic drug action remain to be elucidated, antipsychotic drugs have been shown, by both in vitro and in vivo methods, to interact with a large number of central monoaminergic neurotransmitter receptors, including dopaminergic, serotonergic, adrenergic, muscarinic, and histaminergic receptors. It is likely that the therapeutic and adverse effects of these drugs are separable and are mediated by distinct receptor subtypes.

Currently, it is thought that antipsychotic drugs reduce the positive symptoms in these disorders by blocking dopamine D2 receptors. This is based on the observation that these all antipsychotic drugs have reasonable affinity for this receptor in vitro, and that a correlation exists between their potency to block D2 receptors and their ability to reduce the positive symptoms of these disorders. Unfortunately, it is likely that antagonism of dopamine D2 receptors also mediates the disabling extrapyramidal side effects.

The only other consistent receptor interaction that these drugs as a class display is inverse agonism of 5-HT2A receptors, suggesting that inverse agonism of these receptors is an alternate molecular mechanism that confers antipsychotic

JSUF0025

US 7,601,740 B2

21

22

efficacy. This theory is bolstered by a number of basic scientific and clinical observations regarding serotonergic systems and the 5-HT2A receptor in particular (U.S. Pat. No. 6,358, 698 incorporated by reference).

However, nearly all known antipsychotics lack specificity in their mechanisms of action. In addition to possessing activity at dopamine D2 receptors and 5-HT2A receptors, these drugs as a class have a multitude of pharmacologically relevant interactions with critical neuronal proteins including a host of cell surface receptors, ion channels, and re-uptake transporters. This lack of drug target specificity likely contributes to the multiplicity of adverse effects associated with use of existing antipsychotic agents.

These observations highlight the need to develop novel therapeutic regimens that are specifically designed to not only demonstrate efficacy against these particular disabling symptoms but to also possess tolerability in these specific patient populations. This can be achieved by improving the selectivity of the drug target interactions of new therapeutic agents. Specifically, the development of agents with novel mechanisms of action that avoid the known pitfalls associated with existing agents is desired. In addition, improved selectivity avoids the known adverse effects associated with interactions with non-efficacy off-target receptor interaction. For example many antipsychotic drugs possess high affinity interactions with H1 receptors. H1 antagonism is associated with sedation. Further, other antipsuchotic drugs have affinity interactions with alpha receptors. Antagonism of alpha-1 receptors is associated with orthostasis. Improvements in therapeutic efficacy and safety also can be achieved by combining two or more agents each with selective target interactions to achieve additive or synergistic benefits. Specifically, by combining one drug that specifically interacts with D2 receptors as an antagonist and another drug like the compound of formula (I) that interacts with specifically with 5-HT2A/2C receptors as antagonist or inverse agonist, the multitude of off-target interactions of existing antipsychotic drugs can be avoided.

In one embodiment, serotonin 2A and/or 2C receptor inverse agonists are used to treat a variety of human neuropsychiatric diseases including schizophrenia, schizoaffective disorders, mania, behavioral disturbances associated with dementia and psychotic depression. For example, the compounds disclosed herein have utility in reducing the positive symptoms, improving negative symptoms and enhancing cognitive function in patients with certain neuropsychiatric diseases.

Antipsychotics and dopamine receptor antagonists can be effective in ameliorating positive symptoms in schizophrenia and related diseases. Unfortunately, many of these compounds significantly worsen motor function and increase negative symptoms or leave these and other symptoms untreated in these patients. Biochemical and pharmacological data support the hypothesis that potentiation of serotonergic neurotransmission may be pathophysiologically important in the development of these unwanted effects and conversely blockade of serotonergic neurotransmission may reduced the side-effects associated with antipsychotic drug therapy. While not being bound by this theory, the compound of formula (I) was selected to exploit the relationship of serotonergic activity and the limiting effects associated with antipsychotic therapy.

Haloperidol is a typical antipsychotic with specificity as a D2 receptor antagonist. This compound commonly is used to treat the positive symptoms associated with acute exacerbations of schizophrenia. Unfortunately, the use of this compound is associated with a plethora of unwanted motoric side effects, including akathisia, parkinsonism, tardive dyskinesia

and neuroleptic maliginanist syndrome. This compound also does not alter or worsens negative symptoms and cognitive function in these patients.

In one embodiment, the compound of formula (I) can be used to treat many side-effects that arise from antipsychotic therapy. For example, the compound of formula (I) may be useful for treatment of motoric side-effects of other antipsychotic agents such as haloperidol. In one embodiment, the compound of formula (I) is used for the treatment of motoric side-effects associated with haloperidol treatment.

