**2024-1401**

# United States Court of Appeals
# for the Federal Circuit#

ACADIA PHARMACEUTICALS INC.,
*Plaintiff-Appellee,*

– v. –

AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA, INC., TEVA
PHARMACEUTICALS USA, INC.,
*Defendants,*

MSN LABORATORIES PRIVATE LTD., MSN PHARMACEUTICALS, INC.,
*Defendants-Appellants.*

*On Appeal from the United States District Court for the
District of Delaware, Case No. 1:20-cv-00985-GBW,
Honorable Gregory B. Williams, U.S. District Judge*

### BRIEF FOR PLAINTIFF-APPELLEE

CHAD J. PETERMAN
BRUCE M. WEXLER
SCOTT F. PEACHMAN
PETER E. CONWAY
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000
chadpeterman@paulhastings.com
brucewexler@paulhastings.com
scottpeachman@paulhastings.com
peterconway@paulhastings.com

FELIX A. EYZAGUIRRE
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, TX 77002
(713) 860-7300
felixeyzaguirre@paulhastings.com

*Counsel for Plaintiff-Appellee*

MAY 29, 2024

## ASSERTED CLAIMS

Asserted claim 26 of U.S. Patent No. 7,601,740 depends from claim 22:

22. A compound having the structure of Formula (I):

(I)



26. A compound of claim 22, wherein the salt is a tartrate salt.

## **CERTIFICATE OF INTEREST**

Counsel for Acadia Pharmaceuticals Inc. certifies the following:

| 1. Provide the full names of all entities represented by undersigned counsel in this case. | 2. Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | 3. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
|---|---|---|
| Acadia Pharmaceuticals Inc. | | |

1.     The names of all law firms and the partners or associates that appeared for the party now represented for the entities in the originating court or agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

PAUL HASTINGS LLP:  Rebecca A. Hilgar

SAUL EWING ARNSTEIN & LEIR LLP:  James D. Taylor, Jr., Jessica M. Jones, Michelle C. Streifthau-Livizos, Patrick A. Lockwood

2.     The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

None

3.     Information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases.

Not Applicable

Respectfully submitted,

Dated:  May 29, 2024

/s/ Chad J. Peterman
Chad J. Peterman
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000
chadpeterman@paulhastings.com

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................1

STATEMENT OF ISSUES ..........................................................4

STATEMENT OF THE CASE .....................................................4

    I.      BACKGROUND......................................................4

        A.    The Innovative Compound Pimavanserin..................4

        B.    Claim 26 of the '740 Patent ....................................5

        C.    Relevant Prosecution History .................................6

    II.     THE PROCEEDINGS BELOW ................................8

        A.    Plaintiff's Hatch-Waxman Action ...........................8

        B.    The District Court Declared the Asserted Claims Are Not Invalid for Obviousness-Type Double Patenting ...................10

SUMMARY OF THE ARGUMENT .........................................11

ARGUMENT ............................................................................13

    I.      STANDARD OF REVIEW ...................................13

    II.     THE DISTICT COURT CORRECTLY RULED THAT OTDP DOES NOT JUSTIFY TRUNCATING THE TERM OF THE FIRST-FILED, FIRST-ISSUED PATENT BASED ON ITS OWN PROGENY...................14

        A.    OTDP Is an Invalidity Defense that Prevents Later-filed Patents from Extending the Monopoly beyond the Original Patent Term....................16

        B.    The Later-Filed, Later-Issued '271 Patent Is Not a Proper OTDP Reference Against the First-Filed, First-Issued '740 Patent ...................20

        C.    MSN's Proposed Rule Would Effectively Undo the 1952 Patent Act and Wreak Havoc on the Federal Patent System ...................22

        D.    MSN's Parsing of Legal Precedent Is Deficient.....................24

i

III.    THE DISTRICT COURT CORRECTLY FOUND THAT THE SAFE HARBOR OF § 121 APPLIES.....................................30

    A.    The '271 Patent Issued On An Application Filed as a Result of a Restriction Requirement in the '740 Patent ..........31

    B.    The District Court Correctly Found That the "Filed Before the Issuance of the Patent" Requirement in § 121 Is Inapplicable When the Challenged Patent Issued from An Original Application ...........................................................49

CONCLUSION .....................................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*,
764 F.3d 1366 (Fed. Cir. 2014) ......................................................17, 20, 25, 26

*Allergan USA, Inc. v. MSN Laboratories Private Ltd.*,
Appeal No. 24-1061 (Fed. Cir. 2024)......................................................19, 28, 29

*Boehringer Ingelheim Int'l GmbH v. Barr Lab'ys, Inc.*,
592 F.3d 1340 (Fed. Cir. 2010) ......................................................*passim*

*C R Bard Inc. v. AngioDynamics, Inc.*,
979 F.3d 1372 (Fed. Cir. 2020) ......................................................13

*In re Cellect, LLC*,
81 F.4th 1216 (Fed. Cir. 2023) ......................................................*passim*

*CellSpin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019) ......................................................18

*In re Eckel*,
393 F.2d 848 (C.C.P.A. 1968) ......................................................23

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722 (2002)......................................................16

*G.D. Searle LLC v. Lupin Pharms., Inc.*,
790 F.3d 1349 (Fed. Cir. 2015) ......................................................41, 43, 49

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
349 F.3d 1373 (Fed. Cir. 2003) ......................................................18, 37, 38

*Georgia-Pacific Corp. v. U.S. Gypsum Co.*,
195 F.3d 1322 (Fed. Cir. 1999) ......................................................17

*Gilead Scis., Inc. v. Natco Pharma Ltd.*,
753 F.3d 1208 (Fed. Cir. 2014) ......................................................*passim*

iii

*Immunex Corp. v. Sandoz Inc.*,
  964 F.3d 1049 (Fed. Cir. 2020) ....................................................23, 27

*In re Janssen Biotech, Inc.*,
  880 F.3d 1315 (Fed. Cir. 2018) ..................................................*passim*

*In re Longi*,
  759 F.2d 887 (Fed. Cir. 1985) ................................................................17

*Merck & Co. v. Hi-Tech Pharmacal Co.*,
  482 F.3d 1317 (Fed. Cir. 2007) ............................................................17

*Microsoft Corp. v. I4I Ltd. P'ship*,
  564 U.S. 91 (2011) ..........................................................................18, 20

*Miller v. Eagle Mfg. Co.*,
  151 U.S. 186 (1894) ................................................................................17

*Minerva Surgical, Inc. v. Hologic, Inc.*,
  594 U.S. 559 (2021) ..............................................................................23

*Novartis AG v. Ezra Ventures LLC*,
  909 F.3d 1367 (Fed. Cir. 2018) ..................................................*passim*

*Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.*,
  909 F.3d 1355 (Fed. Cir. 2018) ..................................................*passim*

*Odiorne v. Amesbury Nail Factory*,
  18 F. Cas. 578 (C.C.D. Mass. 1819) ...................................................17

*Ortho Pharm. Corp. v. Smith*,
  959 F.2d 936 (Fed. Cir. 1992) ..............................................................18

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
  678 F.3d 1280 (Fed. Cir. 2012) ...........................................................16

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
  566 F.3d 989 (Fed. Cir. 2009) .......................................................20, 27

*Return Mail, Inc. v. Postal Service*,
  139 S. Ct. 1853 (2019) ..........................................................................18

iv

*SimpleAir, Inc. v. Google LLC*,
    884 F.3d 1160 (Fed. Cir. 2018) ...........................................................20, 24, 27

*Studiengesellschaft Kohle mbH v. Northern Petrochemical Co.*,
    784 F.2d 351 (Fed. Cir. 1986) ....................................................................*passim*

*Wyeth v. Kappos*,
    591 F.3d 1364 (Fed. Cir. 2010) ..................................................................16, 21

**Statutes**

35 U.S.C. § 101 ...................................................................................................*passim*

35 U.S.C. § 120 ...................................................................................................*passim*

35 U.S.C. § 121 ...................................................................................................*passim*

35 U.S.C. § 154 ...................................................................................................*passim*

35 U.S.C. § 253 ...............................................................................................16, 17, 22, 24

35 U.S.C. § 271(e)(2) ..............................................................................................8

The Patent Act, Pub. L. No. 82-593, 66 Stat. 792 (1952).......................................22

**Other Authorities**

37 C.F.R. § 1.312 ....................................................................................................7

150 Cong. Rec. S7521 (June 25, 2004) (statement of Sen. Hatch) .........................22

## **STATEMENT OF RELATED CASES**

No other appeals have been taken in this case, and counsel for

Plaintiff-Appellee Acadia Pharmaceuticals Inc. is aware of no other cases pending

in any court or agency that will directly affect, or be directly affected by, this

Court's decision in the instant appeal.

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '740 patent | U.S. Patent No. 7,601,740 (Appx79-108) |
| '271 patent | U.S. Patent No. 9,566,271 (Appx109-135) |
| '462 patent | U.S. Patent No. 7,732,462 |
| '561 application or the "original application" | U.S. Patent Application No. 10/759,561 (Appx136-214, Appx469-511) |
| '527 application | U.S. Patent Application No. 11/416,527 (Appx215-458) |
| '855 application | U.S. Patent Application No. 11/416,855 |
| 2007 Restriction Requirement | Restriction requirement issued in the '561 application on July 5, 2007 (Appx204-212) |
| MBr. | MSN's Brief |
| Defendants or MSN | Defendants-Appellants MSN Laboratories Pvt. Ltd. and MSN Pharmaceuticals, Inc. |
| PD | Parkinson's disease |
| PDP | Parkinson's disease psychosis |
| OTDP | obviousness-type double patenting |
| POSA | person of ordinary skill in the art |
| PTA | patent term adjustment under 35 U.S.C. § 154(b) |
| PTAB | Patent and Trial Appeal Board |
| PTO | U.S. Patent and Trademark Office |
| 2004 CREATE Act | Cooperative Research and Technology Enhancement Act of 2004 |

| Patent Act | Patent Act of 1952, codified in Title 35 of the U.S. Code |
|---|---|
| URAA | Uruguay Rounds Agreement Act |
| Section 101 or § 101 | 35 U.S.C. § 101 |
| Section 120 or § 120 | 35 U.S.C. § 120 |
| Section 121 or § 121 | 35 U.S.C. § 121 |
| Section 282 or § 282 | 35 U.S.C. § 282 |
| Section 154 or § 154 | 35 U.S.C. § 154 |
| *SGK-C* | Judge Newman's concurring opinion in *Studiengesellschaft Kohle v. North Petrochem*, 784 F.2d 351 (Fed. Cir. 1986) |

## INTRODUCTION

The '740 patent in suit was Plaintiff-Appellee Acadia's *original, first-filed, first-issued* patent protecting its invention of pimavanserin, a novel compound for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis ("PDP"), which has helped many patients suffering from the debilitating effects of PDP. The district court correctly rejected Defendant Appellant's argument that Claim 26 of the '740 patent was invalid for obviousness-type double patenting ("OTDP") over claim 5 of the later-filed, later-issued '271 divisional patent. The decision was based on two grounds, each providing an independent basis for affirmance. First, the district court determined that the '271 patent was simply not an OTDP reference against the '740 patent. Specifically, there is no basis in OTDP law for truncating a patentee's entitled grant of exclusivity, pursuant to 35 U.S.C. § 154, in its *original, first-filed, first-issued* patent based on a later-filed, later-issued patent in the same family that expires earlier solely due to a lack of PTO delay, *i.e.*, PTA. Second, the original '740 patent is protected by the safe harbor of 35 U.S.C. § 121 from the use of its divisional, the '271 patent, as an OTDP reference based on the statute's requirements, this Court's precedent, and the undisputed facts.

