**2024-1401**

# United States Court of Appeals for the Federal Circuit

ACADIA PHARMACEUTICALS INC.,

*Plaintiff-Appellee,*

– v. –

AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA, INC., TEVA PHARMACEUTICALS USA, INC.,

*Defendants,*

MSN LABORATORIES PRIVATE LTD., MSN PHARMACEUTICALS, INC.,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the District of Delaware in No. 1:20-cv-00985-GBW, Gregory Brian Williams, Judge*

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

CHAD A. LANDMON
THOMAS K. HEDEMANN
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8100
clandmon@axinn.com
thedemann@axinn.com

*Counsel for Defendants-Appellants*

JUNE 20, 2024



CP COUNSEL PRESS    (800) 4-APPEAL • (328624)

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...............................................................................1

ARGUMENT ....................................................................................4

I.    THE DISTRICT COURT LEGALLY ERRED IN HOLDING THAT
      ONLY EARLIER-FILED PATENTS CAN BE OTDP REFERENCES. ......4

      A.    Acadia's Assertion the "Original" Patent Is Immune Against
            OTDP Is Contrary to the Bedrock Principle Underlying OTDP. .........5

      B.    The District Court's Earlier-Filed Rule
            Improperly Permits Multiple Infringement Suits
            by Different Assignees Asserting Duplicative Patents. ........................9

      C.    *Breckenridge* supports MSN and not Acadia. .....................................11

      D.    Acadia's Hyperbolic Claims About
            Harm to the Patent System Are Unfounded. .......................................12

      E.    Acadia's Parsing of the Case Law Is Deficient .................................14

II.   THE DISTRICT COURT LEGALLY ERRED IN
      INTERPRETING THE SAFE-HABOR PROVISION SO AS TO
      BLOCK THE '271 PATENT FROM BEING AN OTDP REFERENCE. ...15

      A.    The '271 Patent Did Not Issue on a Divisional Application
            That Was "Filed as a Result of . . . a [Restriction] Requirement." ......16

            1.    The plain meaning of "an application filed as a result of"
                  is a new application and not an amended application...............16

            2.    Acadia cannot in any event
                  meet the "as a result of" requirement.......................................21

      B.    The "Filed Before" Temporal
            Requirement Applies to Reference Patents. .......................................24

            1.    It is settled that "an application filed as a
                  result of such a requirement" is a divisional application. .........25

            2.    The Temporal Requirement is not met here .............................28

CONCLUSION ................................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AbbVie v. Mathilda and Terence Kennedy Institute of Rheumatology Trust*,
    764 F.3d 1366 (Fed. Cir. 2014) ................................................................*passim*

*Amgen Inc. v. F. Hoffman-La Roche Ltd*,
    580 F.3d 1340 (Fed. Cir. 2009) ........................................................25

*Automotive Merchandising Sys., Inc. v. Lee*,
    782 F.3d 1376 (Fed. Cir. 2015) ........................................................23

*Bayer CropScience AG v. Dow Agrosciences LLC*,
    680 F. App'x 985 (Fed. Cir. 2017) ....................................................10

*Bittner v. United States*,
    598 U.S. 85 (2023)................................................................................18

*Boehringer Ingelheim Int'l GmbH v. Barr Lab'ys, Inc.*,
    562 F. Supp. 2d 619 (D. Del. 2008), *rev'd*, 592 F.3d 1340
    (Fed. Cir. 2010)................................................................................22

*Boehringer Ingelheim Int'l GmbH v. Barr Lab'ys, Inc.*,
    592 F.3d 1340 (Fed. Cir. 2010) ................................................................*passim*

*In re: Cellect, LLC*,
    81 F.4th 1216 (Fed. Cir. 2023) ........................................6, 12, 14, 15

*In re Dinsmore*,
    757 F.3d 1343 (Fed. Cir. 2014) ........................................................10

*Eli Lilly & Co. v. Barr Labs., Inc.*,
    251 F.3d 955 (Fed. Cir. 2001) ........................................................11

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
    554 U.S. 33 (2008)............................................................................25

*Food Mktg. Inst. v. Argus Leader Media*,
    588 U.S. 427 (2019)............................................................................16

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*
349 F.3d 1373 (Fed. Cir. 2003) ..........................................................17

*Gilead Scis., Inc. v. Natco Pharma Ltd.,*
753 F.3d 1208 (Fed. Cir. 2014) ....................................................*passim*

*In re Hubbell,*
709 F.3d 1140 (Fed. Cir. 2013) ...........................................................9

*Immunex Corp. v. Sandoz Inc.,*
964 F.3d 1049 (Fed. Cir. 2020) .........................................................10

*In re Janssen Biotech,*
880 F.3d 1315 (Fed. Cir. 2018) ...........................................16, 17, 21

*Ex Parte Janssen Biotech, Inc. &*
*New York Univ. Pat. Owner & Appellant,*
2016 WL 6921121 (P.T.A.B. Nov. 14, 2016) ...................................21

*Microsoft v. I4I,*
564 U.S. 91 (2011).................................................................................9

*Miller. Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.,*
909 F.3d 1355 (Fed. Cir. 2018) ....................................................*passim*

*Miller v. Eagle Mfg. Co.,*
151 U.S. 186 (1894)..........................................................................7, 28

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.,*
566 F.3d 989 (Fed. Cir. 2009) .............................................................9

*SimpleAir v. Google,*
884 F.3d 1160 (Fed. Cir. 2018) ...........................................................9

*St. Jude Med., Inc. v. Access Closure, Inc.,*
729 F.3d 1369 (Fed. Cir. 2013) (Lourie, J.) ..................................4, 25