In one embodiment, the compound of formula (I) may be used prophylactically when for example, it is considered necessary to initiate haloperidol therapy and it is feared that motoric deficits may develop.

In some embodiments, the compound of formula (I) may be used to treat psychosis as a monotherapy or as an adjunct to medicaments to prevent or treat antipsychotic drug side-effects caused by the medicament. Alternatively, the compound of formula (I) may be given in combination with other compounds, which also reduce antipsychotic drug side-effects.

In one embodiment, the compound of formula (I) may used to treat the negative symptoms of certain neuropsychiatric disease including schizophrenia as a monotherapy or as an adjunct to medicaments used to treat the positive symptom of these diseases.

In some embodiments, the compound of formula (I) also may used to improve cognitive function in certain neuropsychiatric disease including schizophrenia as a monotherapy or as an adjunct to medicaments used to treat the positive symptom of these diseases.

Methods of Preparation

The compound of formula (I) may be synthesized by methods described below, or by modification of these methods. Ways of modifying the methodology include, among others, modification in temperature, solvent, reagents, etc.

The first step of the synthesis, illustrated below, is conducted in the presence of acetic acid, NaBH3CN, and methanol to produce the compound of formula (II):



(II)

The compound of formula (IV) can be synthesized by treatment of the compound of formula (III) with isobutyl bromide and potassium carbonate in dimethyl formamide (DMF) at about 80° C.:

JSUF0026

Appx100

US 7,601,740 B2

**23**



(III) → (IV)

i-BuBr
K₂CO₃
DMF
80° C.

The compound of formula (IV) can be converted to the compound of formula (V) by reaction with potassium hydroxide in methanol/water:



KOH
MeOH—H₂O

(IV) → (V)

The compound of formula (V) is heated to reflux with diphenylphosphonyl azide (DPPA) and a proton sponge in tetrahydrofuran (THF) to produce the compound of formula (VI):



DPPA
Proton Sponge
THF
reflux

(V) → (VI)

**24**

Finally, reaction of the compound of formula (II) with the compound of formula (VI) in methylene chloride produces the compound of formula (I):



(II) +



CH₂Cl₂

(VI)



(I)

The tartrate salt of the compound of formula (I) may be produced by mixing with L-(+)-Tartaric acid in ethanol:

JSUF0027

Appx101

US 7,601,740 B2

25                                                                    26



L-(+)-Tartaric acid
EtOH

(I)



## EXAMPLES

The examples below are non-limiting and are set forth to illustrate some of the embodiments disclosed herein.

### Example 1

### Agonist Studies

Parkinson's disease is typically managed using direct acting dopamine agonists. Examples of this class of compounds include pergolide, bromocriptine, pramipexole and ropinirole. These drugs are thought to be effective because of their agonist activity at the dopamine $D_2$, $D_3$, and $D_4$ receptors located in striatal and forebrain regions. This activity may compensate for the progressive loss of forebrain dopaminergic innervation that characterizes the PD. However, these drugs are not specific for these dopaminergic receptors and also possess potent agonist activity at other receptors, including 5HT2A and 5HT2C receptors. Using a physiologically predictive in vitro functional assay, it is shown below that pergolide, lisuride, and bromocriptine display agonist potencies at human 5HT2A receptors that are equivalent to those observed at the human $D_2$ receptor. (FIGS. 1A and 1B, and Table 1).

Using the R-SAT assay, the activity of common dopeaminergic compounds against dopamine and serotonin receptor types was studied. (See U.S. Pat. Nos. 5,912,132 and 5,955, 281, both of which are hereby incorporated by reference.) In FIG. 1, data were plotted as percentage agonist response as determined for a reference full agonist (100%) versus drug concentration. The reference full agonist used for the $D_2$ receptor was quinpirole, while serotonin was used for the 5HT2A receptor. Compounds tested include dopamine (filled squares), quinpirole (filled circles), lisuride (filled triangles), bromocriptine (filled diamonds), serotonin (open squares), and pergolide (filled inverted triangles). Potencies of representative dose response curves using dopamine $D_2$ receptors were determined and are shown in FIG. 1A; (pergolide-0.21 nM, dopamine-8.0 nM, lisuride-0.023 nM, quinpirole-3.3 nM, bromocriptine-0.43 nM, and serotonin-no response). FIG. 1B shows compound potency against the serotonin 5-HT2A receptor; (dopamine-no response, quinpirole-174 nM, lisuride-0.028 nM, bromocriptine-2.7 nM, serotonin-33 nM, and pergolide-0.22 nM).

Because these drugs are administered in the clinic to achieve $D_2$ receptor occupancy, these data argue that direct acting dopamine agonists are also behaving as 5HT2A receptor agonists in vivo when administered in therapeutic doses to PD patients.