1

**First Ground: the '271 Patent Is Not an OTDP Reference Against the '740 Patent**

In rejecting MSN's OTDP challenge, the district court correctly applied this Court's precedent, along with the well-established purpose of OTDP to hold that the '740 patent's progeny cannot serve as OTDP references against it. OTDP is a judicially-created, equitable doctrine that ensures the public gets the benefit of the invention after the original period of monopoly expires. The awarded term of the first-filed, first-issued patent for an invention defines the original period of monopoly, *i.e.*, the inventor's bargain with the public, establishing when the public will be free to use that invention. Accordingly, post-URAA, OTDP prevents a patentee from extending this original patent term by obtaining later-filed, later-expiring patents on obvious variants of the invention. Later-filed, later-issued patents that expire earlier do not extend this original monopoly period and are simply not an "evil," let alone one which OTDP was created to curtail. There is no basis in law or equity to shorten that original award of exclusivity merely because the inventor has acquiesced to shorter patent terms on obvious variants, which benefits, rather than harms, the public.

Here, there was no extension of patent monopoly as the '740 patent established the original term (including PTA) for the inventions disclosed therein,

2

and the '271 patent did not extent that term.  Later-filed, later-issued patents have never been found to truncate or invalidate the original monopoly period to which a patentee is indisputably entitled.  The district court's ruling respects the traditional concerns that underlie OTDP and should be affirmed.

### Second Ground: Alternatively, Safe Harbor Applies to Protect the '740 Patent

The district court likewise was correct in finding that the '740 patent was protected against the '271 patent by the safe harbor of 35 U.S.C. § 121.  The safe harbor protects the "patent issued on" the "original application" from an OTDP challenge that "use[s] as a reference" "[a] patent issu[ed] on … an application filed as a result of [a restriction] requirement."  35 U.S.C. § 121.  Here, the district court correctly found that the divisional line of the patent family, which led to the '271 patent, was filed as a result of a restriction requirement in the original '561 application (which issued as the '740 patent).  Even though the divisional line was initially filed as a continuation application before the restriction requirement, Acadia amended the claims *in toto* as a result of the restriction requirement, expressly noting that the newly-filed claims were in response to the restriction and properly designating the application as a divisional of the original '561 application prior to issuance.  There is no dispute that Acadia maintained consonance with the

3

original restriction requirement in its divisional patent. Acadia's actions resulting from the restriction satisfy the requirements of 35 U.S.C. § 121.

## STATEMENT OF ISSUES

1. Whether, under the OTDP doctrine, a later-filed, later-issued, but earlier-expiring divisional patent can invalidate the first-filed, first-issued patent from that same family.

2. Whether the safe harbor provision of 35 U.S.C. § 121 protects the original patent from a later-filed, later-issued divisional patent, which descends from a divisional application that was initially filed as a continuation application, and then, after the original's restriction requirement but prior to issuance, was amended to an undisputedly consonant divisional application per 35 U.S.C. §§ 120 and 121.

## STATEMENT OF THE CASE

### I.  BACKGROUND

#### A.    The Innovative Compound Pimavanserin

Parkinson's disease ("PD") is a common, chronic, and progressive neurodegenerative disease that affects millions of people worldwide. Appx94. PD is characterized by motor symptoms and non-motor symptoms with an estimated 60% of PD patients suffering from psychosis (e.g., hallucinations and delusions).

4

*Id.* Dopamine receptor agonists are used to alleviate the symptoms of PD, but worsen PDP over time, while the vast majority of antipsychotics exacerbate motor symptoms. *Id.* This results in a therapeutic dilemma between treating either a patient's progressive motor symptoms, or their worsening PDP. Appx99-100.

The inventors of the '740 patent pioneered the development of pimavanserin, a novel atypical antipsychotic with no affinity for dopaminergic receptors that treats PDP without effecting motor function in PD patients. *Id.* The FDA approved the New Drug Application for Plaintiff's pimavanserin-based drug, NUPLAZID®, in 2018, and it is the first and only FDA-approved drug product for the treatment of hallucinations and delusions associated with PDP. Appx76.

### B.    Claim 26 of the '740 Patent

The inventors originally filed the '561 application on January 15, 2004, initially disclosing, *inter alia*, their invention of pimavanserin. Appx80. The '561 application issued on October 13, 2009, as the '740 patent, establishing the original period of exclusivity protecting the invention of pimavanserin and its obvious variations. *Id.* Claim 26 of the '740 patent is directed to the tartrate salt of pimavanserin. Appx64.

To account for PTO delay, the '740 patent received a PTA of 980 days. Appx66. The '740 patent, inclusive of PTA, therefore expires on September 22,

5

2026, for a statutory patent term of 16 years, 11 months, and 9 days.[1]  The '740

patent was the first-filed, first-issued patent to cover pimavanserin.  Appx66-67.

### C.    Relevant Prosecution History

Acadia filed the '561 application on January 15, 2004, initially presenting

claims directed to pimavanserin and its salts, and their various methods of use.

Appx67.

Acadia filed the '527 divisional application on May 3, 2006, initially

designating it as a "continuation" of the '561 application.  Appx71.  On July 5,

2007, in the first Office Action for the '561 application, the PTO issued a

restriction requirement (hereinafter "the 2007 Restriction Requirement"),

separating the pending claims into seven groups of "distinct" inventions, Groups I-

VII, and requiring the applicant to elect a single group for further prosecution.

Appx67-70.  Acadia elected to prosecute the inventions of Group I (compounds

and compositions) in the '561 application on August 6, 2007.  Appx70.

Meanwhile, on June 1, 2009, the PTO issued the first Office Action in the

'527 application, and on July 1, 2009, Acadia responded by canceling all pending

---

[1] The '740 patent received a patent term extension ("PTE") under § 156 to
compensate for FDA delay.  This PTE is not in dispute.  *See* Appx519; *see also In
re Cellect, LLC*, 81 F.4th 1216, 1227 (Fed. Cir. 2023) ("O[T]DP does not
invalidate a validly obtained PTE.").

claims and adding new claims that were within Group IV of the 2007 Restriction Requirement in the '561 application.  Appx71.  In its response, Acadia stated that the new claims "are based on subject matter in restriction groups not elected in [the '561 application]," and the "subject matter of new claims 17-19 is also within group IV (claims 40-47) of the Restriction Requirement dated July 5, 2007 in the '561 application."  Appx71-72.  Acadia also attested that "[u]pon entry of the instant amendment, applicants will amend the claim of priority such that the instant ['527] application will be a divisional of the '561 application."  Appx72.

On January 26, 2010, the PTO allowed the new claims in the '527 application, and on April 13, 2010, Acadia amended the '527 application's specification pursuant to § 120 and 37 C.F.R. § 1.312, designating the application as a divisional of the '561 application.  Appx72-73.  On April 21, 2010, the PTO accepted the amendment as directed to matters of form not affecting the scope of the invention, Appx73, and the '527 divisional application issued as the '462 patent on June 8, 2010 with May 3, 2006 as its filing date, Appx216.

Acadia also filed continuation applications from the '527 divisional application, ultimately leading to the filing of the '271 patent's application on November 6, 2015, and its issuance on February 14, 2017.  Appx67.  The '271 patent thus descends from the '740 patent and claims the benefit of its filing date,

7

January 15, 2004, due to the '561 original application's status as the earliest-filed application for the invention under sections 154(a)(2), 120, and 121.  *Id.*  Because there was no PTO delay during its prosecution, the '271 patent expires on January 15, 2024 for a patent term of approximately 7 years.  *Id.*  Claim 5 of the '271 patent is directed to a method of treatment, namely treating hallucinations or delusions by administering the tartrate salt of pimavanserin.  Appx65.

A chart of the relevant prosecution history dates is provided below:



Appx3.

## II.  THE PROCEEDINGS BELOW

### A.  Plaintiff's Hatch-Waxman Action

On July 30, 2020, Acadia filed a complaint against MSN alleging infringement of the '740 patent by MSN's ANDA No. 214925 for a generic version of Nuplazid® (pimavanserin) under 35 U.S.C. § 271(e)(2).  Appx56-57.

MSN stipulated to infringement of claim 26 of the '740 patent. Appx60-61. The parties also stipulated to resolve MSN's sole invalidity argument, alleged OTDP, on cross-motions for summary judgment since the parties agreed there were no issues of fact. Appx73.

On May 15, 2023, MSN moved for summary judgment. Appx52. On June 14, 2023, Acadia answered and cross-moved for summary judgment of no invalidity. *Id.* On December 13, 2023, the district court denied MSN's motion and granted Acadia's cross-motion. Appx16. On January 11, 2024, the district court entered final judgment in Acadia's favor. Appx17-18.

During the proceedings below, MSN admitted that the '527 application is a divisional application of the '561 application. Appx67 ¶ 21; Appx619 ("In this case, the issue is whether a patent that resulted from the '527 Application, which is a *divisional* application, can serve as a reference patent for OTDP against the 'original' '740 patent."). MSN also admitted that if Acadia had filed the same claims in a new divisional application, rather than amending the existing '527 application, safe harbor would protect the '740 patent here. Appx622 ("Acadia could have filed a divisional application for those claims that it eventually chose to add to the '527 Application in 2009. This way, the safe harbor could apply in litigation to protect the '740 patent from the new divisional application."). As

9

discussed below, MSN now tries to walk back these direct admissions which showed that their arguments were entirely form over substance, and even as form arguments, still failed.

### B.    The District Court Declared the Asserted Claims Are Not Invalid for Obviousness-Type Double Patenting

The district court properly held that claim 26 of the '740 patent is not invalid for OTDP.  Appx1-16.  The district court correctly found that the '271 patent was not an invalidating OTDP reference against the first-filed, first-issued '740 patent because (1) a patent must be earlier-filed to be available as an OTDP reference here, Appx15, and (2) the '740 patent is protected by the safe harbor provision of § 121 against the '271 patent, Appx10.

The district court determined that § 121 safe harbor applied here, because (i) the "filed before the issuance of the patent" requirement is inapplicable based on the plain text of § 121 and this Court's precedent when, as here, the challenged patent issued from the original application, (ii) there was no dispute that the consonance requirement was satisfied in this case, and (iii) the '271 patent was filed "as a result of" a restriction requirement in the original '740 patent prosecution, within the meaning of the statutory safe harbor.  Appx4-12.

This Court should affirm the district court's final judgment in favor of Acadia and against MSN.  Appx17-18.