*Studiengesellschaft Kohle mbH v. N. Petrochemical Co.,*
784 F.2d 351 (Fed. Cir. 1986) (Newman, J.)........................26, 27, 28

*Union Carbide Corp. v. Dow Chem. Co.,*
619 F. Supp. 1036 (D. Del. 1985)...................................................19, 20

*In re Van Ornum*,
686 F.2d 937 (C.C.P.A. 1982) ...............................................................8

**Statutes and Other Authorities**

35 U.S.C. §§ 101 and 154(a)(2)...........................................................6, 7

35 U.S.C. § 120 (1952) .......................................................................18

P. J. Federico, Commentary on the New Patent Act,
35 U.S.C.A. 1-110 (1970)...................................................................27

Annotated Patent Digest § 16:15 .........................................................26

iv

**INTRODUCTION**

Acadia does not dispute that the invention claimed in its '740 patent is an obvious modification of the invention claimed in its '271 patent, or that the '271 patent has an earlier expiration than the '740 patent. Because the '271 patent expired on January 15 this year, Acadia has therefore enjoyed the full twenty-years-from-filing term that the patent statute provides for its invention. In exchange for that full term of exclusivity, the public should now be free to use the invention and any obvious modification. That is the fundamental bargain that justifies the patent system, and the bargain that OTDP protects by rendering the later-expiring and duplicative '740 patent invalid.

Acadia attempts to unjustifiably extend its monopoly on pimavanserin – an expensive drug used by patients suffering from Parkinson's – by erasing this Court's binding precedent that any earlier-*expiring* patent can serve as an OTDP reference in favor of the District Court's novel and erroneous threshold rule that a patent must be earlier-*filed* to be an OTDP reference. This Court should reject that attempt.

The facts here present the exact situation that the OTDP doctrine exists to address, i.e., that of commonly-owned duplicative patents with different expirations. Two problems are raised by this situation: (1) the extension of the statutory exclusionary period provided for a single invention, and (2) the

1

possibility of multiple infringement suits by different assignees asserting duplicative patents. The rule set down in *Gilead, Novartis* and *AbbVie* that any earlier-*expiring* patent can serve as an OTDP reference permits the doctrine to address both problems–either the later-expiring patent is invalid for OTDP or the patentee files a terminal disclaimer in that later-expiring patent. The terminal disclaimer serves to both align the expiration of the two patents and to prevent one of the duplicative patents from being assigned away.

By contrast, the District Court's novel threshold rule that a patent must be earlier-*filed* to be an OTDP reference eliminates the doctrine's usefulness with respect to both problems. First, as this case demonstrates, it permits a patentee to own duplicative patents with different expirations so that the exclusionary period for the single invention exceeds one full statutory term. That result violates the bedrock patent law principle that upon expiration of a patent – here the '271 patent – the public should be free to use the invention claimed in that patent and any obvious modifications. Second, by removing the sanction of OTDP invalidity for the later-expiring patent – here the '740 patent – there is no need for the patentee to file a terminal disclaimer to the earlier-expiring patent. There is therefore nothing stopping the patentee from assigning away one of the duplicative patents, thus raising the specter of multiple infringement suits by different assignees.

On appeal, Acadia defends the District Court's erroneous rule by contending that "original" patents are immune from OTDP.  But that contention lacks any legal basis – the law provides one full term per invention and does not somehow single out an "original" term.  It also fails to address either of the two fundamental problems raised by the common ownership of duplicative patents with different expirations, and it is contrary to this Court's holding, affirmed multiple times, that the OTDP doctrine is centered on patent expiration dates.

Turning to the safe harbor, Acadia's contradictory statutory interpretation arguments fail to save the District Court's erroneous interpretations.  Acadia first argues that the statutory language "filed as a result of" should be interpreted as "filed *or amended* as a result of."  This broadening interpretation is contrary to ordinary meaning, traditional canons of statutory interpretation, and this Court's directive that the safe-harbor provision must be strictly applied.  Furthermore, Acadia cannot show that even its belated amendment was "a result of" the restriction in the original application.  Acadia's assertions that MSN stipulated to the application being a divisional and "conceded" consonance are incorrect and irrelevant.

After having argued for importing "amended" into the statutory term, Acadia then turns around and argues that interpreting that same term to be referencing a divisional application is tantamount to reading in a "non-existing limitation."  Not

3

only is that incorrect as a matter of statutory construction – it also ignores the existing judicial determination, grounded in the statute and its history, that "this provision contemplates that it is divisional applications that are filed pursuant to a restriction. . . ." *St. Jude Med., Inc. v. Access Closure, Inc.*, 729 F.3d 1369, 1382 (Fed. Cir. 2013) (Lourie, J., concurring). Properly interpreted, the safe harbor does not bar the use of the '271 patent as an OTDP reference to the '740 patent.

Acadia's duplicative '740 patent is the only remaining barrier to MSN's ability to launch the first generic pimavanserin product. Especially in these inflationary times, the introduction of a new generic pharmaceutical ranks among the few things that are certain to relieve some of the ever-increasing cost pressure on patients and the healthcare system. The public should not have to wait any longer for that relief.

## **ARGUMENT**

## I.     **THE DISTRICT COURT LEGALLY ERRED IN HOLDING THAT ONLY EARLIER-FILED PATENTS CAN BE OTDP REFERENCES.**

The District Court erred in creating a new threshold rule based on the relative *filing* dates of the reference and challenged patents, when this Court has made clear that the *expiration* dates are the benchmark for OTDP. MSN Br. at 16. It is telling that on appeal, Acadia shies away from attempting to directly defend the District Court's erroneous rule and instead asserts that "original" patents are immune to OTDP. Acadia never made this argument below, making its allegation

4

of "sandbagging" against MSN ring hollow.  Acadia Br. at 41.  Regardless, there is

no basis for Acadia's theory.