TABLE 1

| Serotonin Receptor Agonist Activity of Dopaminergic Agents Used in PD | | | |
|---|---|---|---|
| Drug | Dopamine D2 | Serotonin 2A | Serotonin 2C |
| Dopamine | 8.40 +/− 0.32 | NA | NA |
| Serotonin | NA | 7.73 +/− 0.04 | 7.29 +/− 0.10 |
| Lisuride | 11.00 +/− 0.36 | 10.65 +/− 0.10 | 7.61 +/− 0.13 |
| Pergolide | 9.45 +/− 0.06 | 8.05 +/− 0.22 | 6.66 +/− 0.08 |
| Bromocriptine | 9.30 +/− 0.31 | 8.75 +/− 0.14 | 5.80 +/− 0.05 |
| Ropinirole | 8.19 +/− 0.58 | 6.85 +/− 0.77 | NT |
| Pramipexole | 8.15 +/− 0.38 | 5.93 +/− 0.74 | NT |
| Apomorphine | 6.24 +/− 0.11 | NA | NA |

Data are derived from R-SAT assays. As shown, all compounds displayed full (>75%) relative agonist efficacies. Data are reported as −Log(EC$_{50}$) values +/− standard deviation of three to eight separate determinations. The VGV isoform of the 5HT2C receptor, and the short form of the $D_2$ receptor were utilized for these studies. NA denotes no activity, NT denotes not tested.

The agonist activity of these anti-parkinsonian agents at human 5HT2A/C receptors has particular implications for the generation and treatment of human hallucinations and psychosis. That certain natural and synthetic chemical compounds can induce hallucinatory states in humans has led to detailed investigations of the mechanisms of action of these hallucinogenic or psychotomimetic drugs. These efforts have implicated a number of molecular activities of these classes of

US 7,601,740 B2

**27**

drugs as being relevant to their ability to induce hallucinations, particularly visual hallucinations, in normal healthy individuals. Hallucinogens fall into two distinct chemical classes, the phenylethanolamines, and the substituted tryptamines, both of which are structurally related to serotonin. Many in vitro studies, utilizing radioligand binding techniques, as well as functional pharmacological assays, have repeatedly demonstrated that these drugs are potent 5HT2A and 5HT2C receptor agonists (5). More recent in vivo studies, in which normal volunteers are administered the hallucinogen MDMA (Ecstasy) and then evaluated for clinical response, as well as anatomical measures of brain activation utilizing functional neuro-imaging technologies, have demonstrated that the psychometric and pharmacological activities of hallucinogens can be blocked by anti-psychotic drugs as well as the compound ketanserin (6,7). These drugs share a common molecular property, 5HT2A receptor inverse agonism.

Example 2

Inverse Agonist Studies

Once treatment-induced motoric and neuropsychiatric symptoms develop in PD patients, few viable therapeutic options exist to manage these disturbances. Treatment strategies differ for these two classes of symptoms, but one uniformly clinically efficacious, yet poorly tolerated approach, involves the use of antipsychotic agents. Antipsychotics are known to possess high affinity for the dopamine $D_2$ subclass of dopamine receptors and neutral antagonism of these receptors underlie the therapeutic efficacy of these drugs in human psychosis. In addition to dopamine $D_2$ receptor antagonism, these agents possess a wide range of additional potent and pharmacologically relevant activities at many of the other monoaminergic receptor subtypes including serotonin, adrenergic, muscarinic and histaminergic receptors. Of these additional molecular actions, 5HT2A receptor interactions have been the subject of significant study. That antipsychotics have high affinity for multiple receptor subtypes, including serotonin 2 receptors, was demonstrated by the application of radioligand binding techniques (8). The methodologies used to document this cannot define the nature of the interaction between an anti-psychotic antipsychotic and a given receptor. For example, the methods are unable to distinguish as to whether a drug possesses positive (agonist) or negative (inverse agonist) intrinsic activity, or if it lacks intrinsic activity and functions as a neutral antagonist. Recently, this class of drugs was profiled using a functional assay that can discriminate the mechanistic nature of a drug-target interaction (9).

This approach revealed a number of novel aspects of antipsychotic drug action (See U.S. Pat. No. 6,358,698, which is hereby incorporated by reference in its entirety). It confirmed that these drugs as a class possess potent neutral antagonistic activity at the $D_2$ receptor. Importantly, it also revealed that nearly all antipsychotic drugs, with the exception of the substituted benzamides, possess potent negative intrinsic activity (inverse agonism) at the 5HT2A receptor. These efforts have identified inverse agonist activity at the 5HT2A receptor as being a critical molecular component of anti-psychotic drug action, and suggest that compounds that are selective 5HT2A receptor inverse agonists may have antipsychotic efficacy, even in the absence of $D_2$ receptor activity.