## SUMMARY OF THE ARGUMENT

1.    Grounded in the public policy of § 101, OTDP is a judicially-created, equitable doctrine that prevents a patentee from extending his exclusive right to an invention through claims in a later-filed, later-expiring patent that are not patentably distinct from claims in an earlier-filed, earlier-expiring patent.  The district court correctly found that a later-filed, later-issued patent was not an OTDP reference against the first-filed, first-issued patent.  In denying MSN's challenge, the district court justly upheld Acadia's bargain with the public and preserved its right to enjoy a full patent term on its invention.

OTDP was judicially-created to preserve the original exclusivity period for an invention by preventing the "evil" of a patentee unjustly extending it.  Inversely, OTDP cannot invalidate or truncate that same original exclusivity period for which it was designed to protect.  As such, OTDP does not apply here because Acadia did not unjustly extend the exclusivity period over its invention – the date on which the public can freely use the invention remains unchanged.  When the first-filed '740 patent issued first, Acadia established the original exclusivity period (including PTA), and the subsequent filing and issuing of the '271 patent did not extend that exclusivity beyond the original period to which Acadia was already entitled.  Similarly, by definition the term of the '271 patent is not *extended* by the

11

preexistence of the '740 patent's full term, which was granted before the '271 patent was even filed.  Accordingly, the later-filed, later-issued '271 patent is not a proper OTDP reference against the first-filed, first-issued '740 patent.

2.    As an alternative ground for rejecting OTDP in this case, the district court correctly ruled that the safe harbor of § 121 applied to protect the '740 patent.  Two issues were disputed.  First, whether the "as a result of" requirement of § 121 is met when the application ('527 application) leading to the reference patent was initially filed as a continuation before the restriction requirement in the challenged original patent ('740 patent), and then subsequently amended into a divisional following the restriction requirement (while the '527 application was still pending).  Second, whether the reference patent application needs to be filed before the issuance of the challenged patent.

Regarding the "as a result of" requirement, the district court correctly found that no limitation of § 121 requires a patentee to file a brand new divisional application in response to a restriction requirement.  Instead, amending an existing application to a divisional application while maintaining consonance results in the same outcome, and thus § 121 prohibits using it as an OTDP reference against the original patent.  The district court's decision is supported by the language of the statute, this Court's precedent, and a factually similar district court case that this

12

Court has cited with approval and subsequently relied upon.  Further, the ability to amend applications, while still receiving the benefits associated with the originally filed application, is expressly permitted by § 121, § 120, and PTO practice.

As to the question of whether the reference patent needs to be filed before the issuance of the challenged original patent, the district court engaged in a detailed statutory analysis to find no such requirement under § 121.  Under the plain language of § 121, the reference patent is not required to be a divisional.  The relevant portions of § 121 only refer to divisional patents in the context of challenged patents, and only impose a timing requirement when a divisional patent is being challenged, not when a divisional is being used as a reference.  MSN, on the other hand, resorts to rewriting § 121 to include a non-existent divisional and timing requirement.  However, even if this Court concludes that there is a divisional and timing requirement for reference patents, it is met here.

## ARGUMENT

## I.  STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*. *C R Bard Inc. v. AngioDynamics, Inc.*, 979 F.3d 1372, 1378 (Fed. Cir. 2020). OTDP is a legal issue premised on underlying factual inquiries.  *Novartis AG v.*

*Ezra Ventures LLC*, 909 F.3d 1367, 1372 (Fed. Cir. 2018) ("*Ezra*")[2]. When facts are undisputed, this Court reviews the district court's ultimate OTDP conclusion without deference. *Id.* Likewise, the relationship between OTDP and statutory-patent-term mandates is a legal question this Court reviews *de novo*. *Id.*

"This court reviews questions of statutory interpretation *de novo*, without deference to the district court's interpretation." *Id.* at 1371-72. Similarly, whether the requirements of § 121 have been satisfied is a question of law this Court reviews *de novo*. *In re Janssen Biotech, Inc.*, 880 F.3d 1315, 1321 (Fed. Cir. 2018).

## II.  THE DISTICT COURT CORRECTLY RULED THAT OTDP DOES NOT JUSTIFY TRUNCATING THE TERM OF THE FIRST-FILED, FIRST-ISSUED PATENT BASED ON ITS OWN PROGENY

MSN contends that the "District Court legally erred in creating a threshold rule that a patent cannot be an OTDP reference unless it was filed earlier than the challenged patent." MBr. 7, 16-19. But contrary to MSN's mischaracterization, the district court's well-reasoned decision correctly interpreted this Court's precedent which states that "[t]he key purpose of [OTDP] is to prevent a patent owner from *extending* the exclusivity rights over his invention *beyond a full patent*

---

[2] Unless otherwise noted, all internal citations and quotations have been omitted, and all emphasis has been added.

14

term." *Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.*, 909 F.3d 1355, 1367 (Fed. Cir. 2018) ("*Breckenridge*").  Per § 154(a)(2) of the URAA, when the earliest-filed application for an invention issues first, that patent establishes the full term to which the patentee is entitled, and thus the period beyond which he cannot extend his exclusivity.  *Id.*  As such, this Court has repeatedly provided that post-URAA, OTDP "limits the term of a patent or, at least, ties *later-filed*, commonly owned, obvious variations to the expiration date of an *earlier-filed reference patent.*"  *See, e.g.*, *In re: Cellect, LLC*, 81 F.4th 1216, 1226 (Fed. Cir. 2023).  In accordance with this precedent and under the undisputed facts of this case, the district court correctly held that when the first-filed, first-issued patent in a family is being challenged, "a patent must be earlier-filed to be available as an OTDP reference," and therefore "the '271 patent does not qualify as a proper reference against the '740 patent."  Appx15.

In place of the district court's well-founded rule, MSN proposes expanding the holding in *Gilead Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208 (Fed. Cir. 2014) to cover patents with PTAs, which *Gilead* expressly did not consider, *id.* at 1215 n.6, thereby creating a perfunctory universal rule "[p]ermitting any earlier expiring patent to serve as a double patenting reference."  MBr. 16.  However, MSN's proposed rule not only flouts the statutory basis (§ 101) and precedential

15

purpose of OTDP, it likewise contravenes the statutory provisions of §§ 120, 154, 253, and 282.  Such a careless misapplication of OTDP would "destroy[] the legitimate expectations of inventors in their property" without notice, *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 739 (2002), and in the present case, deprive Acadia of its full, statutorily-guaranteed, original patent term, *see Wyeth v. Kappos*, 591 F.3d 1364, 1371 (Fed. Cir. 2010).  All this for the alleged "evil" of exercising one's statutory right to obtain a later-filed divisional patent that expires earlier (due to no PTO delay), and thus, does not extend the patentee's "exclusivity rights over his invention beyond a full patent term." *Breckenridge*, 909 F.3d at 1367.  OTDP cannot be invoked to truncate the original patent term in defiance of legal precedent, statutory provisions, and clear Congressional intent.  This Court should affirm.

### A.     OTDP Is an Invalidity Defense that Prevents Later-filed Patents from Extending the Monopoly beyond the Original Patent Term

"An inventor may obtain 'a patent' for an invention pursuant to 35 U.S.C. § 101; the statute thus permits only one patent to be obtained for a single invention. The double patenting doctrine precludes one person from *obtaining more than one valid patent* for either (a) the 'same invention,' or (b) an 'obvious' modification." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1297 (Fed. Cir. 2012).  Under § 101, "the power to create a monopoly is exhausted by the first patent," and

16

therefore, the prohibition against double patenting has only ever barred the issuance of "a *new* and *later* patent for the same invention [that] would operate to *extend or prolong the monopoly beyond the period allowed by law*." *Miller v. Eagle Mfg. Co.*, 151 U.S. 186, 198 (1894). The rationale being that "[t]he public have by the first patent acquired an inchoate interest," which vests with "the expiration of the term *specified in the original grant*." *Odiorne v. Amesbury Nail Factory*, 18 F. Cas. 578, 579 (C.C.D. Mass. 1819); *see also AbbVie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*, 764 F.3d 1366, 1372 (Fed. Cir. 2014).

As a corollary of § 101, "[OTDP] is a judicially created doctrine grounded in public policy, which prevents the extension of the term of the original patent via the patenting of an obvious variation." *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1326 (Fed. Cir. 1999); *see also AbbVie*, 764 F.3d at 1373. While, courts apply "[OTDP] to *deny a second* patent on subject matter not patentably distinct from the claims of *the first* patent, … [a] patent may still issue if an applicant … file[s] a terminal disclaimer under 35 U.S.C. § 253." *In re Longi*, 759 F.2d 887, 893-94 (Fed. Cir. 1985). "The purpose of the terminal disclaimer [is] to prevent extension of patent term for subject matter that would have been obvious over an earlier[-]filed patent." *Merck & Co. v. Hi-Tech Pharmacal Co.*, 482 F.3d

17

1317, 1323 (Fed. Cir. 2007); *see also Cellect*, 81 F.4th at 1231.  In other words,

filing a terminal disclaimer to overcome OTDP allows a second, non-divisional

patent for an obvious variant to validly issue.

OTDP is an affirmative invalidity defense that "must be evaluated, like any

other ground of invalidity," *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 942 (Fed.

Cir. 1992), to determine "whether the patent [had] satisfie[d] the *prerequisites for

issuance*," *CellSpin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019).

Thus, for an OTDP "defense[] under § 282…, an alleged infringer may assert the

invalidity of the patent—that is, he may attempt to prove that the *patent never

should have issued in the first place*."  *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S.

91, 96 (2011); *see also Return Mail, Inc. v. Postal Service*, 139 S. Ct. 1853, 1859

(2019); *CellSpin*, 927 F.3d at 1319.  Accordingly, "[t]his court's predecessor…

fashioned [the] doctrine of [OTDP] to *prevent issuance* of a patent on claims that

are nearly identical to claims in an earlier patent.  This doctrine *prevents* an

applicant from *extending patent protection* for an invention beyond the statutory

term by claiming a slight variant."  *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,

349 F.3d 1373, 1377-78 (Fed. Cir. 2003).  Likewise, post-URAA this Court held

that OTDP still must exist at issuance because "*[p]rohibiting* double

patenting *prevents* a patentee from *obtaining sequential patents* on the same

invention and obvious variants, to thereby effectively manufacture a timewise

extension of its patent exclusivity." *Breckenridge*, 909 F.3d at 1362.[3]

MSN's proposed rule—whereby any earlier-expiring patent can serve as an

OTDP reference to invalidate the validly-issued original patent—contravenes this

essential principle that a patent must be invalid *ab initio*.  As the district court

astutely observed:

> If a later-filed patent is used as a reference, the logic and purpose of
> OTDP is flipped on its head: rather than preventing a patent owner from
> unjustifiably extending the term of a patent, OTDP would operate to
> cut off a patent term that would have been valid but for a later-filed
> patent.