### A.     Acadia's Assertion the "Original" Patent Is Immune Against OTDP Is Contrary to the Bedrock Principle Underlying OTDP.

The central circumstance addressed by OTDP is "where two patents that

claim the same invention have different expiration dates." *AbbVie v. Mathilda and*

*Terence Kennedy Institute of Rheumatology Trust,* 764 F.3d 1366, 1374 (Fed. Cir.

2014).  As this Court has repeatedly explained, "it is a bedrock principle of our

patent system that when a patent expires, the public is free to use not only the same

invention claimed in the expired patent but also obvious or patentably indistinct

modifications of that invention." *Gilead Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d

1208, 1214 (Fed. Cir. 2014) (citing *In re Longi*, 759 F.2d 887, 892 (Fed. Cir.

1985)).  Indeed, "[t]he double patenting doctrine has always been implemented to

effectively uphold that principle." *Id.*

That "bedrock principle" is violated where "a patent expires and the public

is nevertheless barred from practicing obvious modifications of the invention

claimed in that patent because the inventor holds another later-expiring patent with

claims for obvious modifications of the invention." *Id.*  And that is precisely the

situation here because, upon the '271 patent's expiration, the public is nevertheless

barred from practicing the claimed invention because Acadia holds the duplicative

and later-expiring '740 patent.

Contrary to Acadia's assertion, MSN is not seeking to "expand" the holding in *Gilead* "to cover patents with PTA." Acadia Br. at 15. MSN's position is simply that the '271 patent is an OTDP reference to the '740 patent because it is earlier expiring. As affirmed in *Novartis* and *AbbVie*, *Gilead* held that "any earlier expiring patent [may] serve as a double patenting reference for a patent subject to the URAA[.]" *Gilead*, 753 F.3d at 1216. There is no dispute that both patents at issue here are subject to the URAA. Whether OTDP is relevant to patents with PTA – like the '740 patent here – is a separate question that this Court affirmatively decided *In re: Cellect, LLC*, 81 F.4th 1216 (Fed. Cir. 2023).

On appeal, Acadia asserts for the first time that the bedrock OTDP principle may be breached when the later-expiring duplicative patent is the "original" patent – by which Acadia means the first-issued patent in a family of applications. *See* Acadia Br. at 11, 15-16. As Acadia would have it, patent law bestows an "entitlement" to this "original" patent such that it is immune from OTDP. There is no basis for Acadia's assertion.

Acadia first points to 35 U.S.C. §§ 101 and 154(a)(2), Acadia Br. at 15-17, which provides, respectively, that an inventor may obtain "a patent," i.e., a single exclusionary patent term, for an invention, and sets that term to be 20 years from filing. But contrary to Acadia's mischaracterization, neither provision states or suggests any "entitlement" granting OTDP immunity for the term provided "when

the earliest-filed application for an invention issues first." *Id.* at 15.  Relatedly,

Acadia is incorrect that applying OTDP to the "original" patent would "destroy the

legitimate expectations of inventors" by depriving them of the full, statutorily-

guaranteed patent term.  Acadia Br. at 16.  On the contrary, after OTDP is applied

to the '740 patent here, Acadia will still have received the full statutory 20-year

term for the invention guaranteed by 35 U.S.C. §§ 101 and 154(a)(2) because that

invention is undisputedly claimed in the already-expired and duplicative '271

patent.

Acadia further cites two 19th century cases for the proposition that "the

power to create a monopoly is exhausted by the first patent" and that double-

patenting therefore applies to "a new and later patent for the same invention."

Acadia Br. at 16-17 (quoting *Miller v. Eagle Mfg. Co.*, 151 U.S. 186, 198 (1894),

*Odiorne v. Amesbury Nail Factory*, 18 F. Cas. 578, 579 (C.C.D. Mass. 1819)).

However, the exhaustion-rationale that animates these cases pre-dates Congress's

creation of the terminal disclaimer in the Patent Act of 1952.  Prior to the terminal

disclaimer, the patent system did not permit a patentee to own duplicative patents.

*See, e.g.*, *Miller*, 151 U.S. at 197 ("[T]wo valid patents for the same invention

cannot be granted . . . to the same . . . party.").  The unavoidable consequence of

double patenting was therefore the invalidity of the later patent.  But with the

creation of the terminal disclaimer, single ownership of duplicative patents became

7

possible.  Because a valid terminal disclaimer ensures that duplicative patents expire at the same time, "a situation is created which is tantamount for all practical purposes to having all the claims in one patent."  *In re Van Ornum*, 686 F.2d 937, 948 (C.C.P.A. 1982) (quoting *Application of Braithwaite*, 379 F.2d 594, 601 (C.C.P.A. 1967)).  The exhaustion-rationale Acadia points to is thus no longer relevant in the context of OTDP.  Furthermore, this Court has "recognized that the change in patent term law under the URAA altered the analytical inquiry for double patenting" applied by older cases like *Miller*.  *Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.*, 909 F.3d 1355, 1362 (Fed. Cir. 2018).

Acadia further points to language in a handful of Federal Circuit opinions discussing terminal disclaimers.  Acadia Br. at 17-18.  To the extent any of the selected language superficially aligns with Acadia's position, the opinions do not provide any discussion or rationale for providing OTDP immunity to "original" patents.  Furthermore, because a terminal disclaimer can only be filed in a later-expiring patent to cure OTDP, it is not surprising that the opinions use temporal language like "first," "second," "earlier," and "original" to the patents at issue.