None of the typical antipsychotics, exemplified by haloperidol, can be administered to PD patients because of severe worsening in their motor states. The more recent development of newer atypical agents, namely those with reduced

**28**

(but clearly not absent) liability to induced motoric side effects, suggested that perhaps these agents could be used in PD patients to control dyskinesias and hallucinosis. Unfortunately, the majority of these agents are not tolerated in PD patients secondary to worsening of motor function (10). Of the atypical agents, only one, clozapine, has shown efficacy in treating these adverse treatment-induced side effects in PD patients without untoward motoric liabilities. As such, an improved understanding of the in vitro molecular profile of clozapine can provide critical insights into the design of novel agents for these difficult to treat indications.

The demonstration that clozapine is tolerated in PD patients comes from studies on treatment-induced psychosis. Two well-designed placebo controlled, double blind clinical trials have shown that clozapine is efficacious in psychotic PD patients, and does not worsen parkinsonism, at doses in the 25-35 mg/day range (11,12). Similarly, two open label studies of clozapine in L-dopa and apomorphine induced dyskinesias also demonstrate efficacy and tolerability of low doses of clozapine, on the order of 50-100 mgs/day in these patients (13,14). The dosages used in these PD patients are much lower than the typical 600-900 mg/day range of doses used in treatment refractory schizophrenia. Commensurate with this lower dosing, plasma levels of clozapine in PD patients with psychosis ranged from 4.5 to 16.1 ng/ml (15). This is dramatically lower than the $\cong 250$ ng/ml average serum levels that are associated with therapeutic response in refractory schizophrenic patients.

Not surprisingly, the administration of low dose clozapine, and the commensurate plasma levels obtained at these doses, are well below those necessary for $D_2$ receptor occupancy, providing a mechanistic understanding of why these dosages are tolerated with respect to motoric liability in these patients. (Positron emission tomography (PET) studies in schizophrenic patients have defined steady state plasma concentrations of clozapine that are required to generate high occupancy of striatal dopamine $D_2$ receptors). These data also argue that efficacy in dyskinesia and psychosis is mediated by one or more of the non-$D_2$ receptor targets of this drug. Since rank orders of receptor potencies, as determined by in vitro pharmacological assays, has repeatedly been shown to be a reliable predictor of in vivo receptor action, the receptor sites for which clozapine display a higher potency than $D_2$ receptors would be predicted to potentially mediate its clinical efficacy in this indication. Detailed functional profiling of clozapine against over 30 of the known monoaminergic receptor subtypes has identified only five sites with higher affinity than dopamine $D_2$ receptors, histamine $H_1$, muscarinic m1 and m4, and serotonin 2A, 2B, and 6 receptors. Table 2 reports the absolute and relative potencies of clozapine at some of these monoamine receptor targets as determined by the physiologically predictive in vitro R-SAT assay. These data suggest that at the clinical dosing and serum levels of clozapine observed in PD, two receptor sites are preferentially occupied, the histamine $H_1$ and 5HT2A receptors.

Conversely, plasma levels achieved with 50 mgs/day of clozapine result in full occupancy of cortical 5HT2A receptors, and extrapolation to the plasma levels observed in PD patients treated for psychosis suggest near complete occupancy of 5HT2A receptors at these dosages as well (16). Whereas central occupancy of 5HT2A receptors, coupled with negative intrinsic activity, may mediate efficacy in these states, central occupancy of histamine $H_1$ receptors is known to cause sedation, an effect that was observed in the majority of PD patients treated with low dose clozapine. Taken together these data suggest that clozapine is acting primarily as a 5HT2A receptor inverse agonist in this clinical setting.

US 7,601,740 B2

**29**

TABLE 2

| Antagonist and Inverse Agonist Potencies of Clozapine at Monoamine Receptors | | | | | |
|---|---|---|---|---|---|
| | $D_2$ | 5HT2A | 5HT2B | 5HT2C | $H_1$ |
| Clo-zapine | 72 +/− 56 | 6.4 +/− 1.0 | 20 +/− 9 | 250 +/− 60 | 0.40 +/− 0.07 |
| Ratio to $D_2$ | | 11 | 3.6 | 0.3 | 180 |

Data are derived from (9) and are reported as Ki values for the D2 receptor determined as a competitive antagonist, and $EC_{50}$ values for the remaining receptors determined as inverse agonists, in nanomolar unit's +/− standard deviation of three to eight separate determinations.