Appx13.  Under § 154(a)(2) of "the URAA, Congress clearly limited the *one*

*period of exclusivity* an inventor can obtain for each of his inventions to twenty

years from the *filing date of the earliest application…* with some limited

exceptions." *Gilead*, 753 F.3d at 1214-15.  Therefore, comparing the filing dates

of post-URAA patents to determine OTDP reference propriety adheres to § 101

and § 282, while "ensur[ing] that the public gets the benefit of the invention after

---

[3] *See* Judge Lourie noting that later-filed, later-issued, earlier-expiring patents did
not extend the patentee's monopoly, which is the evil that OTDP is meant to deal
with at 22:27-22:53, *Allergan USA, Inc. v. MSN Laboratories Private Ltd.*, Appeal
No. 24-1061 (Fed. Cir.), https://cafc.uscourts.gov/05-09-2024-2024-1061-allergan-
usa-inc-v-msn-laboratories-private-ltd-audio-uploaded/

*the original period of monopoly* expires." *AbbVie*, 764 F.3d at 1373.  Accordingly, "[a]s the district court correctly observed, the doctrine of [OTDP] was developed to prevent a patent owner from extending his exclusive right to an invention through claims in a *later-filed* patent that are not patentably distinct from the *earlier[-]filed* patent." *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1167 (Fed. Cir. 2018); Appx13; *see, e.g.*, *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 999 (Fed. Cir. 2009); *Ezra*, 909 F.3d at 1374; *Cellect*, 81 F.4th at 1226, 1230-31.

### B. The Later-Filed, Later-Issued '271 Patent Is Not a Proper OTDP Reference Against the First-Filed, First-Issued '740 Patent

The facts of this case clearly demonstrate that there was no extension of the original exclusivity period:



Appx2-3.  MSN does not contend that the '740 patent lacked "the prerequisites for issuance," or "never should have issued in the first place," *Microsoft*, 564 U.S. at 95-96, but rather faults Acadia for obtaining a divisional patent with *less* than a full

statutory term, *Wyeth*, 591 F.3d at 1371 ("the statutory language should provide a *minimum seventeen-year term* for most patents"). By definition, OTDP cannot apply because when the first-filed '740 patent issued first (exhausting *the one patent* for the invention under § 101), its validly-granted, full patent term with PTA (§ 154(b)) did not contemporaneously (§ 282) extend the term of the non-existent '271 patent (§ 154(a)(2)).

This Court's decision in *Breckenridge* supports the absence of OTDP references against the '740 patent, *i.e.*, the "one full patent term on [Acadia's] invention." 909 F.3d at 1367. "The key purpose of [OTDP] is to *prevent* a patent owner from *extending the exclusivity rights* over his invention *beyond a full patent term*." *Id.* "Here, critically, [Acadia] did not seek to extend its patent rights," *id.*, because "[a]t the time the ['740] patent issued, it cannot be said that [Acadia] improperly captured unjustified patent term," *id.* at 1364, and the issuance of the '271 patent did not "capture additional patent term beyond the term it was granted for its ['740] patent," *id.* "In fact, the ['271] patent's term expired before the ['740] patent's original 17-year term." *Id.* "To find that [OTDP] applies here because a post-URAA patent expires earlier would abrogate [Acadia's] right to enjoy one full patent term on its invention." *Id.* at 1367.

21

Thus, the '740 patent was not invalid-at-issuance over the '271 patent – which did not exist at the time in any form. This is why "claims in the challenged patents are entitled to their full term, including the duly granted PTA, unless they are found to be later-filed obvious variations of earlier-filed, commonly owned claims." *Cellect*, 81 F.4th at 1230.

## C.    MSN's Proposed Rule Would Effectively Undo the 1952 Patent Act and Wreak Havoc on the Federal Patent System

"Federal courts have applied the principles of [OTDP] for over a century to restrict a patent owner's patents on an invention and obvious variants to *one 17-year patent term*," *Breckenridge*, 909 F.3d at 1362, however, "double patenting prior to the Patent Act of 1952 constituted a massive, complex, confusing, and conflicting area of the patent law," *Studiengesellschaft Kohle mbH v. Northern Petrochemical Co.*, 784 F.2d 351, 358 n.2 (Fed. Cir. 1986) (Newman, J., concurring) (hereinafter "SGK-C")[4]. Relying on its understanding that "[OTDP]… is where a claim in a later-issued patent is obvious in view of a claim in a first-issued patent," 150 Cong. Rec. S7521 (daily ed. June 25, 2004) (statement of Sen. Hatch), Congress codified sections 120, 121, and 253, intending

---

[4] This Court has often "approv[ed] … the description of the purpose of § 121 set forth in concurring opinion in *Studiengesellschaft*." *See, e.g.*, *Boehringer Ingelheim Int'l GmbH v. Barr Lab'ys, Inc.*, 592 F.3d 1340, 1350 (Fed. Cir. 2010).

for OTDP to be "eliminated either in the application stage or in the patent stage," *SGK-C*, 784 F.2d at 359, while simultaneously "making public the inventor's original disclosure at an earlier date than … under previous practice," *In re Eckel*, 393 F.2d 848, 857 (C.C.P.A. 1968).  Despite the URAA causing first-filed patents (not first-issued) to establish the full statutory term for an invention, Congress's intent for the "first" patent's PTA to not be disturbed by OTDP still clearly applies for first-filed, first-issued patents.  Therefore, MSN cannot weaponize *Gilead*'s narrow adaptation of OTDP to prevent post-URAA gamesmanship in circumstances without PTA, excuse to abrogate Congressional intent and consequently, Acadia's rights to its original patent term.  *See Breckenridge*, 909 F.3d at 1363-64; Appx14-15.

MSN seeks retroactive abrogation of the validly-granted original term, and commission of patricide by later-filed, later-issued patents.  This would cause the "equitable doctrine of [OTDP]"[5] to force inventors to make the Hobson's choice between abandoning later-filed applications with less PTO delay (§ 120), and truncating (§ 154(b)) or invalidating (§ 282) the term of the first-filed patent (§§ 101, 154(a)).  *See Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559, 563

---

[5] *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1059 (Fed. Cir. 2020).

23

(2021).  Furthermore, it would sever the link between OTDP and terminal

disclaimers (§ 253), despite their being "two sides of the same coin." *Cellect*, 81

F.4th at 1228.  Patentees would no longer "ha[ve] the opportunity to file terminal

disclaimers *during prosecution*" to "[tie] the expiration of the later-filed claims to

the earlier-filed reference claims," *id.* at 1231, and thus "obviate an [OTDP]

rejection… in exchange for limiting the patent term and alienability of the resulting

continuation patent," *Simpleair*, 884 F.3d at 1167.  "[OTDP] [is] a judge-made

doctrine that is intended to prevent extension of a patent beyond a statutory time

limit[, and] [h]ere, agreeing with [MSN] would mean that a judge-made doctrine

would cut off a statutorily-authorized time extension."  *Ezra*, 909 F.3d at 1375.

### D.    MSN's Parsing of Legal Precedent Is Deficient

MSN's heavy-handed reliance on *Gilead* is misplaced.  MBr. 16-19.  The

district court correctly determined that "the chief concerns of *Gilead* do not apply

to this case, nor does *Gilead* overcome the clear language of *Cellect*."  Appx15.

*Gilead*'s decision was limited to the "narrow question," and "circumstances of

[the] case," 753 F.3d at 1211-12, and explicitly did not address OTDP for patent

term extensions, *id.* at 1215 n.6; *Ezra*, 909 F.3d at 1375 n.2.  In *Gilead*, the

patentee had "crafted a separate 'chain' of applications [with] a later priority date,"

that were "not part of the same family of patents and were not before the same

24

patent examiner." 753 F.3d at 1210. Although the later-filed patent issued first, by virtue of the later application date, it expired 22 months after the term of the first-filed patent:



*Breckenridge* at 1362-63. Thus, in *Gilead*, the applicant had received its full statutory term for the first-filed patent, but extended its monopoly by pursuing patentably indistinct claims in a later-filed, later-expiring application chain. None of *Gilead*'s analysis applies to first-filed, first-issued patents or PTAs. *See* Appx14-15.

Likewise, "*AbbVie* is distinguishable from the situation here … because the earlier-filed patent had an earlier issuance date and earlier expiration date," and

was used as the OTDP reference. *Breckenridge,* 909 F.3d at 1366, 1364. *AbbVie*

addressed a challenge to a later-filed, later-expiring patent:



764 F.3d at 1369; Appx15. Thus, *AbbVie* likewise did not reach the issue of

whether a later-filed, later-issued patent may invalidate a first-filed, first-issued

patent. As the district court recognized:

> *Ezra* distinguished *AbbVie* because there [was] no "concern that a
> patent owner, once its patent issued, sought to subsequently secure a
> second, later expiring patent for the same invention." 909 F.3d at 1375
> …. The same circumstances are present in this action, in that the Court
> finds no concern that Acadia was subsequently securing a second, later-
> expiring patent. The '740 patent retains the same expiration date it has
> always had.

Appx15. This Court should find the same.

*Cellect* was "the first time, [this Court] address[ed] how [the] statutorily authorized extension, PTA, interacts with O[T]DP," in which this Court did not cite to *Gilead* a single time. 81 F.4th at 1227. MSN provides a paradoxical mischaracterization of *Cellect* where it labels this Court's provisions stating that OTDP requires an earlier-filed reference patent, 81 F.4th at 1226, 1230, 1231, as "*dicta*," which apparently "stand in contrast to the parts of the [*Cellect*] opinion that … correctly emphasize[] expiration dates," MBr. 17. But any statements in *Cellect* concerning reference patents are *dicta*, because as the district court correctly found, the threshold issue was not raised on appeal, so *Cellect* had "no basis for the consideration of" whether the patents properly served as OTDP references. Appx14 (quoting *Cellect*, 81 F.4th at 1222, 1230). *Cellect*'s provisions, necessitating earlier-filed references, are hardly unique, and "[this Court's] case precedent has clearly delineated how a patent that has received [PTA], a statutorily authorized extension, [should] interact[] with O[T]DP, a doctrine that limits the term of a patent or, at least, ties *later-filed*, commonly owned, obvious variations to the expiration date of an *earlier-filed reference patent*." *Cellect*, 81 F.4th at 1226; *see, e.g.*, *Procter*, 566 F.3d at 999; *SimpleAir*, 884 F.3d at 1167; *Ezra*, 909 F.3d at 1374; *Immunex*, 964 F.3d at 1068 (Reyna, J., dissenting).

Furthermore, the OTDP challenge in *Cellect* did not involve the first-filed, first-issued patent—U.S. Patent No. 6,275,255 ("the '255 patent"), represented in green below—as either a reference or challenged patent.  81 F.4th at 1219-20.[6]  An annotated prosecution timeline of the *Cellect* patents is reproduced below with the OTDP reference chart:



[6] *See* Judge Dyk noting that *Cellect* did not address the factual situation here, where the first-filed, first-issued patent, which sets the priority date, is challenged at 1:07-1:40 and 12:30-12:47, *Allergan*, Appeal No. 24-1061, https://cafc.uscourts.gov/05-09-2024-2024-1061-allergan-usa-inc-v-msn-laboratories-private-ltd-audio-uploaded/

| Patent | Claims | ODP Reference Patent |
|--------|--------|---------------------|
| '742 | 22, **42**, 58, and 66 | '369 |
| '369 | 1, 17, 19, 21, 22, 27, **49**, 55, and 61 | '036 |
| '626 | **1**, 5, 11, 33, 34, 58, and 64 | '369 |
| '621 | 25, 26, 27, 28, 29, and **33** | '626 |

*See id.* Even the PTO recognized that "the challenged claims [in *Cellect*] are not themselves 'parent' claims; rather they are 'child' claims that claim priority to the same parent application, and thus the scenario[]" at issue here is "not implicated." Director's Response to Cellect, LLC's Petition for Rehearing En Banc at 12 n.2, *In re Cellect* (No. 22-1293) (Dec. 14, 2023). Because the '255 patent played no part in the analysis, this Court in *Cellect* did not have the opportunity to address the present issue. Moreover, the '255 patent had not received any PTA, and therefore had the same expiration date as the '036 reference patent. *See* U.S. Patent Nos. 6,275,255 and 6,862,036.