Acadia next contends that permitting an earlier-expiring patent to serve as an OTDP reference against the "original" patent "contravenes [the] essential principle that a patent must be invalid *ab initio*."  Acadia Br. at 19.  The main case that Acadia cites in support for this proposition, however, states that an alleged

8

infringer "may attempt to prove that the patent never should have issued in the first place" in the context of the *statutory* defenses provided in Section 282. *Microsoft v. I4I*, 564 U.S. 91, 96 (2011). OTDP, by contrast, is judicially created and thus a *non-statutory* defense. Furthermore, it is commonplace to file a terminal disclaimer in a patent that has already issued to prevent invalidation for OTDP.

Finally, Acadia cites language from *SimpleAir v. Google* stating that OTDP was developed to prevent the extension of a patent term through a duplicative and "later-filed patent." 884 F.3d 1160, 1167 (Fed. Cir. 2018) (quoting *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 999 (Fed. Cir. 2009). The issue in that case, however, concerned the impact of a terminal disclaimer on the issue of claim preclusion, and OTDP was merely tangential. *Id.* Furthermore, and significantly, the quoted language comes from the earlier *Procter & Gamble* opinion and therefore predates the holding in *Gilead* that expiration, not filing dates, is the relevant consideration for OTDP.

**B.    The District Court's Earlier-Filed Rule Improperly Permits Multiple Infringement Suits by Different Assignees Asserting Duplicative Patents.**

This Court's modern double-patenting case law has recognized that the second important function of the OTDP doctrine is to prevent "multiple infringement suits by different assignees asserting essentially the same patented invention." *In re Hubbell*, 709 F.3d 1140, 1145 (Fed. Cir. 2013). *See also*

*Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1056 (Fed. Cir. 2020) (same);

*Bayer CropScience AG v. Dow Agrosciences LLC,* 680 F. App'x 985, 995 (Fed.

Cir. 2017) (same).

The OTDP doctrine fulfills this purpose by rendering one of the duplicative

patents invalid unless the patentee files a terminal disclaimer in the last-expiring

patent. The terminal disclaimer not only ensures that there will be only one full

patent term for the single invention, but also that the duplicative patents will

remain commonly owned for the duration of that term. The latter is assured

because "a terminal disclaimer must '[i]nclude a provision that any patent granted

on that application . . . shall be enforceable only for and during such period that

said patent is commonly owned with the . . . patent which formed the basis' for the

rejection." *In re Dinsmore*, 757 F.3d 1343, 1347 (Fed. Cir. 2014) (quoting 37

C.F.R. § 1.321(c)). Thus, the terminal disclaimer prevents the patentee from

assigning away one of the duplicative patents.

The district court's earlier-filed rule eliminates the ability of the OTDP

doctrine to serve this purpose because, as this case illustrates, it permits a patentee

to own admittedly duplicative patents *without* ensuring that the patentee will not

assign away one of the patents. Not only is there no reason for the patentee to file

a terminal disclaimer absent the possibility of OTDP invalidity, there is also no

option to do so because only later-expiring patents can be terminally disclaimed.

*See, e.g., Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 967 n.5 (Fed. Cir. 2001)

("A patent owner cannot avoid double patenting by disclaiming the earlier

patent."). Thus, Acadia could not terminally disclaim the '271 patent to the '740

patent even if it had wanted to.

By contrast, permitting any earlier expiring patent to serve as a double

patenting reference, as this Court held in *Gilead, Novartis* and *AbbVie*, perfectly

aligns with the doctrine's goal of preventing multiple assertions of duplicative

patents by different assignees. Under this rule, OTDP serves to invalidate the

later-expiring patent *unless* the patentee files a terminal disclaimer in that patent,

thereby curing both ills the doctrine is intended to prevent.

### C.    *Breckenridge* supports MSN and not Acadia.

As already discussed, the issues OTDP are intended to deal with arise from

commonly-owned and duplicative patents with different expiration dates. *Supra*

at 5. And while a resulting extension of the statutory exclusionary term for an

invention often requires invalidation of the later of the duplicative patents, it is not

always so, as this case aptly demonstrates. The salient point is that regardless of

which patent expires first, application of the OTDP doctrine is required to

safeguard the "bedrock principle" that when a patent expires, the public is free to

use the invention claimed in the expired patent and any obvious variants. *Gilead*,

753 F.3d at 1214.  That principle is agnostic as to whether the first of the duplicative patents to expire is the "original" patent.

This Court's decision in *Breckenridge* supports MSN and not Acadia. Acadia Br. at 21.  As an initial matter, the Court expressly stated there that, post-URAA, "the proper reference point for an obviousness-type double patenting inquiry is the expiration date of the patent in question.*"  Breckenridge*, 909 F.3d at 1362–63.  That, of course, is diametrically opposed to the district court's novel earlier-filed rule.

Furthermore, the issue in *Breckenridge* involved a combination of pre- and post-URAA patent terms, where the challenged patent expired later because it was subject to the pre-URAA patent term of 17 years from issuance.  *Id.* at 1360.  The Court therefore reasoned that the challenged patent covered only the exclusionary term that was statutorily granted to it at the time.  *Id.* at 1366.  Those are far from the facts here, where both the challenged and the reference patents are subject to the same post-URAA patent term.  Of course, to the extent Acadia believes that PTA is part of the statutory patent term, this Court has already held that PTA is subject to OTDP.  *In re: Cellect*, 81 F.4th at 1229.