Behavioral Pharmacological Evidence

The tartrate salt of the compound, N-(1-methylpiperidin-4-yl)-N-(4-flourophenylmethyl)-N'-(4-(2-methylpropyloxy) phenylmethyl)carbamide (compound of formula (I)), is a potent, selective, orally bioavailable 5HT2A receptor inverse agonist. The compound of formula (I) also possesses lesser potency as a 5-HT2C receptor inverse agonist and lacks intrinsic activity at the remaining monoaminergic receptor subtypes. Perhaps most notably, the compound of formula (I) lacks activity at dopamine receptor subtypes. (See U.S. patent application Ser. No. 09/800,096, which is hereby incorporated by reference in its entirety). Extensive behavioral pharmacological profiling of this agent, including pre-clinical models of antipsychotic and anti-dyskinetic drug actions support the therapeutic use of the compound of formula (I) in Parkinson's Disease and related human neurodegenerative diseases.

Example 3

Animal Studies

To determine potential in vivo antipsychotic activity, we studied the compound of formula (I) in an animal model that predicts such efficacy in humans. The compound of formula (I) attenuates hyperactivity induced by the non-competitive N-methyl-d-aspartate (NMDA) antagonist MK-801 (dizo-cilpine) with a minimum effective dose of 1 mg/kg s.c. (FIG. 2A), and 10 mg/kg p.o. (FIG. 2B). The compound of formula (I) also reduced spontaneous locomotion at 3 mg/kg and higher s.c. doses (FIG. 2A), and at oral doses between 10 and 100 mg/kg (FIG. 2B). In FIG. 2A and 2B, asterisks indicate statistical significance (p<0.05) compared to respective vehicle control. Inhibition of MK-801 is a property shared by most atypical antipsychotic agents, and after i.p. administration, the compound of formula (I) attenuated MK-801 hyperactivity at 1 mg/kg, in a manner similar to the atypical antipsychotic clozapine.

Example 4

Primate Animal Studies

To determine the potential in vivo anti-dyskinetic activity, we studied the compound of formula (I) in an animal model that predicts such efficacy in humans. The use of 1-methyl-4-phenyl-1,2,3,6-tetrahydropyrilidine (MPTP) to induce parkinsonism in monkeys, coupled with prolonged administration of L-dopa induces severe dyskinesias. The compound of formula (I), when administered s.c., to dyskinetic primates was found to significantly diminish L-dopa induced dyskinesias in a dose dependent manner as determined by the reduc-

**30**

tion of observable dyskinetic movements scored as a percentage of those present in placebo injected animals (FIG. 3).

Example 5

5HT2A/C Serotonin Antagonist Treatment of Parkinson's Disease

The present example demonstrates that blockage of 5HT2A/C receptors with the compound of formula (I) in parkinsonian patients reduces levodopa-associated dyskinesias and motor response fluctuations. Additionally, the compound of formula (I) is shown to be safe and tolerated at effective doses and potentiates the beneficial effects of levodopa on parkinsonian symptoms.

The compound of formula (I) is administered orally in a group of 21 parkinsonian patients in a double blind, placebo controlled study lasting approximately 5 weeks. An unbalanced parallel-group dose escalation design is used involving an initial placebo run-in, followed by a randomized (active) phase of the compound of formula (I) or placebo. The compound of formula (I) is administered once daily for four weeks, with the dose escalating once each week. Assessments are made on the first day of each dose escalation.

The study is conducted on an outpatient basis. Studies of the compound of formula (I) effect on the motor response to levodopa are conducted in accordance with the standard Experimental Therapeutics Branch (ETB) paradigm, which makes use of a steady state infusion of dopaminomimetics in order to maximize the reliability of data acquisition as well as to permit determination of the anti-parkinsonian efficacy half-time.

Patients who participate in the study have particular characteristics. The patients are between 30 and 80 years of age, inclusively. The patients had been diagnosed with idiopathic Parkinson's disease based on the presence of a characteristic clinical history and neurological findings. The patients displayed relatively advanced disease symptoms with levodopa-associated motor response complications, including peak-dose dyskinesias and wearing-off fluctuations.

The sample size is calculated for the primary endpoint: the Unified Parkinson's Disease Rating Scale (UPDRS) part III motor examination. A sample size of 17 provides 80% power to detect predicted differences, a 40% reduction, with a standardized effect size of 1, using a two-tailed t-test at the 0.05 significance. This assumes an anti-dyskinetic effect of the compound of formula (I) to be compared to that of amanta-dine (as observed in previous ETB studies), and a linear dose-response of the compound of formula (I). In this phase 2 study we will accept a two-sided alpha at a 0.05 significance level. Four patients will be added for the placebo group, totaling 21 subjects enrolled in the study.