Therefore, this is an issue of first impression, and because OTDP cannot be invoked to truncate the original patent term in defiance of legal precedent, statutory provisions, and clear Congressional intent, this Court should affirm.[7]

---

[7] This Court is currently considering the same issue concerning the applicability of OTDP to the original, first-filed, first-issued patent in *Allergan*, Appeal No. 24-1061.

### III. THE DISTRICT COURT CORRECTLY FOUND THAT THE SAFE HARBOR OF § 121 APPLIES

The district court correctly ruled that safe harbor of § 121 applies to protect the '740 patent.  It found (i) the application leading to the '271 patent was filed "as a result of" a restriction requirement in the '740 patent and (ii) the "filed before the issuance of the patent" requirement in § 121 inapplicable when the challenged patent issued from an original application. Appx10, 12.  However, even if the "filed before" requirement is applicable, it is met here.

When it applies, the third sentence of § 121 precludes OTDP arguments in litigation ("safe harbor").  "The safe harbor provision arose from difficulties created by restriction requirements imposed by the [PTO] during examination, followed by double patenting challenges in the courts. … This conflicting result was recognized as inherently unfair, and the safe harbor was created to preclude it." *St. Jude Med., Inc. v. Access Closure, Inc.*, 729 F.3d 1369, 1376-77 (Fed. Cir. 2013).  "This court follows a strict application of the plain language of § 121," *Janssen*, 880 F.3d at 1321, however it has also acknowledged that "[t]he safe harbor provision [is] not a model of clarity," *St. Jude*, 729 F.3d at 1377.  This Court has nonetheless found its purpose apparent, "namely, to prevent a patentee who divides an application in which a restriction requirement has been made from

30

risking invalidity due to [OTDP]." *Boehringer Ingelheim Int'l GmbH v. Barr Lab'ys, Inc.*, 592 F.3d 1340, 1352 (Fed. Cir. 2010).

### A. The '271 Patent Issued on an Application Filed as a Result of a Restriction Requirement in the '740 Patent

#### 1. Acadia's Actions Satisfied the "as a Result of" Requirement

The safe harbor defines the second type of prohibited reference as a "patent issuing . . . on an application filed as a result of such a [restriction] requirement," referred to herein as the "as a result of" requirement. § 121. The district court correctly found that the '527 application, from which the '271 patent descends, met the requirement. The '527 application was initially filed as a continuation patent before the 2007 Restriction Requirement, however, Acadia met the "as a result of" requirement by cancelling all pending claims of the '527 application, adding new claims consonant with the 2007 Restriction Requirement (which is undisputed), informing the PTO that the new claims were added as a result of the 2007 Restriction Requirement, and re-designating the '527 application as a divisional of the '561 application. Appx70-73.

MSN makes a timing argument, asserting that the '527 application cannot meet the "as a result" requirement because it was initially filed before the 2007 Restriction Requirement. MBr. 20-25. MSN's position is contrary to the plain language § 121, other statutes, and precedent.

31

### a)   Text of § 121 Does Not Require a New Application

MSN's position hinges on interpreting § 121's use of the term "filed" within the phrase "[a] patent issuing … on an application filed as a result of [a restriction] requirement" to require newly-filed divisional applications in response to a restriction, while excluding amended filings in response to a restriction.  However, "[i]n expounding a statute, [this Court] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."  *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993).  Thus, MSN impermissibly "reads that [term ("filed")] in isolation.  The applicable rule of statutory interpretation, however, requires that the [safe harbor] be read in the context of the entire statutory provision."  *Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 687 (Fed. Cir. 1990); *King v. Burwell*, 576 U.S. 473, 492 (2015) ("fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").  Accordingly, the only requirement is that the patent ***issued*** on an application filed as a result of a restriction requirement.  Section 121 contains no language requiring a new filing or excluding a patent that issued on an ***amended*** "application filed as a result of [a restriction] requirement."

32

The patent laws and PTO practice specifically allow amendments in applications to change the type of application rather than filing a new application, while still qualifying for benefits of the originally filed application. *Janssen*, 880 F.3d at 1324 ("Amending an application to change its relationship to a prior-filed application—for example, from a CIP to a divisional—is expressly permitted."). Section 120 allows filing amendments in applications to claim priority to prior applications, and 37 C.F.R. § 1.78 confirms that this extends to identifying divisional status. *See, e.g.*, 35 U.S.C. § 120 (application complies "if it contains *or is amended to contain*" reference to prior application); 37 C.F.R. § 1.78(d)(2) (application making benefit claim to a prior-filed application "must contain *or be amended to contain* a reference to each such prior-filed application" and "must identify the relationship of the applications, namely, whether the later-filed application is a continuation, divisional, or continuation-in-part of the prior-filed … application"). Furthermore, the second sentence of § 121 incorporates § 120 stating that "[i]f the other invention is *made the subject of a divisional application which complies with the requirements of section 120* it shall be entitled to the benefit of the filing date of the original application." *See Amgen Inc. v. F. Hoffmann-La Roche Ltd.*, 580 F.3d 1340, 1357 n.7 (Fed. Cir. 2009) ("divisional applications filed in accordance with the requirements of § 120 benefit from an

33

earlier filing date under 35 U.S.C. § 121"). Consequently, because § 120 allows

amendments to include references to prior-filed applications, and § 121 merely

requires non-elected inventions to be made the subject of a divisional application

in compliance with § 120, the term "filed" cannot read in isolation to prohibit

statutorily-provided amendments from being effective. *La. Pub. Serv. Comm'n v.*

*Fed. Commc'n Comm'n,* 476 U.S. 355, 370 (1986) (noting the "familiar rule of

construction that, where possible, provisions of a statute should be read so as not to

create a conflict").

In fact, the Federico *Commentary*, upon which MSN relies, makes clear that

MSN's "newly-filed" requirement is illusory.

> After a requirement to restrict an application is made, the applicant may file a second application for the invention which was not elected to be retained in the first application. This second application, which is referred to in the statute as a divisional application (but ***in practice the term "divisional application" is not restricted to applications filed after a requirement***), is entitled to the benefit of the filing date of the first application if it complies with the requirements of section 120.

Federico, *Commentary on the New Patent Act*, 35 U.S.C.A. 1, 34-35 (1954). MSN

omitted this emphasized portion when it quoted this exact provision. MBr. 35.

Moreover, this statement mirrors section 36 of the initial draft of § 121, which

specified, "[i]f two or more patents are issued in consequence of a requirement for

restriction under this section, no *claim* of any of said patents may be held invalid

34

solely by reason of its *inclusion* in a separate patent." Federico, *Proposed Revision and Amendment of the Patent Laws,* Preliminary Draft with Notes, House Comm. on the Judiciary § 36 (Comm. Print 1950) (hereinafter "Preliminary Draft"). Similarly, the Reviser's Note accompanying § 121 explains that "[t]he requirements of section 120 are made applicable and neither of the resulting patents can be held invalid over the other merely because of their being divided in several patents." Finally, MPEP § 804.01 provides that "[t]he prohibition against holdings of [OTDP] applies to requirements for restriction between independent or distinct inventions… so long as *the claims in each application are filed as a result of such requirement*."

### b)  § 121 Case Law Does Not Require a New Application

#### (1)  *Union Carbide* Supports the District Court's Decision

The district court correctly relied on *Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036 (D. Del. 1985), which presented the same basic factual situation as the instant case. Appx10-11. *Union Carbide* found the "as a result of" requirement was met by a patent (Stamberger III) issued from an application that had initially been identified as a non-divisional application *prior to the restriction requirement* in the original application (Stamberger II) and was *later amended to comport with the restriction requirement* prior to the issuance of the reference

35

patent (Stamberger III). *Id.* at 1059-60. In so ruling, the court found that for the purposes of § 121, "[w]here, as here, the claims of an application are amended in toto to reflect the division of a copending application, I conclude that the amended application is one 'filed as a result of such a requirement' as set forth in section 121." *Id.*[8]

MSN asserts that *Union Carbide* was wrongly decided because it "acknowledged that the 'literal language of section 121' requires that the application be 'filed,'" but ignored the "plain words" of § 121 in favor of practicality. MBr. 21-22. MSN misquotes *Union Carbide* which states that while an application filed before restriction is "*arguably* not protected by the literal language of section 121, … the filing of the [consonant] amendment" resulted in "the amended application [being] one 'filed as a result of such a requirement' as set forth in section 121." 619 F. Supp. at 1059-60. The court did not ignore the "plain words," but rather, found that § 121 as a whole does not require a newly-filed application as opposed to an amended filing, in the same way that other statutes equate original and amended filings. Accordingly, *Union Carbide*

---

[8] *Union Carbide* has been cited by this Court as persuasive. *See SGK-C*, 784 F.2d at 360 (citing *Union Carbide* for the premise that "§ 121 guards against invalidity based on [OTDP] if the division into more than one patent was due to a restriction requirement by the PTO.").

analyzed "the context of the provision as a whole," its legislative history, and the

Congressional intent to ultimately be "[un]convinced that section 121 was intended

to include only" initial filings and not amended filings for the "as a result of []

requirement," particularly where there is "no practical distinction" between the two

under the facts.  619 F. Supp. at 1056-60; *see also Chevron U.S.A., Inc. v. Nat. Res.

Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("If a court, employing traditional

tools of statutory construction, ascertains that Congress had an intention on the

precise question at issue, that intention is the law and must be given effect.")

MSN also argues that *Union Carbide* was decided before this Court made it

clear that a "strict application" of § 121 was necessary "[g]iven the potential

windfall [a] patent term extension could provide to a patentee."  MBr. 21-22

(*quoting Geneva Pharm., Inc. v. GlaxoSmithKline PLC,* 349 F.3d 1373, 1382 (Fed.

Cir. 2003).  Again, § 121 does not exclude amended applications from being "as a

result of," and even under a so-called "strict application" post-*Geneva*, this Court

has utilized a "no practical distinction" analysis in interpreting § 121.  *Boehringer*,

592 F.3d at 1353 n.3 ("We see no principled distinction between filing …

divisional applications from an original application and filing successive divisional

applications…, so long as no two applications claim the same 'invention' as

defined by the examiner.").

37

What MSN is really suggesting is a narrow interpretation of § 121, which would render the expressly permitted right to amend an application from a continuation to a divisional purely decorative. *Janssen*, 880 F.3d at 1324; *La. Pub.,* 476 U.S. at 370. Moreover, the "potential windfall" that was of concern in *Geneva* was in the context of later-filed, later-issued pre-URAA patents with terms based on issuance dates, not post-URAA patents with terms tied to the earliest filing date, e.g., the '561 original application here. *Compare Geneva,* 349 F.3d at 1382, *with Boehringer*, 592 F.3d at 1346 ("[OTDP] is an important check on improper extension of patent rights through the use of divisional … applications… for patents … filed prior to the amendment of 35 U.S.C. § 154").