### D.    Acadia's Hyperbolic Claims About Harm to the Patent System Are Unfounded.

Acadia claims that applying this Court's holding that expiration dates are the proper reference dates for OTDP to the patents here would "effectively undo the

1952 Patent Act and wreak havoc on the Federal patent system." Acadia Br. at 22. Acadia's ill-conceived arguments fall far short of what would be needed to support that hyperbolic assertion.

First, Acadia appears to use a statement by Senator Hatch from June 24, 2004 to evidence Congress's understanding of OTDP when it "codified section 120, 121, and 253" in the 1952 Patent Act. Acadia Br. at 22-23. This makes little sense given that Senator Hatch did not begin his first term until 1977, some 25 years after enactment of the Patent Act. In any event, the emphasis on issue dates that Acadia points to in that 2004 statement plainly predates this Court's line of precedent that began in 2014 with *Gilead* and "recognized that the change in patent term law under the URAA altered the analytical inquiry for double patenting" such that expiration rather than issuance is "the proper reference point for an obviousness-type double patenting inquiry." *Breckenridge*, 909 F.3d at 1362.

Second, Acadia's appeal to a supposed Hobson's choice for inventors is unavailing. Acadia Br. at 23. An inventor is entitled to one patent term per invention and that is exactly what Acadia has received through its '271 patent. Moreover, inventors can hardly complain about the application of OTDP when the necessary predicate for OTDP is their own voluntary filing of duplicative patents.

Finally, it is incorrect that the focus on expiration dates "sever[s] the link between OTDP and terminal disclaimers." Acadia Br. at 24. A patentee may file a

terminal disclaimer in a later-expiring patent until the time the earlier-expiring patent expires, regardless of whether the later-expiring patent has already issued. *See Boehringer Ingelheim Int'l GmbH v. Barr Lab'ys, Inc.,* 592 F.3d 1340, 1347-48 (Fed. Cir. 2010).

### E. Acadia's Parsing of the Case Law Is Deficient

While it is true that *Gilead* was decided on its facts like any other case, its holding that expiration dates are the touchstone for an OTDP analysis is broadly applicable to post-URAA patents. That is confirmed in both *Breckenridge,* 909 F.3d at 1358 ("As the district court correctly summarized, we held in *Gilead* that the expiration date is the benchmark of obviousness-type double patenting."), and in *AbbVie,* 764 F.3d at 1374 ("We now make explicit what was implicit in *Gilead*: the doctrine of obviousness-type double patenting continues to apply where two patents that claim the same invention have different expiration dates.").

*Cellect* is not to the contrary because, as MSN explained in its opening brief, the few statements therein referencing "earlier-filed" claims are *dicta* that stand in contrast to both its express statements of OTDP law that correctly emphasize expiration dates and its holding that affirmed invalidity for OTDP over an earlier-filed patent. MSN Br. at 17-18. Acadia argues that *Cellect* did not cite to *Gilead* (Acadia Br. at 27), but it both cited and endorsed *AbbVie* and its affirmance of the focus on expiration dates in no uncertain terms:

> As the USPTO argues, our case law and the statutory language dictate an outcome where an ODP analysis must be performed on patents that have received PTA based on the expiration date including PTA. In *AbbVie*, we held that ODP continues to apply where two patents that claim the same invention have different expiration dates, including where the different expiration date is due to a grant of PTA. 764 F.3d at 1373–74. Here, we have related patents that claim priority from the same application that, as conceded by Cellect, claim overlapping subject matter and that have different expiration dates only because of PTA. Thus, under *AbbVie*, ODP still applies to ensure that the applicant is not receiving an unjust extension of time.

*In re: Cellect,* 81 F.4th at 1227–28. Of course, *AbbVie* relied extensively on

*Gilead. See Abbvie*, 764 F.3d at 1372-74. Finally, Acadia's argument that the fact

pattern in *Cellect* did not involve the "original" patent in the family would only be

relevant if Acadia had been correct that the patent laws somehow immunize such

patents from OTDP. As discussed above, Acadia is wrong. *Supra* at 5-9.

## II.   THE DISTRICT COURT LEGALLY ERRED IN INTERPRETING THE SAFE-HABOR PROVISION SO AS TO BLOCK THE '271 PATENT FROM BEING AN OTDP REFERENCE.

The safe-harbor provision prevents the use of a divisional patent as an

OTDP reference only if it was both (1) filed as a result of a restriction requirement

in the application from which the challenged patent issued, and (2) filed before the

challenged patent issued. The District Court relied on incorrect statutory

interpretations to hold that '271 patent falls under the safe harbor.

**A.    The '271 Patent Did Not Issue on a Divisional Application That Was "Filed as a Result of . . . a [Restriction] Requirement."**

**1.    The plain meaning of "an application filed as a result of" is a new application and not an amended application.**

There can be no dispute that the plain and ordinary meaning of the words "an application *filed* as a result of . . . a [restriction] requirement" is the filing of a new application and not the amendment of an existing application. Indeed, Acadia's own examples of other statutory provisions and regulations discussing amendments demonstrate that "filing" an application means the submission of a new application while "amending" an application means changing an existing application. Acadia Br. at 32-44.

It is thus Acadia's position – not MSN's as Acadia asserts – that hinges on "interpreting" the statutory text beyond its plain meaning. And no such interpretation is required here where the ordinary meaning of "filed" is crystal clear. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019) (statutory interpretation starts with examination of the ordinary meaning and structure and stops if that examination yields a clear answer) (citation omitted). Indeed, Acadia itself cites a number of cases holding that clear statutory language ends the inquiry. Acadia Br. at 58 (citing cases).