Patients enter the levodopa infusion optimal rate determination (dose finding) portion of the study as soon as all prohibited medication has been withdrawn for at least four weeks. If the patient has had an intravenous dosing rate for levodopa optimized within the past three months, these doses may be used for the study.

Intravenous infusion of levodopa is conducted in an in-patient ward. On the night prior to all infusions, subjects' usual anti-parkinsonian medications are withheld (levodopa by 12 AM, dopamine agonists by 6 PM). During the first and second days of optimal rate determination, two baseline UPDRS ratings are performed prior to levodopa infusion. Initially, the "optimal" rate of levodopa infusion is carefully titrated for each individual to determine the minimum dose needed to achieve a stable "on" state characterized by an "optimal" reduction in parkinsonian signs and mild but ratable dyskinesias (comparable to patient's usual "on" state). Dyskinesia severity is similar to that experienced with each

JSUF0030

Case 1:20-cv-00985-GBW   Document 258-2   Filed 04/28/23   Page 27 of 30 PageID #: 4859

US 7,601,740 B2

<table>
<tr><td>31</td><td>32</td></tr>
</table>

patient's usual therapeutic regimen. Levodopa will be administered by means of an indwelling intravenous catheter. The initial infusion rate of levodopa will not exceed 80 mg/hr. Subsequent infusion rates may be gradually increased until the optimal rate is found, up to a maximum of 2 mg/kg/hour.

Levodopa infusions will ordinarily last up to 8 hours, but may be continued uninterrupted for several days or be repeated on other days to obtain reliable assessment of motor function. The peripheral decarboxylase inhibitor carbidopa (50 mg, given every 3 hours) is administered orally starting at least one hour prior to intravenous administration of levodopa and continuing until levodopa effects have worn off. After the initial "optimal" rate finding for levodopa infusion, all subsequent infusions are given at the predetermined "optimal rate". As an intravenous levodopa formulation is not commercially available in this country, is administered under ETB IND 22,663.

Patients are dosed according to Table 3:

TABLE 3

| Patient group | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 |
|---|---|---|---|---|---|
| I | Placebo | Placebo | Placebo | Placebo | Placebo |
| II | Placebo | 30 mg Compound (I) | 70 mg Compound (I) | 150 mg Compound (I) | 300 mg Compound (I) |

Patients proceed through this dose escalation scheme until week 5 or until maximum tolerated dose is attained.

Throughout the study, patients are evaluated weekly for drug safety and tolerability during their inpatient admission and two weeks after treatment for an outpatient follow-up visit. During each inpatient admission, patients remain under close medical monitoring by staff physicians and nurses. If, at any time during the treatment period, the staff physician determines that a patient does not tolerate any given dose, the patient will be considered to have attained maximum tolerated dose and will not receive any additional doses of the compound of formula (I). Patients are encouraged to contact study staff between study days to report any adverse experiences.

Patients are observed in the hospital and will not be discharged until free of all significant adverse effects, if any. Safety assessments, which are performed on study days, include adverse experiences, monitoring vital signs, standard safety monitoring, and cardiac monitoring.

Subjects in Patient Group II show a reducing in levodopa-associated dyskinesias and motor response fluctuations. The subjects in Patient Group II tolerate the compound of formula (I) at all doses administered. The compound of formula (I) therapy also potentiates the benefical effects of levodopa on parkinsonian symptoms.

Example 6

R-SAT Assay

The functional receptor assay Receptor Selection and Amplification Technology (R-SAT) was used to investigate the activity of the compound of formula (I) as an inverse

agonist at 5HT2A receptors. The compound of formula (I) exhibited high potency (pIC50 of 9.1) and high efficacy (98%) at 5HT2A receptors.

Example 7

Anti-Psychotic Activity Study

To determine potential in vivo antipsychotic activity, we studied the compound of formula (I) in an animal model that predicts such efficacy against positive symptoms in humans (FIG. 4). In FIG. 4, ACP refers to the compound of formula (I). The compound of formula (I) did not reduce hyperactivity induced by 3.0 mg/kg I.P. of the indirect dopamine agonist d-amphetamine when administered alone at doses of 10.0 mg/kg P.O. and below to mice. As expected, haloperidol dose-dependently reduced amphetamine hyperactivity with a minimally significant effect seen at 0.1 mg/kg, s.c. When a 10.0 mg/kg P.O. dose of the compound of formula (I) was administered in combination with various s.c. doses of haloperidol, the minimally significant dose of haloperidol was decreased to 0.03 mg/kg. With this combination, amphetamine hyperactivity is completely reversed. Thus, an inactive dose of the compound of formula (I), when combined with an inactive dose of haloperidol produces a complete reversal of amphetamine hyperactivity. This suggests that the antipsychotic activity of haloperidol may be significantly enhanced when it is combined with the compound of formula (I). Equally important, when the compound of formula (I) is combined with haloperidol, the dose of haloperidol can be lowered without a loss of efficacy. This would be expected to improve the safety margin for the clinical use of haloperidol in neuropsychiatric diseases.