MSN also cites *Ex Parte Janssen Biotech, Inc. & New York Univ. Pat. Owner & Appellant*, in support of its position. No. APPEAL 2016-006590, 2016 WL 6921121, at *6 (P.T.A.B. Nov. 14, 2016); MBr. 9, 22. However, *Ex Parte Janssen* did not concern the "as a result of" requirement and has facts far from the instant case. It dealt with whether the challenged patent met the statutory requirement that "the divisional application [leading to the challenged patent] is filed before the issuance of the patent on the other application." *Id. Ex Parte Janssen*, rejected an attempt by the patentee to invoke safe harbor and obtain additional patent term for the challenged patent, *ten years after the challenged*

38

*patent issued* on a continuation-in-part, by acquiring divisional status during reexamination. *Id.* (finding "such action would violate Section 121 and the inherent notice function of the statutory scheme.").

The appellate decision on *Ex Parte Janssen* contradicts MSN's position. Despite the PTO arguing in its favor, this Court declined to institute a "divisional as filed" rule for § 121 and instead, held that only "once the [challenged] patent issued on a CIP application, it was not entitled to safe-harbor protections." *Janssen*, 880 F.3d at 1324. This Court further provided that "[f]or a challenged patent to receive safe-harbor protections [which would include meeting the as a result of requirement] the application must be properly designated as a divisional application, at the very latest, *by the time the challenged patent issues on that application*," in spite of "such … amendments made prior to issuance" not being presented in the case. *Id.* at 1323-25. This preservation of the issue and *dicta* strongly indicate that amended applications would qualify for safe harbor protection. Furthermore, this Court has "repeatedly held that the 'as a result of' requirement applies to the challenged patent as well as the reference patent," *Boehringer*, 592 F.3d at 1352, so logically *Janssen* would also allow for reference patents to meet the 'as a result of' requirement if properly amended prior to issuance. *See also Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569,

1579 (Fed. Cir. 1991) ("new or amended claims in a divisional application are entitled to the benefit of § 121 if the claims do not cross the line of demarcation … in the restriction requirement.").

Finally, MSN tries to distinguish *Union Carbide* by newly arguing that its holding was premised on the application being "amended in toto to reflect the division of a copending application" and in the instant case, Acadia admitted that the amendment was also based on a second restriction requirement in another related application (the '855 application, a continuation of the original '561 application). MBr. 23. MSN fails to note that in *Union Carbide* the defendant likewise "argue[d] that the inclusion of a [limitation] in the [divisional] claims which did not appear in the [original] application constitutes a material change which renders section 121 inapplicable." 619 F. Supp. at 1060. The court rejected the argument, holding that maintaining consonance is what mattered:

> [Defendant's] argument is, however, unpersuasive. It is almost inevitable that some refinement of the claims will occur after restriction is ordered, since restriction often comes as a preliminary step before the examiner reaches the merits of the patent claims. What is critical then, is that the distinction which prompted the PTO to require restriction because of the existence of more than one invention is retained in the divisional patent. Since that has clearly occurred here, the protection provided by section 121 has not been defeated.

*Id.* Similarly, this Court has since held that:

40

> When separate restriction requirements are imposed on separate applications and the record … show[s] that any of the various restriction requirements carried forward from one application to the next, the earlier restriction requirement [is] viewed as having continued in effect with respect to the later-filed application.

*G.D. Searle LLC v. Lupin Pharms., Inc.*, 790 F.3d 1349, 1356 (Fed. Cir. 2015).

Regardless, MSN's new argument was admittedly not raised below, MBr. 10 n.2, and is an attempt at "sandbagging," *In re Google Tech. Holdings LLC*, 980 F.3d 858, 864 (Fed. Cir. 2020). MSN includes variations of this argument in other sections of its brief, and as discussed more fully below in Section III.A.2, the new argument should be considered waived as it was conceded below and on appeal.

Beyond being waived, MSN's argument is meritless because MSN admitted below that consonance was maintained and the '527 application is a proper divisional (*see* discussion at Section III.A.2, *infra*). Moreover, "[b]ecause the ['527 application] identifies itself as descended from…, and … is a division of the original ['561] application, the section 121 safe harbor [applies]." *G.D. Searle*, 790 F.3d at 1355.

### (2) *Boehringer* Supports the District Court's Decision

The district court also correctly relied on *Boehringer*, which held that the "as a result" requirement is simply met when (1) "[t]he [descendant] application was due to the administrative requirements imposed by the [PTO], in the sense that,

absent the restriction requirement, the applicant could have retained in the [original] application [] the claims prosecuted in the [descendant] application," and (2) consonance is maintained. *Boehringer*, 592 F.3d at 1353 n.3., 1353. In other words, the inquiry revolves on the nature of the claims being prosecuted in the descendant application and maintaining consonance, not on when the descendant application itself was initially filed. *Boehringer* emphasized that "the choice of how to prosecute non-elected inventions [following a restriction requirement] is up to the applicant and is constrained neither by the terms of an examiner's restriction requirement nor by the language of § 121." *Id.* at 1352-54. No "divisional as filed" rule exists. *In re Janssen*, 880 F.3d at 1323.

The district court correctly found that the requirements of *Boehringer* were met. Appx12. Indeed, MSN admitted this below. Citing MSN's briefing, the district court noted: "There is no dispute that this [*Boehringer*] requirement is satisfied in this action. D.I. 263 at 7 ("Acadia could have filed a divisional application for those claims that it eventually chose to add to the '527 Application in 2009.")." Appx12. MSN went on to say that if Acadia had filed a new application instead, "the safe harbor could apply in litigation to protect the '740 patent from the new divisional application." Appx622. Thus, MSN admitted that

Acadia met all of the requirements for "as a result of" except for an illusory "divisional as filed" rule.

MSN faults the district court's reliance on *Boehringer*. MBr. 23. First, MSN argues that the district court incorrectly described one of the divisional applications at issue in *Boehringer* as being initially filed as a continuation. *Id.* The district court's description does not appear essential to its holding. Appx10-12. Moreover, the district court was not incorrect as both the challenged ('671) and reference ('197) applications are described as initially containing all of the claims of the original '947 application, and thus were not proper divisionals as filed. *Boehringer*, 592 F.3d at 1344; *id.* at 1354 ("The divisional application must have claims drawn only to the 'other invention,'" *i.e.*, "the non-elected invention"); *G.D. Searle*, 790 F.3d at 1355 ("A later application for an independent or distinct invention, carved out of a pending application … is known as a divisional application").

Second, MSN argues that *Boehringer* did not specifically address whether an amended application can meet the "as a result of" requirement. MBr. 25-30. To the contrary, "consonance … derives from the safe harbor's 'as a result of' requirement," *St. Jude*, 729 F.3d at 1377, and both the applications at issue were "later amended to include only compound claims other than those … claimed in

43

the [original] patent," *Boehringer*, 592 F.3d at 1344. *Id.* ("In fact, at the time that

the [challenged] application was filed, the [original] patent had already issued").

Accordingly, the district court correctly applied the holding and rationale of

*Boehringer* to find that MSN's nitpicky procedural "distinctions ignore[] … that

what is relevant is not 'how any such applications are filed,' but the application

being 'due to the administrative requirements imposed by the [PTO], in the sense

that, absent the restriction requirement, the applicant could have retained in the

[original application] the claims prosecuted in the [descendant] application."

Appx12 (*quoting Boehringer*, 592 F.3d at 1353-54).

### 2. The District Court Properly Held That MSN Conceded the '527 Application Is a Divisional Which Maintained Consonance

As its final argument against the district court's finding concerning the "as a

result" requirement,  MSN proffers a "novel" interpretation of the safe harbor's "as

a result of" requirement to allege "Acadia must demonstrate that but for the

restriction in the original amendment [sic], the amendment-cum-filing of the '527

application (the purported 'divisional application') would not have occurred."

MBr. 26.  MSN admits that "this argument was not raised below," and cites

*Automated Merch. Sys.'s, Inc. v. Lee*, 782 F.3d 1376, 1380 (Fed. Cir. 2015) for its

conclusory contention that "this Court may consider a new legal argument on

44

appeal." MBr. 10 n.2. However, *Automated* found "[s]everal criteria for discretionary disregard of forfeiture combine[d] to justify consideration of the [unpreserved] issue," 782 F.3d at 1379, while here, MSN merely acknowledges its waiver in a footnote, and asks this Court to overlook it without providing a single justification for the request, MBr. 10 n.2. There are several reasons to apply the waiver doctrine to MSN's belated "purported divisional application" argument as well as its meager plea to ignore waiver.

First, MSN cannot continue to assert that "this Court may consider [its] new legal argument," MBr. 10 n.2, because "an argument that is only made in a footnote of an appellant's brief is forfeited," *CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1296 (Fed. Cir. 2021). "Second, even if the argument were in the body of the brief, it is insufficiently developed." *Id.* Third, contrary to MSN's assertion, "legal issues in patent infringement suits are not immune to the doctrine of waiver on appeal, and except for certain circumstances, those issues not raised below at the district court cannot be heard for the first time on appeal." *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1358-59 (Fed. Cir. 2006). "A de novo standard of review is not an exceptional circumstance," *Finjan, Inc. v. Cisco Sys., Inc.*, 837 F. App'x 799, 812 n.11 (Fed. Cir. 2020), thus, MSN has provided "no exceptional circumstances justifying a departure from that

45

principle here," *Conoco*, 460 F.3d at 1358-59.  Rather, "[i]n pursuing this appeal, [MSN] chose to make certain strategic decisions concerning what material to include in its opening brief, and it affirmatively chose not to include developed arguments on" its failure to preserve the issue for appeal.  *Medtronic*, 86 F.4th at 907.  "It cannot now undo those decisions."  *Id.*

Fourth, unlike the circumstances of *Automated*, MSN did not simply fail to raise the argument below, but rather stipulated to the facts it now disputes, and argued inapposite of the contention it now seeks to bring.  MSN stipulated in the Joint Statement of Undisputed Facts that the '527 application is a divisional of the original application.  Appx67 ¶ 21 ("The '527 Application, filed on May 3, 2006, is in turn a divisional application of the '561 Application.").  It is well-established that "[a] stipulation of fact that is fairly entered into is controlling on the parties and the court is generally bound to enforce it."  *Ring & Pinion Serv. Inc. v. ARB Corp. Ltd.*, 743 F.3d 831, 836 (Fed. Cir. 2014).  MSN also repeatedly asserted the same in its briefs.  *See, e.g.*, Appx519 ("the '527 Application[], which is a *divisional* application of the '561 Application") (emphasis in original); Appx529; Appx616; Appx618-19; Appx621-24; *compare* Appx616 ("There is no dispute that [the '271 patent], which traces back to the divisional ['527] Application…") *with St. Jude*, 729 F.3d at 1374 n.2 ("ACI contends that the parent application was not a

true divisional since it elected the same invention as the grandparent. ACI relied on this fact to support one of its arguments that the Janzen patent does not qualify for safe harbor protection."). Therefore, it is axiomatic that MSN should be precluded from disputing, for the first time on appeal, the stipulated facts which it previously held out as true and the particular argument it expressly forfeited. *Int'l Bus. Machines Corp. v. Booking Holdings Inc.*, 775 F. App'x 674, 679 (Fed. Cir. 2019) (applying waiver where party "affirmatively stated it was not arguing" and "expressly forfeited a particular argument").