Furthermore, to the extent any interpretation is required, this Court has directed "a strict application of the plain language of § 121." *In re Janssen*

*Biotech,* 880 F.3d 1315, 1321 (Fed. Cir. 2018) (quoting *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1353 (Fed. Cir. 2009)).  Strictly applying the language "an application *filed* as a result of . . . a [restriction] requirement" necessarily requires giving it its ordinary meaning, i.e., filing a new application.  And there is no basis for Acadia's apparent suggestion that this Court's strict-application directive applies only to cases involving the specific facts present in *Geneva.*  Acadia Br. at 38.  Unlike *Geneva*, for example, *In re Janssen* applied the directive in holding that a patent that issued on a CIP application cannot be brought under the safe harbor by later amending it to a divisional application.  *In re Janssen Biotech,* 880 F.3d at 1322-23.

Still further, Acadia's proposed broadening interpretation of the statutory language to mean "an application filed *or amended* as a result of . . . a [restriction] requirement" is contrary to the ordinary rules of statutory construction.  Pointing to the general principle that statutory language should be interpreted in context (when interpretation is required because the plain meaning is unclear), Acadia appears to argue that because the second sentence of Section 121 points back to Section 120, and Section 120 references amended applications, "filed" in the third sentence of Section 121 must therefore mean "filed or amended."  Acadia Br. at 33-34.  Not so.

As an initial matter, the safe-harbor provision is contained in the "third sentence of § 121."  *Boehringer*, 592 F.3d at 1350.  Thus, the safe harbor itself

does not reference Section 120 and, conversely, the second sentence of Section 121 does not concern the safe harbor. It is therefore unclear why the second sentence's reference to Section 120 should inform the meaning of the safe harbor language in the third sentence of Section 121.

Furthermore, Section 120 originally read as follows in the 1952 Patent Act:

> § 120. Benefit of earlier filing date in the United States
>
> An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if *filed* before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application *and if it contains or is amended to contain a specific reference to the earlier filed application*.

35 U.S.C. § 120 (1952) (emphasis added). A new application thus had to meet two requirements to receive the earlier filing date: (1) it had to be "filed" before the first application issued or was abandoned, and (2) it had to "contain or be amended to contain" a reference to that earlier application. Far from supporting Acadia's interpretation, therefore, Section 120 demonstrates that Congress understood perfectly the difference between filing a new application and amending an existing application, and knew how to specify when it deemed that an amendment was acceptable. *See Bittner v. United States*, 598 U.S. 85, 94 (2023) (noting a

"traditional rule of statutory construction" that "[w]hen Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning"). Again, there is no basis for interpreting "filed" in the safe-harbor provision to mean "filed or amended."

Acadia's reliance on Federico's discussion of the second sentence is equally misplaced. Acadia Br. at 34. Again, the second sentence is not part of the safe-harbor provision, and the parenthetical Acadia highlights merely clarifies that an application may be a "divisional application" as a matter of ordinary patent prosecution practice even if its filing has nothing to do with a restriction. Of course, to fall under the *safe harbor* the divisional must have been "filed as a result of" a restriction, as Federico states in the very next paragraph. *Infra* at 26-27.

Acadia's defense of *Union Carbide* is also unavailing. Acadia Br. at 35-36. The *Union Carbide* court did not "analyze[] the context of the provision as a whole, its legislative history and the Congressional intent" to interpret "filed" to mean "filed or amended." Acadia Br. at 36-37. In fact, the entirety of the court's reasoning was premised on its own sense of practicality:

> Where, as here, the claims of an application are amended in toto to reflect the division of a copending application, I conclude that the amended application is one "filed as a result of such a requirement" as set forth in section 121. *No practical distinction exists* between an application filed for the first time as a result of a restriction requirement,

19

> and an application which is amended in full to comport
> with that requirement. *I am therefore not convinced that
> section 121 was intended to include only the former and
> decline to limit the statute's application based on a
> formalistic rule.*

*Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1060 (D. Del. 1985)

(emphasis added).[1]  By contrast, the court's review of the statutory history

pertained solely to whether the "the third sentence of section 121 was intended to

apply to a double patenting analysis . . . [or] only to determinations of prior art. . .

." *Id.* at 1059.

Relatedly, MSN has already explained how the District Court was mistaken

in its apparent belief that *Boehringer* provides support for *Union Carbide*.  MSN

Br. at 23-25.  Acadia now confusedly asserts that "MSN admitted that Acadia met

all of the [*Boehringer*] requirements for 'as a result of' except for an illusory

'divisional as filed' rule."  Acadia Br. at 42-43.  First, MSN has made no such

admission.  The statements that "Acadia *could* have filed a divisional application"

and, if so, "the safe harbor *could* apply" here, were plainly conditional argument

limited to a single issue and not some grand admission.  Acadia Br. at 42

(emphasis added).  Second, the issue under consideration in the *Boehringer*

discussion here is the incorrect statutory interpretation of "filed" and not the

---

[1] Of course, this Court has since dictated a strict application of the "formalistic"
safe-harbor requirements.  *Supra* at 16-17.

separate "as a result of" requirement. Third, that the divisional application must be "filed" rather than "amended" as a result of the restriction is not illusory but a plainly stated statutory requirement.