Literature Cited

The following references are incorporated herein by reference in their entireties.

1. Everett, G., M., and Borcherding, J., W. (1970) L-dopa: effect on concentration of dopamine, norepinephrine and serotonin in brains of mice. Nature, 168: 849-850.

2. Butcher, L., Engel, J., and Fuxe, K. (1970) L-dopa induced changes in central monoamine neurons after peripheral decarboxylase inhibition. J. Pharm. Pharmac., 22: 313-316.

3. NG, K., Y., Chase, T., N., Colburn, R., W., and Kopin, I., J. (1970) L-dopa induced release of cerebral monoamines. Science, 170: 76-77.

Birkmayer, W., Danielczyk, W., Neumayer, E., and Riederer, P. (1974) Nucleus Ruber and L-dopa Pstchosis: Biochemical Post mortem findings. Journal of Neural Transmission, 35: 93-116.

5. Sadzot, B., Baraban, J., M., Glennon, R., A., Lyon, R., A., Leonhardt, S., Jan, C., R., and Tietler, M. (1989) Hallucinogenic drug interactions at human brain 5-HT2 receptors; implications for treating LSD-induced hallucinogenesis. Psychopharmacology, 98(4): 495-499.

6. Liechti, M., E., Geyer, M., A., Hell, D., and Vollenwieder, F., X. (2001) Effects of MDMA(ecstasy) on prepulse inhibition and habituation of startle in humans after pretreatment with citalopram, haloperidol, or ketanserin., Neuropsychopharmacology, 24(3): 240-252.

7. Gamma, A., Buck, A., Berthold, T., Liechti, M., E., and Vollenweider, F., X. (2000) 3,4-methylenedioxymethamphetamine (MDMA) modulates cortical and limbic brain activity as measured by [H(2)(15)0]-PET in healthy humans., Neuropsychopharmacology, 23(4): 388-395

8. Leysen, J., E., Niemegeers, C., J., Tollenaraere, J., P., and Laduron, P., M. (1978) Serotonergic component of neuroleptic receptors. Nature (Lond) 272: 168-171.

US 7,601,740 B2

**33**

9. Weiner, D., M., Burstein, E., S., Nash, N., Croston, G., E., Currier, E., A., Vanover, K., E., Harvey, S., C., Donohue, E., Hansen, H., C., Andersson, C., M., Spalding, T., A., Gibson, D., F., Krebs-Thomson, K., Powell, S., B., Geyer, M., A., Hacksell, U., and Brann, M., R. (2001) 5-hydroxytryptamine 2A receptor inverse agonists as antipsychotics. *J Pharmacol Exp Ther,* 299(1): 268-76.

10. Friedman, J., H., and Factor, S., A. (2000) Atypical antipsychotics in the treatment of drug-induced psychosis in Parkinson's disease. *Mov. Disord,* 15(2): 201-211.

11. The Parkinson Study Group (1999) Low-dose clozapine for the treatment of drug-induced psychosis in Parkinson's disease. *New Eng. J. Med.,* 340(10): 757-763.

12. The French Clozapine Study Group (1999) Clozapine in drug-induced psychosis in Parkinson's disease. *Lancet,* 353: 2041-2042.

13. Bennett, J., P., Landow, E., R., and Shuh, L., A. (1993) Suppression of dyskinesias in advanced Parkinson's Disease. II Increasing daily clozapine doses suppress dyskinesias and improve parkinsonism symptoms. *Neurology,* 43: 1551-1555.

14. Durif, F., Vidailhet, M., Assal, F., Roche, C., Bonnet, A., M., and Agid, Y. (1997) Low-dose clozapine improves dyskinesias in Parkinson's disease. *Neurology,* 48: 658-662.

15. Meltzer, H., Y., Kennedy, J., Dai, J., Parsa, M., and Riley, D. (1995) Plasma clozapine levels and the treatment of L-DOPA-induced psychosis in Parkinson's disease. A high potency effect of clozapine. *Neuropsychopharmacology,* 12(1): 39-45.

16. Nordstrom, A., L., Farde, L., and Halldin, C. (1993) High 5-HT2 receptor occupancy in clozapine treated patients as demonstrated by PET. *Psychopharmacology,* 110(3): 365-367.