Fifth, Acadia argued, Appx597-598, and MSN conceded that both the '527 divisional application claims, Appx621-622[9], and the '271 patent claims, Appx518[10], maintained consonance with the 2007 Restriction Requirement. As a direct result of MSN's affirmative positions, the district court held:

> [T]he plain language of *Boehringer* [states] what is relevant is … the application being "due to the administrative requirements imposed by the PTO, in the sense that, absent the restriction requirement, the applicant could have retained in the original application the claims prosecuted in the descendant application." 592 F.3d at 1353-54. *There is no dispute that this requirement is satisfied in this action*. D.I. 263 [Appx622] at 7 ("Acadia could have filed a divisional application for

---

[9] "During the prosecution of the '527 Application, Acadia *added a group of claims from the parent application*, and *changed the status* of the '527 Application to a *divisional*." Appx621.

[10] "The '271 patent is a divisional of the '740 patent." Appx518.

those claims that it eventually chose to add to the '527 Application in 2009.").

Appx12.  The last parenthetical is a direct quote from MSN's brief, and in the next sentence, MSN stated: "This way, the safe harbor could apply in litigation to protect the '740 patent from the new divisional application."  Appx622.  This Court has consistently held that "a party will be judicially estopped from asserting a position on appeal that is inconsistent with a position it advocated at trial and persuaded the trial court to adopt."  *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1345-46 (Fed. Cir. 2001).  Consequently, "arguments that change the scope of [MSN's safe harbor] positions from those advanced in its binding report[s] [should] be deemed to be waived."  *Id.* at 1347-48.

Further, MSN still does not contend that consonance was not maintained between the various patents-at-issue, and "[a]n issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on appeal is necessarily waived."  *Phil-Insul Corp. v. Airlite Plastics Co.*, 854 F.3d 1344, 1357 (Fed. Cir. 2017).  "The judicially-created consonance concept derives from the safe harbor's 'as a result of' requirement," *St. Jude*, 729 F.3d at 1377, and this Court has previously rejected reading the requirement as whether "the claims at issue would have been prosecuted in the original application but for the

48

restriction requirement" because it is a *lower bar than consonance*, *G.D. Searle*, 790 F.3d at 1356-57 (rejecting party's argument for a "but for" standard based on *Boehringer* because "*Boehringer* does not go that far").  As such, MSN's attempt to move the goalposts for the "as a result of" requirement misses the mark because it has already conceded in both instances that a higher standard is met.  Therefore, MSN should be precluded from raising its new "purported divisional application" argument because it expressly waived and/or conceded the argument at the district court and on appeal.

Beyond being waived, MSN's argument is meritless because MSN admitted below that consonance was maintained and the '527 application is a proper divisional.  Moreover, "[b]ecause the ['527 application] identifies itself as descended from…, and … is a division of the original ['561] application, the section 121 safe harbor [applies]."  *G.D. Searle*, 790 F.3d at 1355.

### B.    The District Court Correctly Found That the "Filed Before the Issuance of the Patent" Requirement in § 121 Is Inapplicable When the Challenged Patent Issued from an Original Application

MSN incorrectly asserts that when the original patent is being challenged for OTDP, § 121 requires the reference patent to have issued on "the divisional application" filed before the original patent issued.  MBr. 31-38.  The district court correctly found that the last clause of § 121's safe harbor ("if the divisional

application is filed before the issuance of the patent on the other application") is only relevant to challenges to divisional patents, not challenges to an original patent. Appx6-10.

MSN repeatedly argues that the district court erred by endorsing Acadia's suggestion that original patents have "paramount protection" in § 121. MBr. 31-38. However, the district court merely repeated the phrase once while explaining Acadia's argument, Appx6, before engaging in a detailed analysis of the actual text of § 121 and this Court's precedent to conclude that the text itself does not require the reference patent to be filed before the original patent issued, Appx7-12.

### 1. The "If the Divisional Application" Clause Refers to Challenged Divisional Applications, Not Reference Patents

Section 121 is textually complicated, but when the plain language is broken down into bite-sized pieces, it is clear that "if the divisional application" clause refers to challenged patents, not reference patents. The statute provides:

> If two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions. If the other invention is made the subject of a *divisional application* which complies with the requirements of section 120 it shall be entitled to the benefit of the filing date of the original application. **A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts** against a *divisional application* or against the original application or any patent issued on either

50

> of them, if the *divisional application* is filed before the issuance of the patent
> on the other application.

§ 121.  The safe harbor provision is the emphasized third sentence and the three

unambiguous uses of "divisional application" are italicized.

Congress expressly identified four types of patent applications in § 121:  (i)

"a *divisional* application," (ii) "the *original* application," (iii) "an application with

respect to which a requirement for restriction under this section has been made,"

and (iv) "an application filed as a result of such a requirement."  "An application"

as used in the patent laws includes original nonprovisional utility, plant, design,

divisional, continuation, and continuation-in-part applications.  *See e.g.,* 35 U.S.C.

§§ 111(a), 120, 121; 37 CFR §§ 1.53(b) and 1.78.  When Congress wanted to limit

"an application" in § 121 to a specific type within this broader range, it did so

clearly by using "divisional" and "original" as modifiers.  § 121; *see generally*

*Bates v. United States,* 522 U.S. 23, 29-30 (1997) (noting that Congress acts

intentionally where it "includes particular language in one section of a statute but

omits it in another section"); *Spicer v. McDonough*, 61 F.4th 1360, 1364 (Fed. Cir.

2023) ("We must give meaning to this difference [because] the cardinal rule of

statutory interpretation [is] that Congress's use of different terms within related

statutes generally implies that Congress intended different meanings").

The **bolded** part of § 121, *supra*, identifies two types of patents that "shall not be used as a reference either in the [PTO] or in the courts," (*i.e.*, reference patents) and the <u>underlined</u> part describes patents/applications that are being challenged.

The reference patents are (1) "a patent issuing on an application with respect to which a requirement for restriction under this section has been made" or (2) "a patent issuing . . . on an application filed as a result of such a requirement." Type (2) references are at issue in this case. Notably, Congress used the broad phrase "*on an application*" for both type (1) and (2) reference patents, and did not require type (2) to issue on "a divisional application." The reference patents are not limited to divisional applications/patents and because they are not so limited, it is clear that the "if the divisional application" clause cannot refer to reference patents.

Further, type (1) reference patents clearly cannot require "an application" to be "a divisional application" because it includes any type of application in which a restriction requirement is made. Thus under the presumption of consistent usage of terms, type (2) also cannot be restricted to only "divisional applications." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("[T]he normal rule of statutory interpretation [is] that identical words used in different parts of the same statute are generally presumed to have the same meaning"). Similarly, this Court has held that "§ 121

52

refers broadly to 'a divisional application,' … [h]ad Congress intended to limit the safe harbor only to a divisional of the application in which the restriction requirement was entered, it could have said 'a divisional application of the original application,' rather than simply 'a divisional application.'" *Boehringer*, 592 F.3d at 1351. Following *Boehringer*'s logic, § 121 refers broadly to "an application" and had Congress intended to limit the type (2) references to only patents issuing on divisional applications, it could have said "a divisional application," rather than simply "an application."

"It is also significant that Congress used … the word 'the' before '[divisional application],'" *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003), in the safe harbor provision's requirement that "***the*** divisional application is filed before …." "It is a rule of law well established that the definite article 'the' particularizes the subject which it precedes[, and] is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" *Id.* Therefore, "[t]he words 'the [divisional application]' require antecedent basis; thus, 'the [divisional application]' refers to a specific '[divisional application]' rather than a previously undefined '[application].'" *Id.* Thus, the statutory language "the divisional application" is most reasonably interpreted to refer to the preceding use of "a divisional application," *i.e.*, challenged divisional applications,

53

not "an application filed as a result [a restriction] requirement." As noted above, the challenged patents are identified in § 121 as follows: "*against a divisional application* or against the original application or any patent issued on either of them, *if the divisional application* is filed before the issuance of the patent on the other application." This section of § 121 contains the only two mentions of "divisional applications" in the safe harbor sentence and clearly links the first mention of "against a divisional application" (the challenged patent) to the second "if the divisional application is filed …." "Congress could have been expected to use quite different language if it wanted to reach the opposite result." *Warner-Lambert*, 316 F.3d at 1356.

Accordingly, the purported "if the divisional application" requirement simply necessitates the *challenged divisional application* to have been filed with co-pendency pursuant to § 120, and in accordance with the second sentence of § 121. This language mirrors the preliminary draft of § 120, which provided "[a]n application for patent… shall have the same effect as though filed on the date of the prior application, *if the later application is filed before the prior application is patented*." *Preliminary Draft*, House Comm. on the Judiciary § 35.

Lastly, in addressing whether a challenged continuation-in-part could be afforded safe harbor protection as a divisional, this Court stated:

54

> Although the legislative history reveals no reason why…, there are certainly plausible reasons why Congress would have … not include[d] CIPs. The *need for the protection only existed when a divisional application was filed as a result of the restriction.* … There was *no possible reason for protecting the new matter from double patenting* rejections. … If the drafters wanted to include CIPs within the *protection* afforded by section 121, they could have easily done so.

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 518 F.3d 1353, 1361-62 (Fed. Cir. 2008).

Inversely, Congress could have logically intended the use of "an application" in type (2) references (instead of "a divisional application") to protect divisional and original applications/patents from OTDP challenges based on patents issuing on continuation and CIP applications filed as a result of the restriction, but not entitled to protection themselves.  This interpretation is consistent with the legislative history and remedial "purpose of § 121—namely, to prevent a patentee who divides an application in which a restriction requirement has been made from risking invalidity due to [OTDP]."  *Boehringer*, 592 F.3d at 1352; *Corning Glass Works v. Brennan*, 417 U.S. 188, 208 (1974) ("[a] broadly remedial [statute] should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve.").

## 2.    MSN Seeks to Add Non-Existent Limitations to § 121

Despite arguing for "a strict application of the plain language of § 121" while misconstruing the "as a result of" requirement, MBr. 22, MSN subsequently

rewrites the actual text of § 121 to support its "temporal requirement" position by adding a non-existent modifier "[a divisional]" in front of the phrase "an application filed as a result of." MBr. 32. Only after this addition is MSN able to argue that the last clause ("if the divisional application") applies when challenging either divisional or original applications. However, as discussed *supra* and admitted by MSN, Congress "refers to divisional applications three times" in § 121, MBr. 35, but intentionally chose not to use the "[a divisional]" modifier here, and does not otherwise define "an application filed as a result of [a restriction] requirement" as a divisional. *Bates,* 522 U.S. at 29-30; *Spicer*, 61 F.4th at 1364.