Finally, Acadia's interpretation of *In re Janssen* misconstrues the Court's conclusion there. Acadia Br. at 39. *In re Janssen* explicitly did not reach the issue of whether later amendments qualify an application for safe harbor protection. 880 F.3d at 1325. It thus chose not to disturb the PTAB's determination that amending a continuation after a restriction requirement is not the same as filing a divisional as a result of a restriction requirement. *See Ex Parte Janssen Biotech, Inc. & New York Univ. Pat. Owner & Appellant,* 2016 WL 6921121 at *6 (P.T.A.B. Nov. 14, 2016). Again, construing "filed" to mean "filed or amended" is far from a "strict application" of the statutory language. *See In re Janssen* 880 F.3d at 1321.

### 2. Acadia cannot in any event meet the "as a result of" requirement.

MSN demonstrated that Acadia cannot meet its burden of showing that its amendment of the '527 application was "a result of" of the restriction in the original application. MSN Br. at 25-30. Thus, even if "filed" could somehow be read to mean "filed or amended," the '271 patent still falls outside the safe harbor. In response, Acadia asserts that MSN "stipulated" and "conceded" facts below showing that the '527 application was, in fact, "a result of" of the restriction. Acadia Br. at 46-49. MSN did no such thing.

21

Acadia first contends that MSN stipulated that the '527 application is a divisional. Acadia Br. at 46. But simply being a divisional does not equate to having been filed "as a result of" a restriction requirement. A divisional application is "[a] later application for an independent or distinct invention, carved out of a nonprovisional application [that is] disclosing and claiming only subject matter disclosed in the earlier or parent application. . . ." MPEP § 201.06. There is no requirement that an application must be filed "as a result" of a restriction to be a divisional. Indeed, Acadia itself pointed out Federico's clarification of the second sentence in Section 121 that "the term divisional application is not restricted to applications filed after a requirement." *Supra* at 19.

Acadia then incorrectly asserts that MSN has conceded that consonance was maintained. Acadia Br. at 47-48. None of Acadia's citations comes close to showing any such concession. And it should go without saying that merely opting to refrain from including a potential ground in a motion for summary judgment is not tantamount to conceding that ground. On the contrary, MSN argued during the summary judgment hearing that Acadia's belated cross-motion for summary judgment was inappropriate because it had done nothing to meet its burden of proving that consonance had been maintained. *See Boehringer Ingelheim Int'l GmbH v. Barr Lab'ys, Inc.*, 562 F. Supp. 2d 619, 632 (D. Del. 2008), *rev'd*, 592 F.3d 1340 (Fed. Cir. 2010) ("The burden is on the patent holder to prove that

Section 121 applies.") (citing *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*
349 F.3d 1373, 1381 (Fed. Cir. 2003)).  Furthermore, that the concept of
consonance is "derived" from the "as a result of" requirement does not mean that
the latter is necessarily satisfied if the former is.  Consonance simply means that
the divisional application does not claim the same invention that the applicant
elected to pursue in the restricted application.  That is possible even if the
divisional was not filed "as a result of" that restriction.

Finally, Acadia argues that the Court should disregard MSN's argument
because it was not raised below.  Acadia Br. at 45-46.  However, this Court may at
its discretion consider an issue not previously raised under certain circumstances.
*Automotive Merchandising Sys., Inc. v. Lee*, 782 F.3d 1376, 1379-80 (Fed. Cir.
2015) (considering potentially relevant circumstances).  MSN respectfully submits
that sufficient relevant circumstances are present here for the Court to exercise that
discretion.

First, there is no dispute that OTDP is a pure question of law that is
reviewed *de novo*.  Second, this case presents a significant question of public
concern.  MSN has secured FDA approval for what would be the very first generic
pimavanserin drug product.  The '740 patent is the therefore the only barrier to
significant cost savings for patients with Parkinson's and the healthcare system as
a whole.  Third, Acadia has had a full opportunity to brief the issue (MSN

consented to Acadia's request for a 21-day extension of time for its brief), which it has done.  Acadia Br. at 44-49.  Fourth, Acadia has not asserted any prejudice from the Court's consideration of this argument.  Fifth, no purpose is served by remand given that this issue is purely legal and reviewed *de novo*.

### B.     The "Filed Before" Temporal Requirement Applies to Reference Patents.

On appeal, Acadia wisely disowns its incorrect contention below, which the District Court erroneously accepted, that the safe-harbor provision somehow confers "paramount protection" on "original" patents.  Acadia Br. at 49-50.  In its place, Acadia argues that the safe harbor's Temporal Requirement, i.e., that "the divisional application is filed before the issuance of the patent on the other application," does not apply to a reference patent because the description of a reference patent in the safe harbor is "an application filed as a result of such a requirement" rather than "divisional patent."  Acadia thus ironically accuses MSN of committing the same sin that Acadia itself is committing when contending that "filed as a result of" in the same part of the sentence means "filed *or amended* as a result of."  *Supra* at 16-21.  But whereas there is no statutory basis for Acadia's proposed addition, this Court has – based on the language and structure of the safe harbor – already determined that "an application filed as a result of such a requirement" only refers to a divisional application.

24

**1.    It is settled that "an application filed as a result of such a requirement" is a divisional application.**

This Court has on several occasions reviewed the safe-harbor provision and determined that "an application filed as a result of such a requirement" is a divisional application.  For example, Judge Lourie explicitly noted that "this provision contemplates that it is divisional applications that are filed pursuant to a restriction. . . ."  *St. Jude*, 729 F.3d at 1382.  Among other things, Judge Lourie observed that "[t]he very title of § 121 is 'Divisional applications.'"  *Id.*; *see Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (considering title of subchapter in analyzing meaning of its language).  Similarly, the Court has elsewhere explained that "[t]he statute on its face applies only to divisional applications."  *Amgen*, 580 F.3d at 1353.  Acadia misleadingly suggests that the statement in *Amgen* that "a continuation can satisfy the definition of a 'divisional application'" pertained to the safe harbor language.  Acadia Br. at 60.  What the Court actually said was that "unlike a continuation-in-part application, a continuation application can satisfy the definition of a 'divisional application' in *MPEP § 201.06*."  *Id.* (emphasis added).[2]  Still further, in *Boehringer* the Court held that "where the third sentence of § 121 refers to a patent issuing on an application filed as a result of a restriction requirement, it is referring to patents

---

[2] MPEP § 804 discusses double-patenting and the safe harbor.

issuing from any number of multiple *divisional* applications. . . ." 592 F.3d at

1351 (emphasis added).