17. Bibbiani, F., Oh, F., D., and Chase, T., C. (2001) Serotonin 5-HT1A agonist improves motor complications in rodent and primate parkinsonian models. *Neurology,* 57: 1829-1834.

What is claimed is:

**1.** A composition comprising a compound of Formula (I):

(I)



or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable carrier.

**2.** The composition of claim **1,** further comprising an additional therapeutic agent.

**3.** The composition of claim **2,** wherein the additional therapeutic agent is selected from the group consisting of levodopa bromocriptine, pergolide, ephenedrine sulfate, pemoline, mazindol, d,1-α-methylphenethylamine, methylphenidate, pramipexole, modafinil, and ropinirole.

**4.** The composition of claim **2,** wherein the additional therapeutic agent is an anti-dyskinesia agent.

**5.** The composition of claim **4,** wherein the additional therapeutic agent is an anti-dyskinesia agent selected from the group consisting of baclofen, botulinum toxin, clonazepam, and diazepam.

**6.** The composition of claim **2,** wherein the additional therapeutic agent is an anti-dystonia, anti-myoclonus, or anti-

**34**

tremor agent selected from the group consisting of baclofen, botulinum toxin, clonazepam, and diazepam.

**7.** The composition of claim **2,** wherein the additional therapeutic agent is an anti-psychotic agent with dopaminergic receptor antagonism.

**8.** The composition of claim **2,** wherein the additional therapeutic agent is an anti-psychotic agent selected from the group consisting of chlorpromazine, haloperodol, molindone, thiordazine, a phenothiazine, a butyrophenone, diphenylbutylpiperidine (pimozide), thioxanthines (fluphenthixol), substituted benzamides (sulpiride), sertindole, amisulpride, ziprasidone, aripiprazole, clozapine, olanzapine, riserpidone, N-desmethylclozapine, N-desmethylolanzapine, and 9-OH-respiridone.

**9.** The composition of claim **1,** wherein the compound of formula (I) is the free base.

**10.** The composition of claim **1,** wherein the salt is a hydrochloride salt.

**11.** The composition of claim **1,** wherein the salt is a tartrate salt.

**12.** The composition of claim **1,** wherein the composition is in a single dosage form.

**13.** The composition of claim **12,** wherein the composition is in a single unit dosage form suitable for oral administration to a human.

**14.** The composition of claim **12,** wherein the dosage form is solid.

**15.** The composition of claim **13,** wherein the composition is in the form of a tablet or a capsule.

**16.** The composition of claim **15,** wherein the composition is in the form of a tablet.

**17.** The composition of claim **12,** wherein the amount of the compound of Formula (I), or a salt thereof, is about 0.001 mg to about 50 mg.

**18.** The composition of claim **12,** wherein the amount of the compound of Formula (I), or a salt thereof, is from about 1 mg to about 10 mg.

**19.** The composition of claim **12,** wherein the amount of the compound of Formula (I), or a salt thereof, is about 10 mg.

**20.** The composition of claim **12,** wherein the amount of the compound of Formula (I), or a salt thereof, is about 25 mg.

**21.** The composition of claim **12,** wherein the amount of the compound of Formula (I), or a salt thereof, is about 50 mg.

**22.** A compound having the structure of Formula (I):

(I)



or a pharmaceutically acceptable salt thereof.

**23.** A compound of claim **22,** wherein the compound of formula (I) is in solid form.

**24.** A compound of claim **22,** wherein the compound of formula (I) is the free base.

**25.** A compound of claim **22,** wherein the salt is a hydrochloride salt.

**26.** A compound of claim **22,** wherein the salt is a tartrate salt.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,601,740 B2                                                    Page 1 of 1
APPLICATION NO. : 10/759561
DATED              : October 13, 2009
INVENTOR(S)      : Weiner et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page,

Item [*] Notice:          Subject to any disclaimer, the term of this patent is extended or adjusted
under 35 USC 154(b) by (899) days

Delete the phrase "by 899 days" and insert -- by 1,259 days --

Signed and Sealed this

Twenty-seventh Day of April, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

JSUF0033

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.         : 7,601,740 B2                                                    Page 1 of 1
APPLICATION NO.    : 10/759561
DATED              : October 13, 2009
INVENTOR(S)        : Weiner et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1,249 days.

Signed and Sealed this
Twenty-fifth Day of August, 2015

*Michelle K. Lee*

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

JSUF0034

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  24-1401

**Short Case Caption:**  Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑      the filing has been prepared using a proportionally-spaced typeface and includes  8,934  words.

☐      the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐      the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 03/29/2024          Signature:  /s/ Chad Landmon

Name:  Chad Landmon

Save for Filing