Furthermore, MSN fails to read the statute and its cited treatises with a contemporaneous understanding of how OTDP applied in 1952. MBr. 31-38. In 1952, earlier-issued patents were not assailable for OTDP, regardless of safe harbor, thus protection was only needed for pending applications and later-issued patents. *Breckenridge*, 909 F.3d at 1362 ("under the law pre-URAA … [OTDP] used the earlier-issued patent to limit the patent term(s) of the later issued patent(s)"). This is also why § 121 solely prohibits issued patents from acting as references. Consequently, requiring "a patent issuing… on an application filed as a result of [a restriction] requirement" to be "the divisional application [] filed

before the issuance of the patent on the other application" would have been

contemporarily nonsensical because the divisional patent needed to be *filed and*

*issued before the other application issued* to serve as an OTDP reference against it

or its patent in the first place.  In other words, to be an earlier-issued divisional

patent, it must have been co-pending with the challenged original

application/patent, or co-pending/earlier-filed than the challenged divisional

application/patent, which renders the "filed before the issuance" requirement

vestigial.  *Regions Hospital v. Shalala*, 522 U.S. 448, 467 (1998) (MSN's

interpretation makes the requirement "essentially as surplusage — as words of no

consequence, which, of course, we avoid when possible").  Conversely, requiring

the challenged divisional application to be "filed before the issuance of the patent

on the other application" comports with the second sentence of §121, and limits the

obtainable patent term extension for divisionals by necessitating co-pendency,

which prevents a patentee from claiming safe harbor protection for a divisional

filed years after its parent issued.  *A priori* the "if the divisional application"

requirement could only have been intended to apply to challenged divisional

applications/patents.

Lacking textual support, MSN has to rely on extrinsic evidence to support its

argument that an "application filed as a result of such a requirement" can only be a

divisional application.  MBr. 32-35.  Treatises however cannot replace the clear words of the statute and add limitations that do not appear.  *Spicer*, 61 F.4th at 1363 ("If the intent of Congress is clear from the statutory language, that is the end of our inquiry.); *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 90 (2018) ("If the text is clear, it needs no repetition in the legislative history"); *Sandoz Inc. v. Amgen Inc.*, 582 U.S. 1, 21 (2017) ("the statute's plain language[] is our 'primary guide' to Congress' preferred policy."); *Ezra*, 909 F.3d at 1372 ("As a basic principle of statutory construction, courts ordinarily resist reading words into a statute that do not appear on its face.").  Moreover, the legislative history and various contemporary provisions belie MSN's effort to limit "an application filed as a result of such a requirement" to a divisional application.  *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 90 (2018) (providing that where "legislative history [is] inconclusive," it "cannot defeat the better reading of the text and statutory context").

For example, "[t]he first printed text of this remedial legislation included the following provision: If two or more patents are issued in consequence of a requirement for restriction under this section, *no claim* of any of said patents may be held invalid solely by reason of its *inclusion in a separate patent*." without limiting to a divisional patent.  *SGK-C*, 784 F.2d at 358.  Federico's commentary

upon which MSN relies, also does not require an application responding to a

restriction to be a divisional patent, stating "[i]n keeping with the changed view

that the whole matter is one of form and procedure in the discretion of the [PTO],

section 121 provides, in effect, that the making of a requirement to restrict an

application shall not affect the validity of either of the resulting patents if more

than one patent issues as a result of the requirement." Federico, *Commentary on

the New Patent Act,* at 34 (1954). At the time H.R. 9133 was introduced, the focus

was not on the specific type of patent application used to respond to a restriction

requirement, but "[t]he intention of everybody involved [was] that double

patenting [was] eliminated either in the application stage or in the patent stage."

*SGK-C*, 784 F.2d at 359. "Since its enactment, the courts … have without

significant exception upheld broadly the remedial purpose of 35 U.S.C. § 121." *Id.*

A sentiment with which even MSN agrees. MBr. 36.

Further, MSN misconstrues *St. Jude* (concurring opinion)*, Boehringer,* and

*Amgen* as defining "an application filed as a result of [a restriction] requirement"

as a "divisional application." MBr. 34-35; *see St. Jude*, 729 F.3d at 1382 (Lourie,

concurring) (providing right after MSN's citation that the patent issued on a

continuation application falls within the safe harbor because it maintained

consonance with the original restriction requirement); *Boehringer*, 592 F.3d at

59

1351 (actually explaining that the "multiple divisional applications" are precluded "from being used as a reference against [each] other"). Then later in its brief, MSN contradicts its own reliance on these cases by stating that "opinions … concerned only with the safe-harbor requirements for the challenged patent and not with the requirements for the reference patent… have no bearing on the issue at hand." MBr. 38.

Contrary of MSN's assertion, *Amgen* actually defines "divisional application" as being more than just "an application filed as a result of [a restriction] requirement." *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1350 (Fed. Cir. 2009). This Court "recognize[d] that… a continuation application can satisfy the definition of a 'divisional application,'" but held that "the protection afforded by section 121 to applications (or patents issued therefrom) filed as a result of a restriction requirement is limited to divisional applications." *Id.* at 1352-53. This Court explained that "the plain language of § 121… affords its benefits to 'divisional applications,'" and therefore only "shelter[s] from attack a *divisional application* or ... the original application or any patent issued on either of them, if the *divisional application* is filed before the issuance of the patent on the other application." *Id.* at 1353 (emphasis in original). Accordingly, while continuation patents can meet the definition of "[a] patent

issuing on … an application filed as a result of [a restriction] requirement," they cannot meet the additional requirement of issuing on an application designated as a divisional, which is only necessary to qualify for safe harbor protection.  *Id.* at 1354 ("declin[ing] to construe 'divisional application' in § 121 to encompass *Amgen*'s properly filed, properly designated continuation applications," despite the fact that they "could have been filed as divisional applications").  Protection is limited to divisional applications because "[t]he statute on its face applies only to divisional applications" for challenged applications/patents.  *Id.* at 1352-54.  However, on its face § 121 does not expressly limit a prohibited reference patent to issuing on "a divisional application," but rather merely requires "an application."  Consequently, because this Court declined to construe "a divisional application" to simply mean "an application filed as a result of a restriction requirement" in *Amgen*, it likewise cannot construe "an application filed as a result of a restriction requirement" to now mean "a divisional application" for prohibited reference patents.  *See id.*

> ### 3.     Even If There Is a Timing Limitation Requiring the Divisional To Be Filed Before the Issuance of the Original Patent, It Is Met Here

Having decided that there was no timing requirement for the reference patent, the district court did not rule on whether the '527 divisional application was

filed before the issuance of the '740 patent (although Acadia briefed the issue, Appx600-602).

If this Court determines that there is a timing requirement, it is met under the undisputed facts. The '561 original application and the '527 divisional application were co-pending, which is a requirement for divisional patents. *See Fessenden v. Wilson,* 48 F.2d 422, 424 (C.C.P.A. 1931) ("it is well established that for one application to be a division, within the meaning of the law, of another, the two must at some time be co-pending"); *In re Watkinson*, 900 F.2d 230, 233 (Fed. Cir. 1990) ("[W]e will not permit Watkinson to undermine the co-pendency requirement under sections 120 and 121 by using the reissue statute to avoid a restriction requirement in which she acquiesced.").

Moreover, per 35 U.S.C. § 111(a)(4), "[t]he filing date of an application shall be the date on which a specification, with or without claims, is received in the [PTO]." The '527 application was filed on May 3, 2006, co-pendent with the '740 patent and the PTO accepted Acadia's amendment as timely re-designating the pending '527 application as a divisional. Appx71-73. As such, the date that the divisional '527 application was filed is May 3, 2006.

There is no provision in the patent laws for a later filing date to be accorded if a continuation application is reclassified as a divisional application before the

issuance of that application.  Such a provision would be inconsistent with the co-pendency requirement and §§ 120 and 121.  Consistent with 35 U.S.C. § 111(a)(4) and § 120, the PTO identified the '527 application as a divisional application and accorded it a May 3, 2006 filing date, thus the divisional application was deemed to be co-pending with the original 561 application.  Appx216 ("filed on May 3, 2006, now Pat. No. 7,732,462, which is a division of application No. 10/759,561").[11]

The PTO made a procedural determination of the filing date for the '527 application/'462 patent consistent with the applicable statutes.  *Id.*  MSN has not challenged the PTO's determination, nor is there any viable avenue for MSN to do so.  *See, e.g., Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 663 (Fed. Cir. 2008) (declining review of procedural decision in connection with invalidity analysis because "[i]f any prosecution irregularity or procedural lapse, however minor, became grist for a later assertion of invalidity, accused infringers would inundate the courts with arguments relating to every minor transgression they could comb from the file wrapper").

---

[11] As a corollary, this Court considers challenged patents eligible for "safe-harbor protections, [if] the application [is] properly designated as a divisional application, at the very latest, by the time the challenged patent issues on that application." *Janssen Biotech*, 880 F.3d at 1323.

63

Thus, even if there was a timing requirement for filing a divisional under § 121, it has been met here.  There being no factual dispute regarding the dates and contents of the relevant applications (divisional and original), this Court can affirm the judgment on this basis without the need to remand.  *Athletic Alternatives, Inc. v. Prince Manufacturing, Inc.*, 73 F.3d 1573, 1583 (Fed. Cir. 1996) ("This conclusion, based on undisputed facts of record, establishes the correctness of district court's summary judgment … rendering remand unnecessary.").

## CONCLUSION

This Court should affirm the judgment as to claim 26 of the '740 patent.

Respectfully submitted,

|  | /s/ *Chad J. Peterman* |
|---|---|
| Felix A. Eyzaguirre | Chad J. Peterman |
| PAUL HASTINGS LLP | Bruce M. Wexler |
| 600 Travis Street, 58th Floor | Scott F. Peachman |
| Houston, TX 77002 | Peter E. Conway |
| (713) 860-7300 | PAUL HASTINGS LLP |
| felixeyzaguirre@paulhastings.com | 200 Park Avenue |
|  | New York, NY 10166 |
|  | (212) 318-6000 |
|  | chadpeterman@paulhastings.com |
|  | brucewexler@paulhastings.com |
|  | scottpeachman@paulhastings.com |
|  | peterconway@paulhastings.com |
| Dated:  May 29, 2024 | *Counsel for Plaintiff-Appellee* |

64

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Circuit Rule 32(b)(3) and Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that the foregoing Principal Brief of Plaintiff-Appellee complies with the type-volume limitations in Federal Circuit Rule 32(b)(1), because it contains 13,984 words, excluding the exempted parts under Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

I future certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because the brief was prepared using Microsoft Word 365 in 14-point Times New Roman font.

/s/ *Chad J. Peterman*

Chad J. Peterman

## <u>CERTIFICATE OF SERVICE</u>

I, Chad Peterman, hereby certify that, on May 29, 2024, the foregoing document was filed using the Court's CM/ECF system and a copy served on the parties' counsel of record via ECF.

Date: May 29, 2024

<u>/s/ Chad J. Peterman</u>

Chad J. Peterman
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000
chadpeterman@paulhastings.com