This judicially well-settled interpretation of the safe harbor is reflected in the

secondary patent literature:

> [T]he third sentence of § 121 provides that when the PTO
> issues a restriction requirement, the parent application *and*
> *the divisional application filed as a result of the restriction*
> *requirement* cannot be used as references against each
> other if the divisional application is filed before the
> issuance of a patent from the parent application.

3 Annotated Patent Digest § 16:15 (emphasis added). The interpretation is further

supported by the legislative history and contemporaneous commentary.

Judge Newman's review of the legislative history, which Acadia itself cites,

demonstrates that an application filed as a result of a restriction was understood to

be a divisional. Judge Newman notes, for example, a statement from the hearing

record of a predecessor bill that "Section 121 gives statutory expression to division

practice and specifically forbids the use of either the original or the division as a

reference against the other. . . ." *Studiengesellschaft Kohle mbH v. N.*

*Petrochemical Co.,* 784 F.2d 351, 358 (Fed. Cir. 1986) (Newman, J., concurring).

Another statement in that same record proposed removing a reference to Section

103 in the draft bill to make it clear that "neither a parent nor divisional case could

be used as a reference against the other for any purpose." *Id.* at 359. And law

revision counsel to the subcommittee dealing with the bill commented that "[t]he

use of either the original or the division as a reference against the other is specifically forbidden." *Id.* Each of these statements reflect the understanding that it was a *divisional* application that would be barred from use as a double-patenting reference against an original or a divisional.

P.J. Federico, who Judge Newman notes advised the bar during the introduction of the bill that became the Patent Act, *see id.*, and who actually drafted the first version of that act, *see* MSN Br. at 32 n.13, also makes it crystal clear that an application filed as a result of a restriction was a divisional:

> The third sentence . . . is the one which provides that neither the original *or divisional application (or patent), resulting from a requirement for restriction*, shall affect the validity of the other merely because of their being divided into several applications or patents as a result of the requirement; however, the divisional application must be filed before the issuance of the patent on the other application.

P. J. Federico, Commentary on the New Patent Act, 35 U.S.C.A. 1-110 (1970), at 11 (emphasis added).

In sum, it is a settled and well-supported interpretation that "an application filed as a result of such a requirement" is a divisional application.

Acadia's arguments fail to rebut this settled interpretation. Acadia Br. at 51-57. First, the contention that the safe harbor references "four types" of patent applications is contrary to Federico's Commentary, recited above, that the safe harbor "provides that neither the original or divisional application (or patent),

27

resulting from a requirement for restriction, shall affect the validity of the other. . .

." *Supra* at 27.  As Judge Newman explained, the issue giving rise to the safe

harbor was the Patent Office practice that "required restriction or division between

claims in a patent application, thus requiring that a second patent application be

carved out of the first, and then rejected the second application on the basis of the

first." *Studiengesellschaft*, 784 F.2d at 358.  Second, Acadia's surplusage

argument is premised on "a contemporaneous understanding" that only later-issued

patents could be invalidated for double-patenting.  Acadia Br. at 56-57.  But that

understanding was due to the exhaustion-rationale articulated in *Miller*.  *See supra*

at 7-8.  And along with the safe harbor, the 1952 Patent Act created the terminal

disclaimer mechanism that made it possible for a single patentee to own

duplicative patents, thereby extinguishing that rationale and, with it, the necessity

that only later-issued patents could be subject to OTDP.  *Id.*  Acadia's premise is

therefore not pertinent.

### 2.    The Temporal Requirement is not met here

Acadia's last-ditch defense is to claim that the Temporal Requirement is met

here because the '527 application was filed on May 3, 2006, prior to issuance of

the '740 patent in 2009.  But the requirement is that the "divisional" application be

filed prior to the issuance of the original patent, and the '527 application was a

"continuation" until April 13, 2010 when Acadia changed it to a divisional.

Appx067, Appx073.  Thus, although the filing date on the application states May 3, 2006, it did not exist as a divisional until after the '740 patent issued.  The Temporal Requirement it therefore not met.

## CONCLUSION

For the reasons set out above and in MSN's opening brief, this Court should reverse the District Court's summary judgment rulings and direct entry of summary judgment that claim 26 of the '740 patent is invalid for OTDP over claim 5 of the '271 patent.

Dated: June 20, 2024                Respectfully submitted,

*/s/ Chad A. Landmon*
Chad A. Landmon
Thomas K. Hedemann
**AXINN, VELTROP & HARKRIDER LLP**
90 State House Square
Hartford, CT 06103
(860) 275-8100
clandmon@axinn.com
thedemann@axinn.com

*Attorneys for Defendants-Appellants*
*MSN Laboratories Private LTD. and MSN*
*Pharmaceuticals, Inc.*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 24-1401

**Short Case Caption:** Acadia Pharmaceuticals Inc. v. Aurobindo Pharma Ltd.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  6,959  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/20/2024            Signature:   /s/ Chad Landmon

                            Name:       Chad Landmon